UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAN FRANCISCO HEALTH PLAN, individually and on behalf of the State of California and on behalf of a class of political subdivisions in the State of California, and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through San Francisco City Attorney Dennis J. Herrera,<br><br>　　　　　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>MCKESSON CORPORATION, a Delaware corporation,<br><br>　　　　　　　　　　　　Defendant. | No.<br><br>COMPLAINT FOR VIOLATIONS OF RICO, THE CARTWRIGHT ACT, CALIFORNIA FALSE CLAIMS ACT AND CALIFORNIA UNFAIR COMPETITION LAW, SEEKING DAMAGES, CIVIL PENALTIES AND RESTITUTION<br><br><br><br>MAGISTRATE JUDGE_____ _____ |

## TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION .......................................................................................................1

II.    JURISDICTION AND VENUE .........................................................................................6

III.   PARTIES .............................................................................................................7

IV.    STATEMENT OF FACTS ............................................................................................10

       A.   Drug Manufacturers and NDCs ..........................................................................10

       B.   The Wholesale Acquisition Cost ........................................................................11

       C.   The Average Sales Price ..................................................................................12

       D.   The Average Wholesale Price.............................................................................13

       E.   The WAC-to-AWP Spread .................................................................................13

       F.   Drug Wholesalers......... ..................................................................................14

       G.   Wholesaler Sales Transactions ...........................................................................15

       H.   Retail Pharmacy Channel..................................................................................16

       I.   The Private End Payors for Prescription Drugs.....................................................17

       J.   End Payors Drug Reimbursements Are AWP-Based ...........................................17

       K.   Medicaid Drug Reimbursements are AWP-Based as are
            California's Medi-Cal Payments..........................................................................19

       L.   Medicare Drug Reimbursements Are AWP-Based ...............................................22

       M.   PBMs............................................................................................................23

       N.   U&C Payors...................................................................................................25

       O.   The Brand Drug Pharmaceutical Market was Conducive to a
            Price Fixing Scheme ......................................................................................25

       P.   Private and Public End Payors Rely on Published Drug Pricing
            Compendia.................................................. ...............................................26

       Q.   The Emergence of First Data and MediSpan as Electronic
            Data Publishers ...........................................................................................27

       R.   The Merger of First Data and MediSpan Systems.................................................29

| | S. | First Data Gains the Trust of the Pharmaceutical Industry....................................31 |
|---|---|---|
| | T. | First Data's Representations to Gain Marketplace Reliance on Its Pricing Data ......................................................................................................32 |
| | U. | In the Late 1990s, Retailers Looked to the WAC/AWP Spread to Increase Margin .................................................................................................35 |
| | V. | By 2001, First Data WAC-to-AWP Markups Were Susceptible to Abuse ..........37 |
| | W. | Implementation of the Five Percent Spread Scheme ...........................................39 |
| | X. | McKesson's Purpose in Implementing the Scheme Was to Curry Favor with Retailers and Gain a Competitive Advantage Over Other Wholesalers.................................................................................................50 |
| | Y. | McKesson/First Data Collaborate to Hide the Scheme .........................................54 |
| | Z. | Some Branded Manufacturers' Response to the McKesson/First Data Scheme .......................................................................................................58 |
| | AA. | First Data's March 2005 Announcement..............................................................59 |
| | BB. | Fraudulent Concealment By McKesson And First Data........................................60 |
| V. | | CLASS ACTION ALLEGATIONS FOR THE RICO AND CARTWRIGHT ACT CLAIMS ................................................................................................................62 |
| VI. | | COUNTS...........................................................................................................................65 |
| | | COUNT I (On Behalf of SFHP and Proposed Class) Violations of 18 U.S.C. § 1962(c) [RICO] .........................................................................65 |
| | A. | The McKesson-First Data Enterprise......................................................................65 |
| | B. | The Defendant's Use of the U.S. Mails and Interstate Wire Facilities.................70 |
| | C. | Conduct of the RICO Enterprises' Affairs.............................................................72 |
| | D. | The Pattern of Racketeering Activity .....................................................................73 |
| | E. | Damages Caused by the Defendant's Five Percent Spread Scheme.......................74 |
| | | COUNT II (On Behalf of SFHP and Proposed Class) Violation of CAL. BUS. & PROF. CODE § 16720, et seq. [The Cartwright Act] .......................................................75 |
| | | COUNT III (Brought by SFHP on Its Own Behalf and on Behalf of the State of California) Violations of CAL. GOV'T CODE § 12651(a)(1) [California False Claims Act, Causing Presentation of False Claims] ........... .............................................78 |

- ii -

COUNT IV  (Brought by SFHP on Its Own Behalf and on Behalf of the State of California) Violations of **CAL. GOV'T CODE** § 12651(a)(2) and (a)(3)) [California False Claims Act, Causing a False Record or Statement to be Made or Used to Get a False Claim Paid or Approved by the State of California].....................79

COUNT V  (Brought by SFHP on its Own Behalf and on Behalf of the State of California) Violations of Cal. Gov't Code § 12651(a)(8) [California False Claims Act, Beneficiary of Inadvertent Submissions of False Claims to California Public Entities, Subsequent Discovery of the False Claims and Failure to Report Them Within a Reasonable Time After Discovery ].....................................................................80

COUNT Vl  (Brought by the People of the State of California) Violations of the Unfair Competition Law ..............................................................................................80

PRAYER FOR RELIEF ................................................................................................................82

## I.    INTRODUCTION

1.    This action is brought by the San Francisco Health Plan ("SFHP"), on behalf of itself, the State of California and a class of governmental entities, agencies and political subdivisions in the State (collectively, "the Class"), and by the People of the State of California, acting by and through San Francisco City Attorney Dennis J. Herrera (the "People") against McKesson Corporation ("McKesson") for wrongfully increasing the so-called WAC to AWP markup factor for hundreds of brand-name prescription pharmaceuticals through a scheme beginning in late 2001, thereby causing Plaintiff, SFHP and members of the Class, whose payments for pharmaceuticals are directly tied to AWP, to make hundreds of millions of dollars of excess payments for those pharmaceuticals.

2.    In the pharmaceutical marketplace, those in the retail distribution chain – national chain drug pharmacies, independent pharmacies, mail order houses and other retailers – purchase drugs on the basis of the published wholesale acquisition cost or "WAC," a benchmark price established by manufacturers and used by them and wholesalers to establish prices to retailers. Although retailers *buy* pharmaceuticals on the basis of WAC, they *get paid* (*i.e.*, get reimbursed) for branded drugs based on a different benchmark, *the average wholesale price or "AWP."* As the difference between AWP and WAC increases, the larger "spread" affords retailers and other middlemen like pharmaceutical benefit managers ("PBMs") opportunities for larger profits.

3.    Each year more than three billion prescriptions are written in the United States. The various actors in the marketplace must have a way of determining what the AWP is at any moment in time for the approximate 65,000 drugs used in the marketplace. AWPs are therefore compiled and published by several publishing companies, including First Data Bank ("FDB" or "First Data") and Medispan. Through these compilations, which are available in both hard copy or electronic form, those in the distribution chain can determine the AWP for any given drug and effectuate reimbursement accordingly.

- 1 -

4.     Consumers, health and welfare plans, health insurers and governmental entities, including the State's Medi-Cal program and other governmental entities ("End Payors"), that pay for prescription drugs use and rely on AWP in doing so. Virtually all these entities had contracts for the brand-name drugs at issue that use AWP as a pricing standard.

5.     At all times relevant to this lawsuit, First Data, McKesson and pharmaceutical companies knew that governmental and public payors such as Plaintiff SFHP and the Class of governmental entities utilize AWP as a pricing benchmark and were relying on its legitimacy as a pricing standard.

6.     Until March 15, 2005, First Data represented to those in the pharmaceutical market that it derived the WAC/AWP markup either from manufacturers or by conducting "a survey" of wholesalers whose purpose was to verify prices reported by the manufacturer. First Data further represented that AWP was the "average of prices charged by the national drug wholesalers," and that the number of surveys it was conducting to determine the published AWP was "increasing." McKesson is one of the national wholesalers whom First Data purportedly "surveyed" as part of this process.

7.     Historically, with limited exceptions, to arrive at the AWP for branded drugs, manufacturers and/or wholesalers applied a markup of 20% or 25% to WAC. Whatever markup was given to a particular branded drug "stuck" with that drug indefinitely. For example, manufacturer A might have a markup of 20%, while manufacturer B might utilize a markup of 25%.

8.     In late 2001, First Data and McKesson reached a secret agreement on how the WAC to AWP markup would be established for hundreds of brand-name drugs. The two companies agreed to artificially raise and fix prices on brand-name drugs and therefore artificially raise prices in that market. As part of this agreement, First Data, to the extent it received information from others besides McKesson, used the WAC-to-AWP markup provided only by McKesson as the basis for its published AWP. First Data did not "survey" any other

- 2 -

wholesalers. To the extent it received material from other wholesalers, such material was not the basis for its published AWP; only McKesson's information was. McKesson knew that First Data was using its pricing as the basis for setting the markup over WAC. Sometimes, within a day or less of requesting a price change or markup from McKesson, FDB responded by increasing the markup.

9.      Thus, as part of their agreement and conspiracy, McKesson and First Data, without any legitimate economic justification, raised the WAC-to-AWP markup to 25% for over four hundred brand-name drugs (involving many more NDCs) that previously had received only the 20% markup amount. The scheme was concealed in part because price changes occurred only when some other WAC-based price announcement was made by a drug manufacturer. This camouflaged both the associated increase in the WAC-to-AWP markup as well as McKesson's identity as the source of the increased markup. McKesson communicated its proposed markup to First Data. First Data then published AWPs with the new markup without regard to manufacturers' suggested AWPs or the historic markup for these manufacturers and without surveying other wholesalers for their markup. First Data did so despite receipt of information, in some instances, directly from manufacturers specifying or suggesting a 20% markup as appropriate. On some occasions, some of the manufacturers secretly questioned this increase. But First Data refused to change the published AWP, and the manufacturers failed to take any action to remedy First Data's unjustified raise in the AWP.

10.     This secret plan and collaboration between McKesson and First Data to raise the WAC-to-AWP spreads is referred to as the "Five Percent Spread Scheme" or "Spread Scheme" or "Scheme" or "Price Fix." The dramatic nature of the Spread Scheme is illustrated by the following chart depicting the hundreds of drugs whose WAC-to-AWP spread was raised as part of the Spread Scheme. The spike in 2002 reflects implementation of the Spread Scheme:

- 3 -



Number of NDCs with Spread Change from 20% to 25%, Jan 1999 - Oct 2004

**Note**: "NDC" means National Drug Code and refers to a number assigned to each drug by the United States Food and Drug Administration.

11.     Once McKesson and First Data raised the WAC-to-AWP spread to 25% on a given drug that spread remained in place and still remains in place to this day and thus continues to injure those entities– including SFHP and the Class – that rely on AWP as a pricing standard.

12.     McKesson had an economic incentive for implementing the Scheme.  A major part of McKesson's business comes from large pharmaceutical retail chains and other retail pharmaceutical clients.  McKesson implemented the Scheme to benefit those important retail pharmacy clients.  For sales to cash and non-cash paying customers, pharmacies are reimbursed by health plans and other pharmacy benefit providers based on AWP.  Consequently, pharmacies make a profit on the spread between AWP and their acquisition cost for a drug – which is based on the WAC.  Under this system, a higher WAC-to-AWP markup results in increased profits to pharmacies.  As McKesson explained to one of its pharmacy clients with respect to McKesson's

- 4 -

role as a benefactor to the retailers as a result of raising the AWP on the popular drug Clarinex, "fat cat status is just around the corner."

13.     McKesson was proud of its efforts. It quietly and secretly boasted to select retail clients that McKesson "had been working on AWP expansion with some success." Internally McKesson noted that clients were "very glad that McKesson was doing this." MCKAWP 0069726. Confirming the secrecy of the Scheme, McKesson cautioned that its "AWP expansion effort" and information about its role in inflating AWP is "not intended to be handed out to customers" but could be described to show "McKesson is doing our part" to increase AWPs. MCKAWP 0069732. "AWP expansion" was McKesson's euphemism for its WAC-to-AWP price fix scheme.

14.     First Data agreed to this Scheme to ease the burden of establishing accurate markups and to maintain the demand for its business among entities in the pharmaceutical distribution chain whose reimbursement is based on AWP, even though First Data knew that it no longer had the industry contacts and cooperation necessary to ensure the publication of accurate pricing. Thus, First Data and McKesson shared multiple common purposes, though they may have had different reasons for doing so, and each acted to achieve those purposes by implementation of the 5% Spread Scheme.

15.     Plaintiff SFHP and members of the Class have contracts that tie their payment for pharmaceuticals to First Data's or Medispan's published AWPs. Medispan's AWPs were derived directly from FDB's-AWPs.

16.     As a direct, foreseeable and intended result of the Scheme to increase the WAC-to-AWP markup from 20% to 25%, Plaintiff SFHP and members of the Class paid artificially inflated drug prices.

17.     Among the drugs whose prices are artificially inflated by the Scheme are some of the top brand drugs used by hundreds of millions of Americans, such as: Allegra (a leading allergy drug), Azmacort (a leading asthma drug), Celebrex (a leading arthritis/pain medicine),

- 5 -

Coumadin (a leading anticoagulant). Flonase (a leading asthma drug), Lipitor (the world's top selling drug, a statin), Neurontin (a leading pain medication), Nexium (a leading reflux drug), Prevacid (a leading ulcer/reflux drug) and Valium. Given the billions of dollars spent on prescription drugs, a 5% increase in the WAC-to-AWP spread results in a substantial increase in payments for pharmaceuticals. For example, AstraZeneca's Nexium had annual sales in 2004 of almost $4 billion. A bump of 5% in the WAC-to-AWP spread results in an increase of over $100 million per year in reimbursements for Nexium alone. Another such drug is Pfizer's Lipitor, whose annual sales in 2004 exceeded $10 billion. As a result of the 5% increase imposed by First Data and McKesson, hundreds of millions of dollars in excess payments were spent each year on Lipitor that would not have been made absent the Scheme.

18.    In this action, SFHP seeks to recover damages incurred by itself, the State of California and the Class as a result of McKesson's unlawful acts and practices. SFHP asserts claims for violations of the federal RICO Act, 18 U.S.C. § 1962(c); the Cartwright Act, CAL. BUS. & PROF. CODE § 16720, *et seq.*; and the California False Claims Act, CAL. GOV'T CODE § 12651, *et seq.* The False Claims Act claim is asserted by SFHP on its own behalf and on behalf of the State of California. The RICO and Cartwright Act claims are asserted by SFHP individually and on behalf of all governmental entities or political subdivisions in the State, including the State of California, that used AWP as a pricing benchmark for the drugs at issue. In addition, the People assert a claim against McKesson for engaging in unlawful, unfair, and deceptive business practices in violation of the California Unfair Competition Law, CAL. BUS. & PROF. CODE §§ 17200 *et seq.*

## II.    JURISDICTION AND VENUE

19.    Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this Complaint states a claim under the federal RICO statute, 18 U.S.C. § 1962, *et seq.*

20.    Subject matter over the state law claims is proper in this court pursuant to 28 U.S.C. § 1367(a) because such claims are so related to claims in this action within the Court's

- 6 -

original jurisdiction that they form part of the same case or controversy under Article III of the
United States Constitution. This Court has personal jurisdiction over the parties because
Plaintiffs SFHP and the People submit to the jurisdiction of the Court and Defendant McKesson
transacts business in Massachusetts and systematically and continually conducts business
throughout the Commonwealth of Massachusetts; and the Court has jurisdiction over a related
case.

21.     Venue is proper in this District pursuant to RICO's special venue provision, 18
U.S.C. § 1965, because McKesson transacts business in the State of Massachusetts.

### III.     PARTIES

22.     Plaintiff SFHP offers full medical, hospitalization, vision and dental coverage
through its health care coverage programs. They include: Medi-Cal, The Healthy Families
Program, Healthy Workers and Healthy Kids & Young Adults. The latter has garnered much
state and national attention for its extension of benefits to 19 to 24-year-old citizens, regardless
of immigration status. Propelled by the continued success of its Healthy Kids & Young Adults
program, SFHP achieved a major milestone recently by welcoming its 50,000th member. SFHP
now provides complete medical, dental, and vision coverage to over one-quarter of San
Francisco children and youths aged 0-18, contributing to the 99.2% coverage rate for San
Franciscans in that demographic. In recognition of its contribution to the City's pursuit of
universal health coverage for all San Franciscans, Mayor Gavin Newsom showed his
appreciation by proclaiming Wednesday, October 3 as *San Francisco Health Plan Day*.

23.     Each SFHP program pays for prescription brand-name drugs on behalf of plan
members based on the published AWP of those brand-name prescription drugs. SFHP's
pharmacy benefit management vendor utilizes AWP listings.

24.     The SFHP Medi-Cal program pays for prescription and over-the-counter brand-
name and generic drugs on behalf of otherwise uninsured adults and children who are
documented California residents and fall within income guidelines.

- 7 -

25.     The SFHP Healthy Families program pays for prescription brand-name and generic drugs on behalf of children who are documented California residents, otherwise uninsured, under 19 years of age, not eligible for no-cost Medi-Cal, and fall within income guidelines.

26.     The SFHP Healthy Kids & Young Adults program pays for prescription brand-name and generic drugs on behalf of children and young adults who are otherwise uninsured, under 25 years of age, and not eligible for no-cost, full-scope Medi-Cal or the Healthy Families program. Members in this program include those in the foster care system who have aged-out of Medi-Cal at age 21 but are still under 25 years old. Prior to January 1, 2004, the program only covered children under 19 years old.

27.     The SFHP Healthy Workers program pays for prescription drugs on behalf of temporary, exempt as-needed San Francisco employees and individuals who provide in-home support services in San Francisco for Medi-Cal members. SFHP utilized an AWP-based payment methodology for this program until November 1, 2004, when the San Francisco Department of Public Health took over management of the pharmacy benefit.

28.     For each of these programs (including Healthy Workers through October 31, 2004) SFHP paid for drugs on behalf of its members through a contract with a pharmacy benefit management vendor. Similar to many pharmacy benefit management contracts, the contract rate that SFHP pays for drugs utilizes AWP as part of the rate calculation method.

29.     SFHP is a political subdivision within the meaning of CAL. GOV'T CODE § 12650(a)(3).

30.     Pursuant to CAL. GOV'T CODE §§ 12650, *et seq.*, the San Francisco City Attorney is the prosecuting authority charged with bringing this action under the California False Claims Act for claims that involve funds of the SFHP, which is a political subdivision within the County. Pursuant to CAL. GOV'T CODE § 12652(b)(2), the San Francisco City Attorney may bring a civil action to recover damages based on false claims made for local funds and state

- 8 -

funds. Where, as here, a false claim action brought by a local prosecuting authority involves both local and state funds, the local prosecuting authority must serve the complaint on the California Attorney General's Office. The Attorney General's Office then has sixty days to notify the Court whether it intends to intervene in the action or whether it declines to intervene and therefore allows the local prosecuting authority to conduct the action on behalf of the State of California.

31.     Pursuant to California Business and Professions Code § 17206(a), the City Attorney of the City and County of San Francisco is authorized to sue on behalf of the People of the State of California to seek injunctive relief and civil penalties against McKesson for violations of the California Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq*.

32.     The State of California ("State") operates the California Department of Health Care Services ("DHCS"), previously named California Department of Health Services ("DHS"). DHCS is a state agency and administers the State's Medi-Cal program, which paid benefits from a combination of State and Federal Government funds. DHCS provided Medi-Cal benefits to qualified recipients, including payment of claims to providers for the prescription drugs at issue. These claims were paid based upon the false, inflated and illegal representations of the cost of drug products as a result of McKesson's conduct. The State's Medi-Cal program benefits are paid from a combination of State and Federal Government funds in an approximate 50/50 ratio.

33.     Defendant McKesson Corporation is a Delaware corporation with its principal place of business at McKesson Plaza, One Post Street, San Francisco, California 94101. McKesson Corporation is the leading provider of supply, information and care management products and services designed to reduce costs and improve quality across healthcare. Founded in 1833, with annual revenues of more than $50 billion, McKesson ranks as the 18th largest industrial company in the United States.

34.     McKesson's unnamed co-conspirator is First DataBank, Inc. ("First Data" or "FDB"), a Missouri corporation with its principal place of business at 1111 Bayhill Drive, San

- 9 -

Bruno, California 94066. First Data is a subsidiary of the Hearst Corporation and is the leading

provider of electronic drug information to the healthcare industry. For the period of 1998

through about January 2002, when it agreed to divest, Hearst Corporation jointly operated First

Data and Medi-Span, First Data's only competitor in the electronic drug pricing market. As part

of the divestiture agreement First Data provided its drug price information to Medi-Span until

approximately October 2004.

## IV.    STATEMENT OF FACTS

35.    This case involves the artificial increase in the "markup" factor between the so-

called wholesale acquisition cost (or "WAC") and the so-called average wholesale price (or

"AWP") of a large number of brand-name prescription drugs, a scheme first implemented in late

2001 by McKesson (the largest U.S. pharmaceutical wholesaler) and First Data (the nation's

most widely used and "trusted" electronic drug data publisher).

## A.    Drug Manufacturers and NDCs

36.    Drug makers manufacture brand-name and generic drugs. Generally, a drug

product that is covered by a patent and thus is manufactured and sold exclusively by one firm is a

brand-name drug. After the patent expires, multiple companies can produce the same drug

product in the same manner, but the brand name itself remains with the original manufacturer.

Drug products not covered by patent protection and produced and/or distributed by many firms

are referred to as generic drugs. Manufacturers tend to be either brand-name manufacturers or

generic-drug manufacturers, although some manufacture both types of drugs.

37.    There are approximately 65,000 branded and generic drug products in the United

States market, including different dosages of the same drug. Prescription drugs are dispensed to

patients primarily through four different drug distribution channels:  (a) retail pharmacies

(including national chain pharmacies, independent pharmacies, supermarket chains, and mail

order pharmacies); (b) physicians who administer the drug in an office; (c) home infusion (*i.e.*,

drugs administered into the patient's bloodstream): and (d) other medical providers. This lawsuit primarily involves branded drugs distributed through the first channel, the retail pharmacies.

38.    All drugs intended for retail pharmacy sale are identified by an eleven-digit National Drug Code ("NDC") that is listed with the United States Food and Drug Administration ("FDA"). The NDC is used to identify the drug delivered to the patient. The first five digits of the NDC show the identity of the company that manufactured and/or packaged the drug, the middle four digits identify the drug ingredient and dosage, and the last two digits identify the package size (*e.g.*, whether the bottle of pills contained 100 or 1,000 pills). While there are currently about 65,000 active NDCs, many more NDCs have been issued over time (over the years many drugs and associated NDCs have been phased out).

**B.    The Wholesale Acquisition Cost**

39.    Branded manufacturers arrive at an original launch price by taking into account research and development costs, launch and marketing costs, competitor prices and estimates of consumer and physician demand. (Generic makers, of course, generally use commodity pricing approaches.) Once an introductory price has been set, the branded manufacturer establishes the wholesale acquisition cost, or "WAC," which is used as a baseline for sales to wholesalers (subject to many adjustments, as will be seen). The WAC for branded drugs is then published by the manufacturer.

40.    Manufacturers establish the WAC as a baseline for sales to wholesalers and others in the distribution chain. Thus, while WAC may not represent *actual* acquisition cost (as wholesalers may obtain discounts through volume purchases or special deals, and as wholesalers' customers who also buy based on WAC may receive other price concessions charged back to the manufacturers), it is the baseline for branded drug sales by manufacturers to national wholesalers. In addition, WAC is a publicly available price for most branded drugs. It is the closest reported price to the actual transaction price between a manufacturer and the wholesaler or other direct purchaser of a drug product. Because the wholesalers' price to the

- 11 -

retail class of trade is also typically based on, or is a function of, the WAC, a change in WAC generally results in a similar percent change in price to both wholesalers and to retail pharmacies.

41.      WACs are typically reported on invoices between the manufacturer and the drug wholesaler (and between the wholesaler and the retailer, or between the manufacturer direct to the retailer). Some drug manufacturers have other names for the WAC price such as manufacturer list price, catalog price, direct price, wholesale net price, or book price.

## C.      The Average Sales Price

42.      After all price concessions are considered, a drug manufacturer achieves a net sales price, *i.e.*, a transaction price paid by a pharmacy or provider when purchasing a drug product from either a drug manufacturer or wholesaler. The net sales price takes into account the invoice price and all on-invoice, as well as off-invoice adjustments for discounts, rebates, purchasing allowances, or other forms of economic consideration.

43.      Of course, manufacturers can (and do) calculate for internal purposes the net sales price at which they are able to sell their products. The average of those net sales prices is usually called the average sales price (or "ASP"). While net acquisition prices and associated ASPs are known to each drug manufacturer, they are not typically published or made public.[1] Some drug manufacturers may have a variety of terms for specific discounts that are based on class of trade, volume of purchase, market share movement, preferred formulary status, terms of payment, and other criteria. Because ASP is meant to be the net price after all forms of discounts, rebates, purchasing allowances or any other forms of economic consideration have been taken into account, discounts that contribute to ASP are considered proprietary and confidential by drug manufacturers. As a result, for retail pharmaceutical products the exact relationship of ASP to WAC (or to the average wholesale price or AWP, discussed below) for a particular drug at a particular point in time is not publicly known.

---

[1] The important exception to this is Congress' recent enactment of the Medicare Modernization Act of 2003, in which Congress changed the Medicare reimbursement system for drugs and biologicals from an AWP-based system to an ASP-based system physician-administered. This exception is not relevant here.

**D.    The Average Wholesale Price**

44.    In addition to causing to be published a wholesale acquisition cost or WAC for branded drugs, over the years branded (and generic) manufacturers have also caused to be published an average wholesale price (or "AWP") for prescription pharmaceuticals. The average wholesale price or AWP is a list price used for invoices between drug wholesalers and pharmacies (or other appropriate drug dispensers, such as doctors for physician-administered drugs) and is used as a benchmark for the reimbursement by End-Payors (such as SFHP) to dispensers (such as retail pharmacies or doctors) for drugs provided to patients. Historically, the AWP is set directly or indirectly hy the drug manufacturer, with an effective date and remains in effect until a change in price is published.

45.    WAC and AWP differ in that they represent list prices at different levels in the market. WAC represents a list price from manufacturer to wholesaler, while AWP represents a list price from wholesaler to dispenser (*e.g.*, pharmacy, physician, hospital, or other provider).

**E.    The WAC-to-AWP Spread**

46.    In the pharmaceutical industry, the amount by which the AWP exceeds the WAC is sometimes known as the WAC/AWP "markup" or "spread" for a particular drug product.

47.    The relationship between AWP and WAC is sometimes expressed as the percentage by which the difference is above WAC (*e.g.*, 20% or 25% above WAC, usually called "the markup").

48.    For many years preceding the Scheme alleged in this Complaint. the WAC-to-AWP spread for branded drugs had predictably set patterns, and the competitive pricing marketplace for pharmaceuticals had adjusted and accommodated for those patterns. For branded pharmaceuticals, the WAC/AWP markup tended to fall in two quantum places: 20%, and 25%. In other words, in the many years preceding the Scheme alleged in this case, a particular branded drug NDC would carry both a published WAC (*e.g.*, $100 for a 100 count

- 13 -

001821-16 224176 1

bottle) and a published AWP, typically at either 1.20 or 1.25 times the WAC (*e.g.*, $120 or $125).

49.     These standard 20% and 25% WAC/AWP markup factors were commonly associated by McKesson, First Data and others in the pharmaceutical industry with particular divisions of pharmaceutical companies. For example, a pharmaceutical division might be designated as a "20% markup" company, while another company, working in a different therapeutical area, would be designated as a "25% markup" company.

50.     Another predictable aspect of brand drug prices over the years was the unchanging nature of the WAC/AWP markup for a particular NDC. In other words, if a particular NDC first launched at a 20% markup value, that NDC would remain as a 20% drug during the lifetime of that NDC, almost as if it were part of the genetic code for that NDC. Thus, the WAC and AWP for that drug moved in parallel fashion (usually up), keeping the same markup factor associated with that NDC. Indeed, prior to the Scheme alleged in this case, it was extraordinarily rare for the WAC/AWP spread to be changed for any particular NDC.

## F.     Drug Wholesalers

51.     Branded manufacturers' primary customers are wholesalers, although to a much broader extent, manufacturers also sell directly to retail pharmacy chains, mail-order pharmacies, hospital chains and some health plans. Wholesalers are manufacturers' largest group of purchasers, and wholesale prices depend partially on volume purchased.

52.     Like most other types of wholesalers, pharmaceutical wholesalers purchase goods from manufacturers and then resell them to other purchasers. Wholesalers, whose main customers are retail and mail-order pharmacies, buy pharmaceuticals in large quantities, sort them by customer needs and disperse them in usable quantities.

53.     The price wholesalers pay to manufacturers for any given product at any given time can fluctuate with the quantity purchased. The manufacturer may quote a wholesaler a

- 14 -

price close to or at WAC, however, there is often a small volume discount or early cash payment discount off that price.

54. National wholesalers are the primary intermediate level in the distribution process retail channel. They accounted for 45.7% of prescription drugs sales ($98.5 billion) in 2002. Other intermediate channels of distribution include chain warehouses with 32.3% ($69.8 billion) of the market, regional and specialty wholesalers with 9.3% ($20.2 billion) of the market, and group purchasing organizations that usually contract with a wholesaler to perform the distribution function on their behalf. Only about 12% of prescription sales by drug manufacturers are made directly to providers (*e.g.*, physicians or hospitals) or pharmacies.

55. Wholesale drug distribution is heavily concentrated. The three largest wholesalers are defendant McKesson, Cardinal Health, Inc. ("Cardinal") and AmeriSource Bergen Corporation ("ABC"). Each of these "Big Three" wholesalers has slightly less than one-third of the national market of prescription drug wholesale distribution. Collectively, they account for more than 80% of drug sales that flow through drug wholesalers (national, regional, and specialty).

## G.    Wholesaler Sales Transactions

56. National drug wholesaling is generally perceived as price competitive, with McKesson, Cardinal and ABC (or their predecessors) competing for business with retailers (primarily major chain drug retailers, independent pharmacies, supermarket drug retailers, and mail order businesses). As a result, drug wholesaler margins to retailers tend to be thin (even at times non-existent), with a significant portion of national drug wholesaler revenue instead being derived from prompt pay discounts received from manufacturers and from wholesaler inventorying measures that anticipate price increases.

57. National drug wholesalers sell branded drugs to the retail class of trade based on prices pegged to the WAC. Given the tendency for narrow margins in the national drug wholesaling business, the published WAC for a manufacturer's retail-channel branded drug is

- 15 -

not only a strong market indicator for the wholesaler's buy-side cost for a branded drug, it is also expected that the WAC, subject to certain adjustments, is a reasonable benchmark of the sell-side costs charged by national wholesalers of branded drugs to major pharmacy retailers.

## H.    Retail Pharmacy Channel

58.    The retail pharmacy channel (including chain drug store companies, independent pharmacies, mail orders and supermarkets), comprises roughly two-thirds of the estimated market share of dollars for prescription drugs. Currently, the four largest drug store chains account for most of the retail pharmacy market share today, and the recent consolidation trend appears to be continuing. Some large national or regional retail chains (including pharmacy, supermarket, mass- merchandiser chains) purchase drugs in large enough volumes so that they can bypass the wholesaler and buy directly from the manufacturer, but these direct purchases remain a small portion of the overall picture.

59.    Regardless of whether the retail pharmacy is large or small, its purchase of prescription drugs uses WAC as a benchmark, although that benchmark is subject to adjustments such as a variety of discounts, rebates, and direct or indirect offsets to pricing.

60.    When large chain pharmacies buy directly from manufacturers, manufacturers offer these pharmacies both up-front discounts for purchasing their products and back-end discounts and formulary rebates for selling specific volumes of drugs or achieving a certain share of a specified market. When purchasing drugs directly from manufacturers, pricing is based on the same WAC benchmark system, but the actual transaction cost varies considerably from the WAC given these other arrangements.

61.    Smaller retail entities, such as independent retail pharmacies and regional retail chains, purchase directly from wholesalers or join group purchasing organizations ("GPOs") in order to leverage their combined purchasing power. Some of these groups further reduce their costs through direct rebate deals offered by manufacturers. In making purchases from

- 16 -

wholesalers, resellers and manufacturers, the starting benchmark for transactions is the WAC but, again, the actual transaction cost is highly variable due to the additional arrangements.

62.     In short, entities in the retail distribution chain (including wholesalers, resellers (retailers), retail chain pharmacies, independent pharmacies, mail order houses, and GPOs) purchase brand-name drugs based upon WAC. While the actual transaction purchase price varies from the WAC, WAC acts as the actual baseline for the many millions of transactions by which entities in the retail distribution chain acquire branded drugs.

## I.     The Private End Payors for Prescription Drugs

63.     At the most basic level, prescription drug expenditures are funded by either private or public sources. In the United States, more than $200 billion dollars is spent annually on prescription drugs. About three quarters of this amount is privately funded.

64.     Private payors for prescription drugs include drug benefit plan sponsors and consumers. The drug benefit plan sponsors (who pay for part or all of the cost of prescription drugs for their covered beneficiaries) include self-insured employers, health and welfare plans, health insurers and managed care organizations (MCOs). Most of these plan sponsors reimburse retailers (for retailers' drug purchase costs) through pharmacy benefit administrators (either health plans or pharmacy benefit management companies) who negotiate discounts with retail pharmacies and rebates from drug manufacturers. The vast majority of such purchases are for out-patient drugs that are self-administered, *i.e.*, drugs distributed through the retail distribution channel.

## J.     End Payors Drug Reimbursements Are AWP-Based

65.     Although retail pharmacies *purchase* pharmaceutical products based upon pricing formulae that employ the WAC, retail pharmacies *get paid* (*i.e.*, receive reimbursement) from plan sponsors and consumers based upon an AWP reimbursement formula plus a dispensing fee. This is a fundamental anomaly of the retail distribution channel for drug products – that retail

- 17 -

pharmacies' *purchases* are based on prices pegged to the published WAC, but retail pharmacies' *reimbursements* or charges are based on the published AWP.

66.     Health plans typically contract with intermediaries called pharmacy benefit managers ("PBMs") to negotiate prices with manufacturers and retail pharmacies and thereafter adjudicate the numerous transactions that occur during the administration of a plan. Although the PBM negotiates prices and adjudicates claims, the plan sponsor (*i.e.*, insurer, self-insured employee, health and welfare plan) remains at risk for the charges paid to retail pharmacies and mail orders. In the contracts between PBMs and plan sponsors, the retail pharmacies' drug ingredient costs for brand-name drugs are reimbursed at the AWP less a certain percentage, or "discount."

67.     Brand drug reimbursement for retail pharmacy ingredient cost contained in the contracts between PBMs and plan sponsors, and PBMs to pharmacies, use an AWP-based reimbursement structure. For example, since 2002, Express Scripts' standard form contract has expressly stated that its reimbursement formula is based on AWP from the "current information provided to ESI by drug pricing services such as First Data Bank...." Similarly, Caremark's website states: "For both brand and generic drugs, the pricing formula at retail and mail is based on the discounted Average Wholesale Price (AWP) as reported by First Data. Caremark loads First Data's updated data into the system on a daily basis." Other PBMs expressly utilize First Data's published AWPs as the source of AWP pricing to be utilized in payment.

68.     The AWP-based reimbursement benchmark for payments in the retail class of pharmaceutical trade has long been acknowledged. For example, at a hearing on December 7, 2004, before the United States House of Representatives Committee on Energy and Commerce, a former Senior Vice President of Aventis Pharmaceuticals, testified that "*AWP has been codified as the benchmark price, by statute and regulations, in the public sector and by contract in the private sector.*" Those paying for drugs, by statute or contract, rely on and use the published AWP.

- 18 -

69.     Third Party AWP-based reimbursement has also been acknowledged by
McKesson. For example, in September 2001, Robert James, McKesson's Director Brand
Pharmaceutical Product Management [later Vice President, Brand Rx Pharmaceutical Product
Management], internally noted that "I think it is important to understand that the AWPs that are
used for third party reimbursement are the First Data Bank ("FDB") AWPs."
MCKAWP 0068514.

70.     In summary, thousands of pharmaceutical reimbursement contracts are based on
AWP minus a specified discount. As a result, a leading expert on pharmaceutical pricing has
concluded that "AWP is the glue that binds the system of pharmaceutical reimbursement rates.
All or predominantly all, reimbursement rates for pharmaceuticals purchased under public sector
and private drug benefit insurance plans are negotiated based upon AWP and discounts from
AWP." Public and private payor reliance on AWP was well known to McKesson.

## K.     Medicaid Drug Reimbursements are AWP-Based as are California's Medi-Cal Payments

71.     Public entities purchase prescription drugs through a variety of programs for low-
income and elderly patients, veterans, members of armed services, and federal, state and local
government employees. These public payors rely on and use AWP as a basis for reimbursement
to pay for dispensers' ingredient costs for branded pharmaceutical products.

72.     The Medicaid Program, jointly financed through federal and state funds, is
designed to aid certain low-income people and the disabled. It covers about 40 million
individuals. Between 1997 and 2002, Medicaid expenditures for prescription drugs in the fee-
for-service part of the program increased at an average annual rate of 18%, going from
$10.2 billion to $23.4 billion. While these are significant sums, they amount to less than 10% of
the overall annual prescription drug expenditure.

73.     Medicaid's reimbursement system relies upon the published list prices of drugs
(which are largely set directly by manufacturers) to determine pharmacies' reimbursement.
States reimburse pharmacies using formulas that are typically based on the average wholesale

- 19 -

price or AWP of a drug. For example, a state might reimburse a pharmacy 85% to 90% of the average wholesale price of a drug plus a fixed dollar amount of $3 to $5 (as dispensing fee) to cover the pharmacy's other costs.

74.    California's Medi-Cal program routinely provides prescription drug coverage as part of its medical assistance to the poor, needy, elderly and disabled. Included in that coverage are payments for drug products, both single source drug products (brand-name drugs) and multi-source drug products (generally generic drugs), delivered to the patient by Medi-Cal providers including pharmacies and physicians.

75.    Medi-Cal reimburses providers for drugs from most manufacturers at what is called the Cost of the Drug Product ("CDP"), which is the lowest of the drug's Estimated Acquisition Cost ("EAC"), Federal Allowable Cost ("FAC"), or Maximum Allowable Ingredient Cost ("MAIC") for the Standard Package size, or the amount billed by the provider. EAC for a drug product is the Direct Price ("DP") or Average Wholesale Price ("AWP") minus a determined percentage. CAL. CODE REG. TITLE 22 § 51513, *et seq.*

76.    Medi-Cal drug reimbursement rates at all times relevant to this Complaint have been based on price data published by FDB or other price reporting services.

77.    During all relevant times covered by the Complaint:

    (a)    Medi-Cal contracted with a fiscal intermediary, Electronic Data Systems ("EDS"), to evaluate and process claims for payment;

    (b)    EDS, on behalf of Medi-Cal, contracted with FDB to provide the requisite drug pricing information to establish provider reimbursements;

    (c)    Medi-Cal has relied on FDB as its primary source of pricing data and has utilized reports of AWP, DP, and the Federal Upper Limit ("FUL") supplied by FDB.

    (d)    FDB reported AWPs, DPs, wholesale acquisition costs ("WACs") and FULs for the specific prescription drugs based on the price information provided by McKesson for the respective drugs.

- 20 -

(e)     Medi-Cal paid for drugs under various delivery systems, including the following:

     (i)     Pharmacy; and,

     (ii)    Incident to a physician's service.

78.    McKesson caused to be reported false or misleading drug prices to Medi-Cal by providing false or misleading price information to FDB with knowledge that FDB would in turn utilize such false and misleading price information to determine the AWPs reported to Medi-Cal.

79.    The claims which are the subject of this action were submitted to Medi-Cal for reimbursement for prescription drugs provided to Medi-Cal beneficiaries. Claims for each prescription are submitted on hard copy claim forms or through an electronic claims filing procedure using drug identification numbers known as National Drug Code ("NDC") numbers. Claims for physicians' services are submitted and paid using California-specific "X-Codes."

80.    The number of pharmacy claims processed for Medi-Cal from July 1994 through March 2004 is as follows:

| Fiscal Year | Paid Claims |
|-------------|-------------|
| 1994-1995 | 61,754,453 |
| 1995-1996 | 62,637,343 |
| 1996-1997 | 61,564, 937 |
| 1997-1998 | 61,205,223 |
| 1998-1999 | 61,352,480 |
| 1999-2000 | 63,438,437 |
| 2000-2001 | 67,712,496 |
| 2001-2002 | 78,713,259 |
| 2002-2003 | 86,768,629 |
| 2003-03/2004 | 67,518,078 |
| Totals | 672,665,335 |

81.    The number of pharmacy claims Medi-Cal received on average during the fiscal years from 1994 through March 2004 was approximately 1.37 million per week. The number of NDCs for which Medi-Cal processed the preceding claims has been reported at around 20,000

- 21 -

per year. From 1991 to present, however, the number may have reached as many as 40,000 NDCs.

**L.      Medicare Drug Reimbursements Are AWP-Based**

82.      The other significant public purchaser for prescription drugs is the federal Medicare Program.

83.      Until recently, the Medicare Program generally did not cover the cost of out-patient prescription drugs that a Medicare beneficiary self administers (*e.g.*, by swallowing the drug in liquid or pill form). However, Medicare Part B does cover approximately 450 drugs, including injectables administered directly by a doctor, certain oral anti-cancer drugs, and drugs furnished under a durable medical equipment benefit.

84.      Medicare Part B reimburses medical providers 80% of the allowable amount for a drug. The remaining 20% "co-payment" amount is paid by the Medicare Part B beneficiary. All medical providers are required by law to bill the 20% co-payment and make attempts beyond merely billing to collect that amount. Moreover, before Part B benefits are payable, beneficiaries under Part B are required to pay an annual deductible amount.

85.      Some Medicare beneficiaries can purchase private Medigap insurance, which covers, among other things, all or part of the 20% co-payment for Covered Drugs.

86.      For many years up to and through 1997, Medicare's reimbursement system for the relatively narrow band of physician-administered drugs sought to estimate providers' acquisition costs by pegging reimbursement to either the estimated acquisition costs or to the national average wholesale price sale price. In practice, carriers that administered the Medicare Program reimbursed physicians and clinics for physician-administered drugs covered by Medicare on the basis of the published wholesale price or AWP.

87      Beginning in 1998, Medicare's practice of reimbursing based upon the published AWP was codified by statute and implemented by regulation. Beginning in 1998 and until

- 22 -

recently, Medicare reimbursed for drugs and biologicals based upon 95% of the published average wholesale price.

88.     At the end of 2003, Congress enacted the Medicare Modernization Act. Among other things, the Act changed the AWP-based reimbursement system for Medicare to a system based upon each manufacturers' actual calculation for the average sales price for each drug or biological covered by the program. Interim rules transitioned the AWP-based system with modifications to the percentage off of AWP. Beginning in 2004, Medicare has been transitioning to an ASP-based reimbursement system.

89.     In summary, the two largest public purchaser programs for prescription pharmaceuticals – Medicaid and Medicare – historically relied upon published average wholesale prices as the fundamental basis upon which to reimburse for branded drug ingredient costs incurred by dispensers (retail pharmacies for Medicaid, and medical providers in the Medicare arena).

**M.     PBMs**

90.     Third-Party Payors ("TPPs") do not typically look at AWP-WAC but look instead to overall price trends. This is because most TPPs do not negotiate directly with retail pharmacies to set their rate of reimbursement. Instead, they contract with Pharmacy Benefits Managers ("PBMs"), who act as the middlemen between TPPs and pharmacies. But PBMs make very little money processing TPP claims and look to other sources for generating revenue. For example, in its 2005 Annual Report, Express Scripts, Inc. reports that it receives 35% of its revenue from mail order operations compared to 1% from services offered to TPPs. Similarly, in its 2005 Annual Report, Medco identifies client services as less than 1% of its overall revenue, while its mail order business accounts for 37%. One observer recently explained the evolution of PBM services and competition as follows:

> Initially, the goal of the PBM was to simplify the administration of benefits for health plan members and to provide some cost-management services.... In the early 1990s, as electronic point-of-sale (POS) claims processing became prevalent, PBMs began to

shift their dependence on revenue from claim processing to other sources, including manufacturer rebates, selling data to manufacturers, and selling mail order and retail drugs. PBMs found that health plans and employers were more interested in lower administrative fees, because the result of pharmacy-cost reduction appeared to be too difficult to measure. This practice created a price war among PBMs for business from large health plans and resulted in a perception of POS pharmacy claims as a commodity.... *Gradually, the PBM industry shifted to aggressive strategies of seeking revenues from alternative sources to compensate for selling benefit administration services at lower costs.* PBMs that could not buy or build mail order capabilities quickly turned to other revenue sources. These included the sale of claims data to drug manufacturers and repricing of the retail network, known as spread pricing (fees gained through continual negotiation of lower rates with the pharmacy network that are not passed on to the health plan or employer). *Today, revenue from POS claims processing provides little to no margin for PBMs.*[2]

91.     Mail order services are a particularly lucrative source of revenues for PBMs. In their mail order capacity, PBMs stand in the same shoes as McKesson's retail pharmacy clients by profiting from the increase in the WAC-AWP spread. Thus, PBMs had a strong incentive to remain silent about the Scheme or risk losing additional profits stemming from new markups.

92.     Indeed, after the Scheme was commenced the major PBMs profited from the increased spreads. ESI, for example, noted in a secret internal e-mail, that "the AWP increases being pushed through by First Data Bank [are] having a very favorable impact on our mail margins." The e-mail goes on to state "our clients will not be sympathetic to our financial situation since we will have benefited from the AWP increase in the mail [orders]." The e-mail includes a handwritten note, in response, "Let's put a lid on it and not make it a big deal." And ESI and the other PBMs did exactly that.

---

[2] Steve Martin, "PBM Industry Today: Who's Managing Drug Costs?", *Managed Care Magazine*, Dec. 2001, http://www.managedcaremag.com/archives/0112/0112.pbmfuture.html, accessed August 29, 2007 (emphasis added).

N.      U&C Payors

93.     In increasing numbers throughout the Class Period there is a portion of the
population who are uninsured or underinsured and who pay for drugs in cash. This is referred to
in the industry as the usual and customary ("U&C") charge.

94.     U&C payments are tied to the reported AWPs, and are usually set at a price above
AWP. Hence an artificial increase in the AWP uniformly impacts such class members.

95.     These are the most vulnerable of all consumers purchasing drugs. They have no
power to negotiate discounts.

O.      The Brand Drug Pharmaceutical Market was Conducive to a Price Fixing Scheme

96.     The market for brand-name prescription drugs has a number of features that
facilitated the implementation of the price-fixing conspiracy alleged in this Complaint. The
industry relies almost exclusively on electronic publishers for the source of AWPs, especially
First Data. Additionally, from 2001 through late 2004, First Data and Medispan acted as one for
the purposes of calculating and publishing AWPs. "This means that essentially the Medispan
data is the First DataBank data." MCKAWP 0057415. First Data was therefore the industry
standard bearer for both AWP, and by implication, the AWP-WAC markup.

97.     During the time the Scheme was implemented, First Data purported to use a so-
called survey of the major wholesalers. But as a matter of policy, First Data refused to share the
responses to its so-called surveys even when questioned by manufacturers or others concerned
about changes to their traditional markup. Further, in this same time frame, Cardinal and
Amerisource did not participate in the so-called surveys as a matter of policy. Their own list
prices adhered to the manufacturer's suggested or historical markup, *i.e.*, they did not comport
with First Data's increases – although in some instances and at a much later date, they changed
their markups to be consistent with First Data's. First Data's secretive process of alleged
"surveys," involving only McKesson, allowed McKesson to systematically "normalize" brand
drug markups at 25%. Additionally, the effects of the Scheme were further obscured because

First Data stored its markup information separately from its database of published prices and generally increased the markup on individual drugs only when the manufacturer announced a price change to the WAC. Most TPPs, both public and private, do not track changes to markups, particularly not markups on brand-name drugs. Moreover, the market participants most likely to have observed these changes, the retail pharmacies and PBMs, directly benefited from the Scheme and were therefore loathe to disclose them to End Payors.

## P.     Private and Public End Payors Rely on Published Drug Pricing Compendia

98.     The private and public pharmaceutical reimbursement systems have at their core critical dependence and reliance upon accurate and timely publication of the current AWP for every active formulation of drugs dispensed by retail pharmacies in the country, given the breadth of this dependence (private insurance systems covering more than 200 million lives as well as millions of cash payors); the healthcare system's growing reliance on pharmaceutical products as a treatment of first resort; and the scores of thousands of available drugs on the market. Private (and public) reimbursement systems, including the plan sponsors and consumers who reimburse drug dispenser costs, also rely upon pharmaceutical pricing publishers to accurately and fairly publish AWPs and WACs for NDCs. McKesson and FDB were aware of this reliance.

99.     Several pharmaceutical industry compendia periodically publish the AWPs for active NDCs in the United States. Generally these publications are available in either hard copy format or in electronic media.

100.    Generally speaking, the two printed compendia include Drug Topics Red Book (the "Red Book") (published by Thompson Healthcare) and American Druggist First Data Bank Annual Director of Pharmaceuticals and Essential Director of Pharmaceuticals (the "Blue Book") (which for several years has been defunct). While the Red Book is used to determine published AWPs (primarily for physician-administered drugs), and while certain limited

- 26 -

electronic information is available regarding Red Book published prices, the Red Book remains primarily an annual printed publication with periodic printed updates.

101.    In periodically announcing the AWP for each drug, publishers generally report prices supplied to them by manufacturers for their respective drugs. For instance, the forward to the 1999 edition of the Red Book states that "all pricing information is supplied and verified by the products' manufacturers, and it should be noted that no independent review of those prices for accuracy is conducted." In addition, a June 1996 Dow Jones news article reported that Phil Southerd, an associate product manager of the Red Book, stated that Red Book only publishes prices faxed directly from the manufacturer.

## Q.    The Emergence of First Data and MediSpan as Electronic Data Publishers

102.    In addition to printed publications of pharmaceutical prices, the AWP for NDCs is also widely made available to manufacturers, wholesalers, retailers (including major chain pharmacies, independents, mail orders), pharmacy benefit managers and third-party payors, (*i.e.*, plan sponsors of drug benefit plans such as insurers, Taft-Hartley Funds and self-insured employers), through large electronic drug databases.

103.    Drug databases started back in the mid-1970s with the advent of significant drug benefit programs. These programs, along with the pharmacists who are dispensing the drugs and the third-party payors (primarily insurance companies) who are paying for them, needed comprehensive and accurate descriptive and pricing information to ensure the accuracy of the claims they were paying.

104.    The processing of claims became a massive job as drug prescriptions increased. The need for a consistently accurate and comprehensive drug price database became a major need. As First Data documents acknowledge, the "specter of inaccurate drug prices drove the database companies to develop techniques to assure the accuracy and comprehensiveness of the data."

001821-16 224376-1

105.    During the 1990s, there were only two major electronic drug database companies: (1) First Data, which describes itself as "started as the only purely electronic database company;" and (2) MediSpan, which had its roots in the printed drug price catalog business.

106.    The principal products sold by First Data are based upon information contained in its National Drug Database Files, or "NDDF." The NDDF is a massive electronic database dating back many years and containing scores of fields of information for both active and non-active NDCs. Among many other pieces of quantitative and non-quantitative information contained in the NDDF, are the current and each historical WAC (known in the NDDF as the wholesale net price, or "WHN") and AWP (set forth in various fields, including an AWP field designated by First Data as Blue Book AWP or "BBAWP") for each NDC.

107.    The principal electronic database products sold by MediSpan are based upon its Master Drug Database Files or "MDDF." The MDDF electronic database is smaller than the NDDF, but nevertheless contains numerous fields of data for each NDC, including current and historical WAC and AWP. Both the NDDF and the MDDF are comprehensive, intragratable drug information databases.

108.    Comprehensive, intragratable drug information databases ("intragratable drug data files") are electronic databases containing purportedly comprehensive clinical, pricing, and other information on prescription and non-prescription medicines. Intragratable drug data files are uniquely capable of being readily integrated with other computerized information systems to help pharmacists and third-party payors quickly obtain information important to decisions regarding the prescription, dispensing, price reimbursement and purchase of medicines, and also to automatically provide drug information that patients need for safe use of their drugs. Retail pharmacies and PBMs usually use intragratable drug data files to determine third-party payor reimbursement (when using AWP fields), as well as their own acquisition costs (when using WAC fields).

- 28 -

109.    Drug information in other forms is usually not an adequate substitute for the provision of much information obtainable only in intragratable drug data files. For example, a pharmacist filling a prescription can more quickly and reliably check for harmful drug interactions through an instant, automatic check of a drug data file when he or she enters the prescription into the pharmacy's computer system, than through consulting a separate, unintegrated, and less up-to-date information source such as a book or data on a compact disk. Relying on such a separate reference would be more time-consuming and would increase the risk that a harmful drug interaction would not be detected until after the patient purchased and used the drug.

110.    During the 1990's and up to 1998, First Data and MediSpan were substantial, direct competitors within the relevant market of intragratable drug data files in the United States. They faced little or no competition from other firms. Until 1998, two electronic drug databases – First Data's NDDF and MediSpan's MDDF – were used in essentially all electronically-based drug reimbursement transactions in the United States They accounted for billions of transactions each year and many billions of dollars of payments.

111.    Of course, First Data's NDDF and MediSpan's MDDF both contained critical price point data fields for the approximate 65,000 NDCs then active in the marketplace.[3] The retail class of trade relies on these systems for health and reimbursement among the data fields for each active NDC (in the NDDF and the MDDF) information, using the AWP for the associated NDC when seeking reimbursement for drug ingredient cost.

**R.    The Merger of First Data and MediSpan Systems**

112.    In 1998, the Hearst Corporation caused First Data to be merged with the smaller MediSpan. After the merger, First Data began the process of combining its NDDF with MediSpan's MDDF (resulting in a product sometimes known as NDDF Plus). Through this

---

[3] First Data's NDDF also contains historical information and thus, it contains data for almost 200,000 NDCs since many are no longer active in the marketplace.

- 29 -

process, the Hearst Corporation caused First Data to become the sole United States provider of intragratable drug data files, including the publication of electronic drug database pricing information such as the WAC and associated AWP for branded pharmaceutical products. Thus, beginning in or around 1998 and thereafter, virtually every participant in the pharmaceutical distribution chain who used electronic database systems in undertaking reimbursement transactions for billions of dollars of pharmaceutical products used and relied upon the accuracy of data from First Data's NDDF and MDDF, including the published WAC and AWP price fields.

113.    In 2001, the Federal Trade Commission (after a lengthy investigation) brought suit against the Hearst Corporation and First Data claiming, among other things, that the First Data and MediSpan merger had been unlawful. Shortly thereafter, the Hearst Corporation agreed to divest its MediSpan assets, culminating in a consent decree late that year. But by this time, First Data's merger of the NDDF and MDDF, along with changes of personnel and related systems effectuated over the prior three years, was nearly complete. As a result, as part of First Data's divestiture of the MediSpan assets, First Data was required to provide the purchaser of the MediSpan assets with transitional and editorial services for many years into the future.

114.    As a practical matter, pricing data contained in both the NDDF and the MDDF post-divestiture remained the same. Since 1998 and despite the late 2001 divestiture, First Data has functioned as the sole editor of data populating the only available comprehensive intragratable electronic drug data systems (the NDDF and the MDDF) for branded drug pricing information used in the United States for reimbursement transactions in the retail pharmacy channel.

115.    All changes in FDB's electronically published AWPs and WAC-to-AWP spread were the same. The Consent Decree that implemented the Medispan divestiture from FDB required that FDB continue to provide Medispan with all FDB pricing information until Medispan (now called Facts and Comparisons), could develop its own pricing production

001821-16 224376 1

system.  Thus, during the Class Period (from August 1, 2001 to present), when the Scheme effectuated an increase in FDB's published spread, this increase also occurred in Medispan's published prices.  FDB and McKesson knew this would be a consequence of the Scheme.

116.    During the 1990s and up to the end of 2001, both First Data and MediSpan maintained the historical proportion between AWP and WAC when branded price increases were announced.  This enabled the publishers (when receiving, for example, information only regarding WAC changes to a branded drug) to automatically calculate the corresponding AWP. As a result, the marketplace had predictability and marketing pricing dynamics adjusted according to that expected practice.

## S.      First Data Gains the Trust of the Pharmaceutical Industry

117.    Prior to and throughout the Class Period, pharmaceutical End Payors operated on the belief that the AWPs were the result of honest reporting both by pharmaceutical companies, with respect to the publication of their WACs or submission of their suggested AWPs to publishers, and by an empirical and professional analysis undertaken by First Data or Medispan.

118.    The reliance of End Payors upon the accuracy and legitimacy of First Data's data was not only known to First Data, but was the foundation of its business model, marketing and promotion plans.  For example, First Data stated:

> -- "For over two decades, healthcare professionals have come to depend on First DataBank's comprehensive knowledge bases to deliver the timely, accurate drug information they need to support their business and clinical decision-making."
>
> -- "Thus developers can respond quickly to their customers' demands for reliable, easy-to-access drug information, available on multiple platforms.
>
> -- "[First Data:] A partner you can trust."
>
> -- Trusted Drug Knowledge...Comprehensive drug knowledge bases that have been trusted for decades by healthcare professionals – in thousands of installations – to provide the timely, accurate information they need to support their clinical and business decision-making.

119. First Data promoted its pricing information as "accurate," of "high-quality," and as "set[ting] the standard in the healthcare industry for comprehensive coverage of descriptive, pricing and clinical information on drugs." It also recognizes that its pricing information is "relied upon by professionals in th[e] industry," and that, *"[t]o be useful to its audience, First Data's data must be accurate and up-to-date."*

120. In pleadings filed in the *In re Pharmaceutical Indus. Average Wholesale Pricing Litig.*, MDL No. 1456 (D. Mass.), First Data admitted that buyers and sellers in the pharmaceutical marketplace rely on its pricing data: "FDB knows the pharmaceutical industry well and is relied upon by professionals in that industry to report reliable information."

121. Throughout the 1990s, First Data gained the trust and reliance of participants in the pharmaceutical marketplace – most notably pharmacies and the third-party payors that reimbursed them – upon First Data's electronic publication of AWP for each active NDC.

122. Throughout this time, First Data knew, of course, that the primary purpose of publication of the WAC, the AWP, and the associated WAC-to-AWP markup (embedded in the difference between the AWP and WAC data fields), was to serve as an electronic basis for the mass-reimbursement of retail pharmacies for thousands of daily transactions and billions of yearly transactions. After all, First Data acknowledged: "AWP was developed because there had to be some price which all parties could agree upon if machine processing was to be possible." As First Data stated: "AWP represents the average wholesale price: the average price a wholesaler would charge a customer for a particular product. The operative word is *average*. AWP was developed to provide a price at which all parties could agree upon for electronic processing to be possible."

## T.   First Data's Representations to Gain Marketplace Reliance on Its Pricing Data

123. First Data gained this reliance upon the empirical integrity of its electronic publication of AWP due to representations it made to its customers and others in the

- 32 -

pharmaceutical marketplace regarding how First Data populated WAC and AWP information fields.

124. Among other things, First Data held out that its electronic databases contained accurate field information for each NDC's AWP. Emphasizing that as to the AWP the "operative word is *average*" (First Data's emphasis), First Data indicated that its empirically derived information was obtained directly from its specific contacts "within each major drug manufacturer/labelers organization." First Data represented that when it was apprised that the AWPs suggested by manufacturers were also those used by the wholesalers, First Data published as the AWP the exact AWP that had been suggested by the manufacturer. On other occasions, First Data represented that its AWPs were based upon empirically determined markup factors obtained by First Data after it undertook a comprehensive and sound survey. In these situations, while the manufacturer effectively established both price points (the WAC and the AWP, since the manufacturer established the WAC and knew of the existing mathematical markup factor resulting in the AWP), First Data held out that its markup factors had been corroborated through empirical research of wholesalers' actual markup of WAC to AWP.

125. During these years, First Data published information regarding how it derived the markup factors for the WAC-to-AWP spread. This information always emphasized the empirical nature of the data populating its electronic database. Thus, First Data represented:

> -- That industry changes "have made the wholesale survey
> fundamental in maintaining current pricing data";
>
> -- That when a manufacturer had not provided a suggested
> wholesale price for a new product, "wholesaler surveys" were
> undertaken in order to derive an empirically based markup actually
> used by wholesalers;
>
> -- That wholesaler surveys were also undertaken in order "to
> confirm that the markup that First DataBank utilizes for AWP is
> representative of the wholesaler industry";
>
> -- In the early 1990s, First DataBank represented that it "surveys a
> minimum of five drug wholesalers that represent over two-thirds of
> the total dollar volume of drug wholesalers," and that the "number
> of surveys performed is increasing";

- 33 -

This is page 38 of 88.

> -- Throughout the 1990s, and again in order to paint a picture that the markups are empirically derived, First DataBank represented that because "individual wholesalers may markup each manufacturer differently, a weighted average, not a consensus average, is calculated," and that then "the market share held by the wholesalers surveyed affects the markup proportionally," and that thereby "a higher degree of certainty is achieved."
>
> -- While in most cases the "surveys" matched current data, where they did not, "it is the policy that First DataBank will change the markup on file to report marketplace reality."

126.   First DataBank's representations and marketing efforts regarding empirically

driven markup factors obtained by "wholesaler surveys" continued throughout the 1990s. A late-

1990, widely published editorial by First Data regarding AWP pricing stated:

Average Wholesale Price

> I have many conversations regarding what is "AWP" and how does FDB determined [sic] it. There is much folklore and misunderstanding as to the determination of AWP and where we get the data. AWP is the average wholesale price. That is, AWP is the average of the prices charged by the national drug wholesalers for a given product (NDC). The operative word is average. AWP was developed to provide a price which all parties could agree upon for electronic processing to be possible.
>
> *In order to determine the AWP, First DataBank surveys national wholesalers to ascertain what they use as a price basis in their AWP files.* We contact the wholesalers to determine what the markup should be for a new company or to confirm that the markup that we are applying is current. A survey may be performed on a single NDC number or for a manufacturer's entire line of products. In either case, each national wholesaler is surveyed on a number of products from each manufacturer.
>
> *The number of surveys performed is increasing. First DataBank surveys drug wholesalers that represent over two-thirds of the wholesaler total dollar volume.* The markup that First DataBank utilizes is representative of wholesalers on a national level. Because individual wholesalers may mark up each manufacturer differently, a weighted average, not a consensus average, is calculated. That is, the market share held by the wholesalers surveyed affects the markup proportionally. Wholesalers with higher drug dollar volumes have more weight in the determination of the final markup. Thus, a higher degree of certainty is achieved. We also consider the manufacturer's suggested wholesale price (SWP) in our determination.

- 34 -

> Many are under the impression that the manufacturer sets the
> AWP. FDB considers the wholesale price suggested by the
> manufacturer a "Suggested Wholesale Price (SWP)" and has a
> different data element called "SWP" on the NDDF file for those
> customers who chose to use the SWP instead of AWP. Frequently,
> the SWP and AWP are the same; however, we are having more
> instances where they are differing. We will populate the SWP with
> the new markup, but will survey the national wholesalers to
> determine AWP. The AWP will be populated with the wholesaler
> survey price even if it disagrees with the SWP.
>
> In most cases, the results from surveys match what First DataBank
> is using. In the instances that they do not, it is policy that First
> DataBank will change the markup to report marketplace reality.
> (Emphasis added.)

127.    First Data's representations regarding the accuracy of its electronic publication of

AWP were highly successful. By 1998, after its acquisition of its only competitor, MediSpan,

First Data was the sole provider of comprehensive, intragratable electronic data files providing

AWP information throughout the retail pharmacy distribution chain, including most private

third-party payors. Of course, First Data made this known when marketing its products, stating

that it "provides you the same AWP prices used by Aetna, PAID PCS, MEDI, MET, most Blue

Cross Blue Shield Plans, wholesalers and approximately 49 Medicaid programs."

## U.    In the Late 1990s, Retailers Looked to the WAC/AWP Spread to Increase Margin

128.    Also during the 1990s, national wholesalers and drug retailers continued to report

significant declines in margin, despite an overall escalation in drug costs. In order to address

escalating healthcare costs, including the significant rise in prescription drug expenditures, third-

party payors and managed care organizations had, to some extent, placed significant pressure on

national wholesalers and the retail distribution industry, causing widely reported reductions in

wholesaler and retailer margins.

129.    With this increased pressure on margin, retail pharmacies began to look for ways

to stave off the reduction. To insiders in the pharmaceutical industry, it has long been

recognized, as one manufacturer has stated, that "the AWP-WAC spread is the primary

determinant of the end retail pricing of prescription drugs. As a result, changes in the spread will

- 35 -

have a direct impact on retailer profitability as well as drug expenses for not only consumers but even more uniformly for health insurers and other third party payors."

130. Another industry insider stated:

> Payors currently use AWP or average wholesale price as a basis for reimbursing retail pharmacy for providing RX's to patients with insurance and by retail pharmacy as a basis for pricing cash prescriptions. Pharmacy reimbursement – a higher spread translates into higher reimbursement to retailers and mail order pharmacies. The usual reimbursement formula for private third party Medicaid RX's in anchored off of AWP – so a higher markup will increase the reimbursement level at least in the short term.

131. In 1998, McKesson tested the waters to see whether an increased WAC-to-AWP spread might help its relations with its retail customers. In March 1998, McKesson announced that it would begin utilization of First Data's AWP. McKesson and First Data knew – along with a few of the national chain drug retailers – that many of First Data's AWPs, and the timing of the reported AWPs, were often, albeit marginally, higher than other publications. While the stated purpose was to provide customers "with consistency in AWP pricing," McKesson made clear to its retail pharmacy customers "that in almost every case retail prices will go up helping increase gross profit." McKesson even instructed its retail customers regarding how to electronically access the changed "markup percentages" to access increased gross profits earned at the expense of plan sponsors and consumers by shifting to First Data's publication of AWP.

132. Following McKesson's switch to exclusive use of First Data data, a handful of the largest national chain drug retailers continued to push for increased AWP/WAC markups on drugs, including increased WAC-to-AWP markups for branded drugs that were not already at the 25% level. In and around 1999, national chains and retailers requested increased AWP spread for branded products. Some of them engaged in practices to ensure that the increased markups would occur. For example, some large retailers refused to stock drugs that had therapeutic equivalent products if the product only had a 20% markup. Thus, these more powerful retailers could lock out the products unless the AWP/WAC spread was adjusted upward.

- 36 -

## V.  By 2001, First Data WAC-to-AWP Markups Were Susceptible to Abuse

133.  By late 2001, the First Data editorial process for imputing the WAC/AWP

markup factor for numerous NDCs of retail branded drugs was susceptible to manipulation by

First Data and those with whom it worked, most notably McKesson. Although First Data held

out to the public that its determination of the WAC/AWP markup factor was empirically driven

through multiple sources, in truth there was no empiricism.

134.  Many of First Data's historical claims about its determination of the WAC/AWP

markup were simply false. For example:

> -- Although First Data claimed that because "individual
> wholesalers may markup each manufacturer differently, a weighted
> average, not a consensus average, is calculated", in fact First Data
> never undertook weighted averages of reported markups. Thus,
> First Data's publications over a decade had falsely claimed
> mathematical precision on empirical data for the markups.
>
> -- Although First Data claimed that it undertook "surveys" , in fact
> no "surveys" in the reasonable sense of that word were undertaken.
> First Data's questions were not set forth in a survey design, nor
> were they even in writing. Responses received were not
> memorialized in writing. No other paper trail was kept.
>
> -- The purported "surveys" undertaken by First DataBank rarely
> occurred. When a inquiry was made, it was a momentary phone
> call lasting only a few moments.
>
> -- Although First Data claimed, during the 1990s, its surveys were
> "increasing" in fact the "surveys" were was decreasing given the
> ongoing consolidation among national drug wholesalers.
> Moreover, First Data was not taking a calculated average of the
> markups reported. Instead, it only used a "consensus" approach
> which did not require a response from all the major national
> wholesalers.
>
> -- During most times during the 1990s, even the wholesalers that
> were "surveyed" apparently did not know that they were being
> surveyed. Since the wholesalers themselves purchased their
> information about AWP from First Data itself, most found circular
> at best the notion that First Data would "survey" them to find out
> AWP information that the wholesalers themselves had already
> purchased from First Data.
>
> -- By around 2000, only a few national wholesalers existed and
> were on the short list for First Data "surveys." Most of these
> wholesalers professed never to have participated in First Data

- 37 -

"surveys" at any time.  By the end of 2001, it appears that virtually all communications by wholesalers back to First Data regarding the WAC/AWP markup and/or AWP generally were expressly prohibited by management with the singular exception of McKesson.

135.    First Data continued to mislead its customers and the public about the nature of its

AWP and WAC-to-AWP markup data.  For example, in a 2002 letter to subscribers of its

publication Price Alert, First Data's Kay Morgan, Manager of Product Knowledge Base

Services, describes AWP as follows:

> I have had many conversations regarding what "AWP" is and how First Data determines it.  There is much folklore and misunderstanding as to the determination of AWP and how we obtain the data.
>
> AWP is the average wholesale price.  That is, AWP is the average of the prices charged by the national drug wholesalers for a given product (NDC), often referred to by First Data as the "Blue Book Price."  The operative word is *average*.  AWP was developed to provide a price, which all parties could agree upon.
>
> In order to determine the AWP, First DataBank surveys national wholesalers to ascertain what the price is.  This is based on their AWP price files.  We contact the wholesalers to determine what the markup should be for a new company.  ***First, DataBank then confirms that the markup is accurate and current***.  A survey may be performed on a single NDC number or on a manufacturer's entire product line.  In either case, a survey will be performed with all national wholesalers to determine the appropriate AWP.
>
> ***With increased numbers of surveys done, the determination represents over two-thirds of the volume of the wholesalers, and is also representative of wholesalers on a national level***.  Because individual wholesalers may mark up each manufacturer differently, a weighted average, not a consensus average, is calculated.  That is, the market share held by the wholesalers surveyed affects the markup factor proportionally.  Therefore, wholesalers with higher drug dollar volumes have more weight in the determination of the final markup.  Thus, a higher degree of certainty is achieved.  We also consider the manufacturer's suggested wholesaler price (SWP) in our determination.  [Emphasis added.]

136.    This 2002 publication, mimicking the similar 1991 First Data publication of

eleven years earlier, maintained most of the falsehoods about First Data.  On its 2002 website,

- 38 -

First Data again claimed that its published AWPs result from *surveys* of national wholesalers and that the number of surveys was "increasing."

## W.    Implementation of the Five Percent Spread Scheme

137.    On the eve of the McKesson and First Data Scheme, McKesson observed that: "[E]verything was straight forward for many years. Manufacturers' product lines were very consistent in their markups, and so were the FDB AWP's." This would soon change.

138.    The genesis of the conspiracy to raise the WAC-to-AWP markup was McKesson's desire to raise the markup or the AWP to "support our customers." MCKAWP 0068514. By "support" McKesson meant an increase in the margin earned by its retail clients. Thus, in September 2001, McKesson's Robert James reported in an internal e-mail (now marked "Highly Confidential" by McKesson) that McKesson chose to increase "the markup on the Park-Davis line (Lipitor) last January, when Pfizer took over. This was our attempt to raise AWPs to support our customers."

139.    Shortly after his September 2001 e-mail, Robert James approached FDB to discuss FDB's willingness to "normalize the brand product AWPs." MCKAWP 0068599 (marked "Highly Confidential"). "Normalization" became one of the buzzwords used by McKesson and FDB to describe their manipulation of the WAC-AWP spreads on hundreds of brand-name drugs.

140.    As one of the largest national wholesalers, McKesson knew it had "an opportunity to 'normalize' AWP spreads on brand pharmaceuticals at a 25% markup (or 20% spread)" and, if it were to succeed, that "most [of its] customers would love it." MCKAWP 0068514. McKesson also knew it would not be difficult to impose its suggested sell prices on First Data's published AWPs for use in drug reimbursement because First Data's "wholesaler surveys" consisted of nothing more than a brief phone call or e-mail. Initially McKesson merely changed its suggested sell price "in the hopes that one of the other wholesalers happens to raise their markup on an item (maybe due to pressure from retail customers), and FDB happens to resurvey

- 39 -

the items." MCKAWP 0068514. But when the competition did not respond as expected, or First Data failed to survey the change as quickly as hoped, McKesson decided to take direct action.

141. McKesson was aware that First Data had a virtual lock on the determination of AWPs because it was one of only two electronic sources for price information. Although it was "not widely known," McKesson knew that First Data had "a contract with the Medispan group [the only other electronic pricing source] requiring that FDB supply the data over the next 3 or 4 years [*i.e.* through 2005 or 2006]. This means that essentially the Medispan data is the First DataBank data."

142. In August 2001, despite McKesson's knowledge that AWPs were supposed to be the result of publishers' surveys of actual wholesale prices, McKesson and FDB "mutually agreed" to move the AWP or WAC-to-AWP spread on all Searle products from 20% to 25%. Thereafter, McKesson and First Data agreed to implement a fundamental change in the WAC-to-AWP markups for branded drugs of all major manufacturers.

143. That Defendant McKesson and First Data's collusion began as early as August 2001 is documented by an internal memorandum drafted by Robert James, McKesson's Director of Brand Pharmaceutical Production Management, stating:

> After a discussion with FDB last August [2001], we mutually agreed to standardize Searle (16⅔% spread) product line because it had been acquired earlier by Pharmacia (20% spread). There seemed to be momentum in the industry to move to a normalized markup of 25% on brand Rx products. In December [2001], after several discussions with FDB about our [normalization] strategy we began to move many of the manufacturers with mixed spreads (16⅔ and 20% products in the same line) to a consistent 25% markup. These were companies like GlaxoSmithKline,[4] AstraZeneca, Aventis, Berlex, Bristol Myers Squibb, Merck, JOM, and 3M, Forest, Novertis, Roche, Schering and several others. These were mixed product lines and we just set their Suggested Sell Prices at a consistent 25% markup.
>
> First DataBank re-surveyed most of these companies during January and February when price increases occurred. Many of the

---

[4] GlaxoSmithKline ("GSK") wrote on March 1, 2002 to First Data asking it to explain the "unexpected change" which led First Data to list GSK products with a 25% markup. FDB-AWP 053695.

- 40 -

> AWP's have been increased by FDB. Because a large number of
> price increases occurred, some AWP's were affected twice, once
> when the price increase[] took effect and then a second time when
> FDB raised the AWP after the survey process.... Not all products
> in these companies have had AWP increases at this point in time.
> However, as price increases occur FDB will re-survey those
> products and make their determination.

MCKAWP 69608-09.

144.     Beginning sometime in late 2001 or early 2002, First Data and McKesson agreed
to utilize for markup purposes data received solely from McKesson. At the same time and as
part of a common plan, McKesson implemented a 5%[5] increase in the WAC-to-AWP markup for
hundreds of brand-name drugs that it distributed. This increase was from 20% above WAC to
25% above WAC for the affected drugs. As part of their price fixing agreement, and their
agreed-upon course of conduct and common plan, First Data then published new figures for
hundreds of brand-name drugs without contacting any other wholesaler. First Data continued to
publicly state that it contacted more than one wholesaler to obtain a "weighted average." First
Data knew that this across-the-board increase from 20% to 25% was not due to any real
economic change in the average wholesale price, and that by publishing this increase, it was not
providing "reliable" and "accurate" information as it had promised. McKesson for its part knew
that the 5% increase was not justified by any change in the price of drugs or any other change in
the marketplace. Rather, McKesson implemented this 5% increase solely to benefit its own
pharmaceutical business and the business of its prominent retail pharmacy clients.

145.     By November 2001, FDB's Kay Morgan, and McKesson's Robert James, were
exchanging e-mails confirming the results of their collaboration: "Hello Kay.... Just went
through the Merck items and updated a couple of our items to 25% markup. However, found
some items that you might want to review. They include Noroxin's Prinvil and Prinzides. The

---

[5] Sometimes the increase was more than 5%, as the intent was to raise all markups to 25%. So if a drug was at
18%, it was moved up to 25%.

latter two should probably be consistent with the new AZ 1.5 markups." MCKAWP 0068621

("Highly Confidential").

146.    McKesson's own internal documents describe the profitability of increasing

spreads for its key customers. Thus, McKesson noted the following:

> Here are a few examples of increased profits that our customers
> should be realizing now and into the future. The following results
> are based on a reimbursement formula of AWP minus 15% plus a
> $2.00 fee.

| | Old 16 ⅔% spread | New 20% spread |
|---|---|---|
| Lipitor 20mg 90's | $6.86 | $17.18 |
| Prilosec 20mg 30's | $4.22 | $8.92 |
| Allegra 60mg 100's | $3.97 | $8.16 |
| Advair Diskus 500/50 60dose | $5.11 | $11.70 |
| Befaseron (previously a flat $7.00 fee) | $20.00 | $58.25 |

Most would agree that these improvements are extremely significant. MCKAWP 0069609.

147.    In December 2001, FDB and McKesson engaged in "discussions" that resulted in

an increase in the markups of companies "like GlaxoSmithKline, AstraZeneca, Aventis, Berlex,

Bristol Myers Squibb, Merck, JOM, and 3M, Forest, Novartis, Roche, Schering and several

others." MCKAWP 0069608.

148.    McKesson's collaboration with First Data was highly effective. In March 2002,

Robert James reports:

> My guess is that things should look very good in the next couple of
> months. I am working with FDB to point out problem suppliers as
> Erlinda's group [Business Information Services] provides me with
> weekly information comparing our List price with the FDB
> AWP.... [The] results should have a very positive impact on our
> customers['] profitability.

MCKAWP 0042663. In April he reports that First Data gave up all pretense of conducting a

survey for new products: "All new brand vendors will be set up as 1.25 markup factor vendors,

both at McK and FDB." MCKAWP 0069616.

- 42 -

149.    As intended by McKesson and FDB, the increase in the WAC-to-AWP spread directly resulted in higher prices to Plaintiff SFHP and members of the Class.  For example, in the case of AstraZeneca's Prilosec (as reflected in the chart below), the AWP spread increase raised the AWP for that drug by $295.72.  The following chart reflects, for a single drug manufactured by certain companies, the AWP spread increase and related AWP increase:

| Manufacturer | Drug | AWP Before 2000 | WAC Before 2000 | AWP Spread Before 2000 | AWP After 2000 | WAC After 2000 | AWP Spread After 2000 |
|---|---|---|---|---|---|---|---|
| Abbott | Biaxin 500 mg #60 | $396.72 | $334.08 | 18.8% | $437.98 | $350.38 | 25% |
| AstraZeneca | Prilosec 40 mg #1000 | $6,171.66 | $5,143.05 | 20% | $6,621.67 | $5,297.34 | 25% |
| Aventis | Allegra 60 mg #100 | $118.36 | $98.63 | 20% | $123.29 | $98.63 | 25% |
| BMS | Tequin 400 mg #100 | $818.86 | $682.27 | 20% | $895.48 | $716.38 | 25% |
| GSK | Combivir #100 | $1,241.26 | $1,034.38 | 20% | $1,370.55 | $1,096.44 | 25% |
| J&J (Janssen) | Risperdal 2 mg #500 | $2,320.10 | $1,933.42 | 20% | $2,535.20 | $2,028.16 | 25% |
| Novartis | Exelon 2 mg/ml | $246.96 | $205.80 | 20% | $267.29 | $213.83 | 25% |

150.    Another way to understand the widespread nature of the change in the WAC-to-AWP markup as a result of the McKesson-First Data agreement is to examine the change in the WAC-to-AWP markup of all drugs manufactured by the following illustrative pharmaceutical manufacturers over time:  The increases, all occurring in hundreds of drugs, among multiple manufacturers, at the same time, could not have happened by chance or independent conduct, but instead are the result of a common plan.

- 43 -

## Number of NDCs Experiencing an WAC/AWP Spread Change from 20% to 25%









001821-16 224376 1





001821 16 224376 1



151.   Examining the Scheme on an annual basis also illustrates the timing and extent of the Scheme's implementation:



- 47 -

152.    The dramatic across-the-board increase in the spread on hundreds of brand-name drugs was implemented pursuant to the joint Scheme between McKesson and First Data. As noted, McKesson reported the WAC-to-AWP increase to First Data, and First Data in turn agreed to report the new AWPs.

153.    First Data was aware that the markups McKesson reported were inflated to improve relations with McKesson's customers – the pharmacies – by increasing their profits. Around August 2001, McKesson discussed this with First Data. Moreover, in February 2002, Rohert James sent Kay Morgan a document he drafted entitled, "AWP Discussion," explaining that 20% markups "had a negative impact on McKesson's customers' profitability," and that "McKesson has chosen to 'normalize' the markups in the Brand Rx area resulting in a consistent 25% markup or use of the 1.25 factor." MCKAWP 0069613. Later, on May 1, 2002, Rohert James wrote to Kay Morgan about the "normalizing process," the term McKesson coined to refer to its efforts to impose a uniform 25% markup on all brand prescription drugs. MCKAWP 0069642. In an July 2002 e-mail sent to Alicia Nielson, First Data's Senior Research Associate, Product Knowledge Base Services, Robert James enclosed a prior internal communication in which he explained that McKesson had "been normalizing all Brand Rx mark ups at 25% for the suggested sell price." MCKAWP 0069775. First Data enthusiastically embraced the "normalization" program, as reported in the following Aventis March 11, 2002 e-mail from Guerdon Green, Director of Trade Administration & Development at Aventis:

> First Data Bank has advised me after surveying the wholesalers,
> they feel that there are very few manufacturers that still have a
> 20% AWP to WAC spread [sic, markup]. As a result, First Data
> Bank has determined to employ a higher 25% AWP to WAC
> [markup] for all Aventis products. This will be implemented as we
> have price increases. Immediately *the entire Allegra line will be
> moved to a 25% [markup] from its current 20%.* This will be
> effective immediately. The most noticeable impact will be that it
> will be more profitable to the retail pharmacist to dispense Allegra.

154.    First Data ceased consulting and/or receiving pricing information from any other wholesalers and relied entirely on the information that McKesson provided it to determine

- 48 -

AWPs. McKesson was aware that First Data routinely disregarded manufacturer's suggested sell

prices – Kay Morgan frequently shared such snubs with her friend Bob James:

> Let's start a list of the hated manufacturers, we will update it
> weekly or monthly. Today, Organon is the top of my list. The
> person in charge of EDI is trying to tell me to put O in the first
> position. McKesson and we have it wrong. Wound up telling her
> that the world does not turn around Organon and sending a note to
> my contact telling him the product was coming off.

MCKAWP 0069586.

\* \* \* \* \*

> [in response to an e-mail from Gilead Sciences announcing that it
> would not longer report AWPs for its products and requesting that
> any publication of an AWP calculated by First Data be
> accompanied with the statement that the price was not authorized
> by Gilead, Kay Morgan writes:] Wonderful. If we don't report an
> AWP, the NDC will not be listed. It is the rules of the database....

> [to Bob James] FYI –Just thought you should be aware. They
> appear to be playing hardball and I just don't play.

MCKAWP 0001183.

155.    Before 2000, McKesson estimated that only 20% of the prescription drug

manufacturers were 25% mark-up companies. MCKAWP 0069502. By early 2002, however,

McKesson estimated that, through its efforts, 90% of the industry had turned to the 25% markup.

MCKAWP 0069609. By late 2002, McKesson estimated that the number had increased to 95%.

MCKAWP 0069502. In 2004, McKesson estimated that 99% of the prescription drugs were set

at a 25% markup. MCKAWP 0069766. McKesson acknowledged that without its efforts, "the

AWP's most likely would not change," MCKAWP 0069732, and that the industry shift

"probably speaks to First Data Bank's willingness to work with us to normalize the brand

product AWPs." MCKAWP 0068599. Thus, McKesson knew the Scheme had impacted public

and private end payors throughout the country in the form of higher prices.

## X.     McKesson's Purpose in Implementing the Scheme Was to Curry Favor with Retailers and Gain a Competitive Advantage Over Other Wholesalers

156.    McKesson had a motive to implement this Scheme. Pharmacies are reimbursed for drugs by health plans and other pharmacy benefit providers based on AWP. Consequently, pharmacies make a profit on the spread between AWP and the actual acquisition cost for the drug. Under this system, a higher WAC/AWP spread results in increased profits to pharmacies. Thus, McKesson and First Data, by operation of the Scheme, benefited retail pharmacies. The Scheme also benefited PBMs (Pharmacy Benefit Managers), particularly those who operate by mail order, by allowing them to make increased profit off the spread. As set forth below McKesson's major client base on many levels of its business are retail pharmacies. The scheme was highly beneficial to such clients and as outlined below pleasing these clients was a major objective, that McKesson believed would provide it with an advantage over its competitors.

157.    For several years many of the major retail pharmacies had jointly approached various pharmaceutical manufacturers and urged that they raise the WAC/AWP spread by 5%. The manufacturers did not do so. On information and belief, these same retailers then urged McKesson to do so. Unlike drug manufacturers, McKesson had a strong financial incentive to cooperate with retail pharmacy clients. This incentive was one of the motivating factors for McKesson in terms of implementing the Scheme:

        (a)     McKesson lost considerable goodwill with retail pharmacies, including Rite Aid, in about 1989, when it still owned a majority interest in PCS, one of the largest PBMs at the time (currently Caremark/CVS) and a company that was causing a lot of friction with McKesson's customers. At a time when most pharmacies were selling prescriptions drugs at or about AWP, PCS demanded that pharmacies accept compensation at AWP-10% or lower.[6] Some chains, including Rite Aid, dropped PCS plans because of the decreased reimbursement,

---

[6] *See, e.g., Rite Aid to PCS: No Pay, No Play - Pharmaceutical Card Systems,* DRUG STORE NEWS, Feb 6, 1989, available at http://findarticles.com/p/articles/mi_m3374/is_n3_v11/ai_9229474; SUSAN BALL, *Where will Mck's Buyout of PCS Lead?* DRUG STORE NEWS, Jan 22, 1990, available at http://findarticles.com/p/articles/mi_m3374/is_n2_v12/ai_8568189.

and many disgruntled pharmacists, particularly independents who used McKesson as their drug wholesaler, turned to McKesson to resolve the conflict.[7] McKesson's erstwhile director of public relations, James Cohune, acknowledged the inherent conflict between McKesson's role as wholesaler and PBM owner and assured its primary customers (retail pharmacies) that it was on their side:

> "Our role as their primary supplier is in direct conflict," Cohune said. "We're both the buyer and the seller, we're aware of the problem and *we're trying to create an environment in the industry to raise the compensation rate for pharmacists.*"[8]

(b)     In recent years, the wholesale drug industry (including McKesson) and retail pharmacies have been economically threatened by the managed care industry. McKesson, as have other wholesalers, has seen its relationships with retail pharmacies as a key to its future. In this regard, over the past five years, the wholesale drug industry and McKesson have sought to compete by downplaying their traditional product distribution functions and by developing new programs to strengthen their retail pharmacy customer base. These include dozens of specialized services ranging from departmental "planogramming" to special contract administration programs for buying groups. The provision of these value-added services is a key element in the campaign by drug wholesalers like McKesson to build customer loyalty in retailers to help them shore up their own sagging profit margins. McKesson offers dozens of value added programs to retail pharmacies, including technology and care management solutions offered to "25,000 retail and 5,000 health systems pharmacies nationwide."[9] McKesson's customers for these programs include "large national chains and community drugstores, as well as hospital pharmacies,

[7] *McKesson Publishes Ad Explaining PCS Relationship - Response to Controversy over Discounted Average Wholesale Price as Reimbursement in Third-Party Prescription Plans*, DRUG STORE NEWS, Feb 20, 1989, available at http://findarticles.com/p/articles/mi_m3374/is_n4_v11/ai_9335744.

[8] *Id.* (emphasis added). McKesson took the immediate step of buying all outstanding shares of PCS, making PCS a fully owned and controlled subsidiary of McKesson, and replacing PCS management. *Supra.* BALL. McKesson's CEO also stepped down in the wake of this controversy. PAMELA MECK, *Field Resigns from Mck; Long-Term Impact Unclear*, DRUG STORE NEWS, Sept 25, 1989, available at http://findarticles.com/p/articles/mi_m3374/is_n18_v11/ai_7981031.

[9] McKesson website: http://www.pharmaceutical.mckesson.com/wt/home.php.

- 51 -

outpatient clinics, and other institutional providers."[10] By causing First Data to report a higher AWP, McKesson curried favor with retailers who used McKesson as their wholesaler. As noted in McKesson's 2004 Annual Report, in recent years a significant portion of its revenue growth came from large customers, including large retail pharmacy chains like Rite-Aid. Rite-Aid represented 8% of McKesson's 2003 revenues. In 2003, Rite-Aid named McKesson its wholesaler of the year. In a 2003 article in Chain Drug Review, McKesson executive Pat Blake described McKesson and retailers as "we're really positioned to be a business partner" due to the company's automation and information technology offered to retailers as well as its Access Health Programs linking retailers with third-party payors. Indeed, Rite-Aid was one of the companies that had asked, without success, certain drug manufacturers to increase the WAC/AWP spread by 5%. McKesson agreed to the 5% Scheme when the manufacturers apparently would not (notwithstanding the manufacturers' own inflation of AWPs and WACs for drugs specified in the ongoing AWP litigation and their, at a minimum, acquiescence to the results of the Scheme). McKesson offered large retail pharmacy chains a chance to make a profit off the increased spread.

(c)     On several occasions McKesson implemented the Scheme at its customer's direction or request and was proud of it. For example, in September 2002, Bartell Drug complained that an "entire line is low … even the generic side.… Kill them." McKesson responded by stating that as a follow up: "Celexa and Lexapro will have an AWP markup of 25% or a spread of 20% as FDB information is updated. Look for change to happen next week." MCKAWP 0069817. McKesson closed by telling Bartell "keep smiling [sic] … and who said we never listen to our customers and old friends." Thus, the 5% Spread Scheme was a direct benefit to McKesson's largest clients, many of whom, like Bartell's, had previously approached the drug manufacturers seeking imposition of the 5% increase.

---

[10] *Id.*

(d)     Internally McKesson calculated how it could pitch the Scheme's benefits, new AWPs and larger spreads, to obtain large retail accounts. So, for example, the following was the pitch to one account:

> WAC x old markup of 1.20 ($16^{2/3}$ spread) 19,582,854 (old AWP)
> ... = \$326,381 Profit

> WAC x new markup of 1.25 (20% spread) = 20,398,806 (new
> AWP) ... = \$1,019,940 or **3 times the profit as before**.

MCKAWP 0068312 (bold in original). This benefit was the result of the "FDB process," *i.e.,* the Scheme at work and again evidences McKesson's knowledge and intent that the Scheme would injure private and public payors in the form of higher prices.

(e)     McKesson's "Blue-Chip" customer base includes retail national chains such as Rite-Aid, Eckerd, Brooks, Albertson's, Safeway and Giant Eagle. Other "Blue-Chip" clients included "retail small chains," such as Bartells, Bi-Mart, A&P and Haggen. All of these blue-chip accounts benefited from the spread and McKesson touted its role in increasing the spreads.

158.   First Data also saw advantages to participating in the 5% Scheme:

(a)     First Data agreed to this Scheme because it had an interest in perpetuating AWPs as an industry pricing benchmark, and because wholesalers other than McKesson were unwilling to provide First Data with pricing information on which to base published AWPs. By agreeing to adopt McKesson's markups, First Data could perpetuate the illusion that it was still "calculating" AWPs based on industry input, when in fact it was allowing McKesson to completely redefine retail pharmacy profit margins on brand name drugs. Indeed Alisha Nielson of First Data, who worked alongside of Kay Morgan to determine AWPs, testified that even though First Data was not receiving markup information from the other wholesalers, she believed that they had adequate information on which to base their AWPs because

> ... we had reached out to other companies, we were not getting
> information from them, we addressed it as being an issue. Kay
> had taken it up [with senior management]. We knew that the
> policy was going to be eventually changed into the new pricing

001821-16 224376 1

> policy that is in place today. So until that had changed, we
> acquired information from the company that we could receive it
> from.
>
> Q    And that was McKesson.
>
> A.    Correct.

Nielson Dep. at 100:3-19.

(b)    Second, at some point in 2002-2003, certain manufacturers who were angry at the bump in the WAC–to–AWP spread, refused to provide First Data with pricing information. If First Data publicly revealed that certain manufacturers were disavowing the current WAC-to-AWP spread, the use of the AWP system could be threatened which in turn would threaten, if not eliminate the use of First Data's published prices. By participating in the Scheme and continuing the illusion of surveys, First Data maintained the demand for its services.

## Y.    McKesson/First Data Collaborate to Hide the Scheme

159.    McKesson and First Data also agreed to hide the price fixing Scheme by implementing the WAC-to-AWP increases only when the manufacturer increased WAC. McKesson and First Data were fearful to implement the Scheme without such an increase because such action "would trigger a lot of questions on why there was a change to the item when the MFG (manufacturer) hasn't sent any price changes." MCKAWP 0071440. To avoid having end payors ask questions, McKesson and First Data camouflaged the Scheme by imposing the 5% increase when other price changes were reported, thus in effect compounding price increases. This part of the Scheme is depicted by the following chart showing a dramatic increase in the number of 25% spreads associated with price changes in 2002 and 2003:

- 54 -



160.    After the Scheme was implemented, and despite the flak from some drug manufacturers, First Data and McKesson continued their collaboration to ensure that First Data's WAC/AWP markups mimicked those of McKesson, and vice-versa. In their efforts to effectuate the Scheme, McKesson conducted weekly comparisons of its list prices and First DataBank's published AWPs. Moreover, McKesson and FDB regularly communicated to "point out the problem suppliers." MCKAWP 0042663.

161.    These post-2001 communications were in no sense a First Data "survey." Indeed, the communications were bilateral, with First Data equally enforcing the new WAC/AWP markup protocol. And even when disparities arose in the databases, First Data would counsel against making changes because "it would trigger a lot of questions on why there was a change to the item when the MFG [*i.e.*, manufacturer] hasn't sent any price changes." MCKAWP 0071440.

162.    At times, when McKesson was "catching some flack from our large retail friends," McKesson would ensure that both it and First Data's databases contained the higher

- 55 -

WAC/AWP markup. MCKAWP 00001169. At other times, a large national chain pharmacy would call "complaining about" the particular AWP for a product, and McKesson, in turn, would contact First Data in order to get it "fixed." MCKAWP 00001168.

163.    Other facts evidence McKesson's desire to hide the Scheme. When Brian Ferreira of VPS Retail wrote to Robert James, asking him to "[p]lease provide the list of items and/or manufacturers that were included in the AWP standardization process," James knew better than to respond to the request in writing, instead responding: "Brian, this is an interesting request.... Please give me a call when it is convenient." MCKAWP 0069714. McKesson knew that if it did not keep its manipulations of the AWPs a secret, there would be serious repercussions:

> Confidentially. Not to pass on. We have [only] about 470 brand Rx items

> \* \* \* \* \*

> [John Bonner, Director, McKesson's Branded Rx Product Management and Investment] Bob James is working with FDB to make this happen over time and I'm not sure it is something we want discussed. Please contact him before discussing outside the company.

MCKAWP 0066465.

> [Bob James] For obvious reasons we don't want to write a memo and send it out because it would not be kept confidential.

MCKAWP 0069591.

> [Bob James to McKesson field associate] I would be careful about 'being ahead of the curve with Lilly. You be the judge on how your customer will interpret.

MCKAWP 0069594.

> [McKesson field associate writing to John Bonner] My accounts are having issues with us 'Normalizing brand pricing at 25%'.... You also mentioned that we should not discuss [this] outside of McKesson. how would you suggest we answer our customers['] questions?

MCKAWP 0066464.

- 56 -

[McKesson field associate] Obviously this is not out to the field.

MCKAWP 0069732.

> [Bob James] Sorry for the extra confusion and questions that have
> come up from our customers. The (unintended consequences)
> results [of the normalization process] should have a very positive
> impact on our customers['] profitability.

MCKAWP 0042663.

164.    First Data also knew the importance of keeping the Scheme a secret. In response
to an e-mail inquiry regarding whether electronic drug pricing publishers were increasing the
AWP/WAC spread, Kay Morgan denied any involvement, adding, "I am most curious as to the
source of this rumor. First Data has always used a wholesaler survey to determine AWP."
MCKAWP 0069588. She forwarded on the exchange to Bob James at McKesson, stating, "I
thought you might want to see my answer," to which he responds: "I love it!  You are the best."
*Id.*

165.    When in 2003 one manufacturer indicated that it would "no longer report average
wholesale prices (AWP) for its products," First Data reported to McKesson that this
manufacturer appeared "to be playing hard ball and [First Data] just won't play." First Data
indicated that it would, then, "just assume the markup is 1.25." In this situation, when the
manufacturer wanted to be assured that any disclosure of an AWP associated with its product
was a price that "has not been authorized" by it, First Data wrote back stating: "Wonderful.  If
we don't report an AWP, the NDC will not be listed. It is the rules of the database. That
database does not allow for statements such as your attorneys wrote below."
MCKAWP 0001183.

166.    First Data's participation in the Scheme is also evidenced, in part, by its conduct
with respect to AWPs reported to First Data from certain manufacturers. For example, in *In re
Pharmaceutical Indus. Average Wholesale Pricing Litig.*, MDL No. 1456 (D. Mass.), Novartis
filed declarations stating that Novartis regularly communicated its AWP to the publishers,
including First Data and that for the period March 27, 2000 through August 21, 2002, the AWP

- 57 -

published for its drugs was 20% higher than the WAC Novartis reported. Novartis then stated in its declaration that, since January 18, 2002, First Data consistently published an AWP that was 5% higher than the AWP reported by Novartis, or 25% over WAC. The Novartis declaration, however, did not describe anything Novartis had done to remedy First Data's fraudulent reporting of Novartis' AWP.

**Z.      Some Branded Manufacturers' Response to the McKesson/First Data Scheme**

167.    Some branded manufacturers noticed implementation of the Scheme and immediately appreciated its purpose – to provide additional profit to retailers in the pharmacy class of trade. One branded company commented that "First Data, at the direction of the wholesale industry, has begun to change all branded pharmaceutical products to a 25 % markup" and that "the spread will be changed as product price changed[.]" The same company observed that the "largest negative factor is publicity" since the increase in AWP would increase End Payors' prices. AZ0463636.

168.    A different branded manufacturer also observed that the changed WAC/AWP markup for many branded drugs was being driven at wholesaler level and that the changes would be "implemented as we have price increases." AV-BCA -0010336.

169.    Because branded and generic manufacturers have historically established AWPs for their NDCs either directly (by suggesting an AWP that was incorporated by First Data and wholesalers) or indirectly (by setting a WAC and setting or knowing of the markup factor to be applied to that WAC), manufacturers whose NDCs had been affected by the McKesson/First Data Scheme asked First Data for answers as to why the markups had changed for selected branded products in 2002. In response, First Data generally pushed them off, giving different answers to different manufacturers. To make matters worse, First Data had counsel for its parent, the Hearst Corporation, write letters to various branded manufacturers' representatives. In these letters, Hearst's lawyers made claims which were false.

170.    Ultimately, brand-name manufacturers acquiesced to the results of the
McKesson/First Data Scheme. Moreover, branded manufacturers took no action to disclose the
existence of the inflated AWPs which had been effectuated by the Scheme to change the
WAC/AWP markup. As a result, while First Data and McKesson as insiders to the Scheme were
well aware of the changed markup factor (and corresponding increase in reimbursement
payments being made throughout the country), and while some branded manufacturers were
similarly aware that many of their branded products had experienced the WAC/AWP markup
change without their explicit request, none of them disclosed this to the marketplace at large.
Indeed, some manufacturers republished or utilized the new First Data AWPs in communications
to customers or other publishers. In a market where billions of prescriptions are filled each year,
where over 65,000 NDCs are actively in the marketplace, and where the WAC/AWP Scheme
was sequentially implemented during the course of 2002 and later as price increases imposed by
the manufacturers were effectuated, the Scheme went unnoticed by the marketplace at large.
Indeed, even when players in the pharmaceutical marketplace noticed the increases in the
WAC/AWP spread, they assumed by virtue of the manufacturers' silence that those increases
were the result of the actions of those manufacturers.

## AA.    First Data's March 2005 Announcement

171.    Then, in a March 15, 2005 letter, First Data announced that the unreliable surveys
would be discontinued. Reviewing its past practices with respect to establishing AWP, First
Data restated that it had conducted surveys to establish AWPs:

> March 15, 2005
>
> ### Re:  First DataBank's Blue Book AWP Data
>
> Dear Customer:
>
> It is our pleasure to serve you as a customer of First DataBank.
> We are writing to make you aware of upcoming changes to First
> DataBank's National Drug Data File Plus™ database, or NDDF
> Plus™, that may impact your use of our products.

In order to publish various drug pricing data fields available through its NDDF Plus database and related products, *First DataBank has historically relied on drug manufacturers and wholesalers to report or otherwise make available information concerning their list price for drugs.* Unfortunately, First DataBank is no longer able to obtain information relating to list prices directly from wholesalers in a manner that is consistent with First DataBank's editorial standards and policies. In fact, it is our understanding that some wholesalers often do not use catalog or list prices as a basis for determining actual transaction prices. As a result, First DataBank must implement certain changes to its publication of the "Blue Book AWP" pricing data field. Effective immediately, First DataBank will no longer survey drug wholesalers for information relating to their catalog or list prices.

First DataBank historically relied upon wholesalers to provide information relating to their catalog or list prices for purposes of publishing the Blue Book AWP data field. *First DataBank periodically surveyed full-line national wholesalers to determine the average markup applied to a manufacturer's line of products. The average markup of the wholesalers responding to the survey was applied against the Wholesale Acquisition Cost (the manufacturer's list price to wholesalers, also commonly referred to as WAC)* or, if a Wholesale Acquisition Cost was not available, the Direct Price (the manufacturer's list price to non-wholesalers), with the resulting value populating the Blue Book AWP field. In certain instances, wholesalers would accept a manufacturer's suggested wholesale price, in which case the Blue Book AWP and Suggested Wholesale Price data fields would reflect the same value. [Emphasis added.]

## BB.   Fraudulent Concealment By McKesson And First Data

172.   The conspirators, McKesson and First Data, cleverly hid their conduct behind

FDB's confidential survey process to avoid detection and to preserve for as long as possible the

benefit they had conferred to McKesson's pharmacy customers and other pharmacies. FDB

continued to make false or misleading statements about the integrity of its data and the means by

which it calculated its AWPs.[11] FDB also kept McKesson's participation in the process secret by

refusing to disclose the alleged survey results on alleged grounds of confidentiality.

Additionally, both McKesson and FDB either denied, or failed to disclose to the public, their

---

[11] For example, FDB-AWP 02005 (page from FDB's website, dated November 4, 2002) (stating that FDB surveys each of the national wholesalers to determine markup), which Kay Morgan acknowledged was never a true statement of FDB's survey practice. Patricia Kay Morgan 6.28.07 Dep. at 100:16-23.

common plan of "normalizing" WAC/AWP markups at 25% and their respective roles in achieving this goal.[12] Communications between McKesson and FDB, and internal McKesson communications about FDB, over a three-year period indicate that they fraudulently concealed the 5% Scheme. McKesson voluntarily provided FDB drug pricing information, including WACs, AWPs and WAC/AWP markup information.[13] McKesson and FDB regularly communicated and shared drug pricing information, usually by telephone and e-mail, including discussions, in which they agreed to inflate the markup factor for a manufacturer or brand-drug line.[14]

173.    Plaintiff SFHP and members of the Class had no knowledge of the combination and conspiracy alleged herein or of any of the facts that might have led to the discovery thereof in the exercise of reasonable diligence prior to the filing of a complaint in U.S. District Court in Boston alleging the Scheme in June 2005.

174.    Plaintiff SFHP and members of the Class could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and secrecy employed by McKesson and its co-conspirator, First DataBank, to avoid detection and their affirmative concealment of such violations, including without limitation, falsely attributing markup increases to the wholesaler industry as a whole, as opposed to McKesson's secret normalization agenda. Additionally, when asked directly whether First DataBank was in the process of normalizing markups, First DataBank not only denied this and demanded to know the source of this "rumor," but forwarded its response to McKesson's Bob James, who responded: "I love it! You're the best." Similarly,

---

[12] For example, Kay Morgan forwarded an e-mail to Robert James, in which she is directly questioned about whether FDB is moving all manufacturers to a uniform 25% markup. Morgan categorically denies the Scheme. James' response is: "I love it. You are the best!" MCKAWP 0069588.

[13] Both FDB employees charged with maintaining the integrity of the drug pricing data at FDB testified that McKesson regularly provided markup information. Morgan 6.28.07 Dep. at 89:17-90:11; Alisha Nielson 5.18.07 Dep. at 97:16-19.

[14] For example, MCKAWP 0068621; MCKAWP 0069586; MCKAWP 0069857; MCKAWP 0001168; and MCKAWP 0001188.

in a conference call with Aetna, McKesson denied that it had any control over rising AWPs, while at the same time it bragged to select customers that McKesson had "done its part" to increase AWPs through increased markups. Moreover, First DataBank refused requests to disclose the responses to its so-called surveys, claiming confidentiality in the process. Nor did McKesson publicly reveal its normalization scheme, knowing that if the increases were revealed, managed care would renegotiate with retail pharmacies and McKesson's "gift" to retailers would be lost.

175. As a result of the active fraudulent concealment of the conspiracy, Plaintiff asserts the tolling of the applicable statute of limitations affecting the causes of action by Plaintiff SFHP and other members of the Class.

## V. CLASS ACTION ALLEGATIONS FOR THE RICO AND CARTWRIGHT ACT CLAIMS

176. Plaintiff SFHP brings this action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and the Class comprised of:

> All governmental entities, agencies and political subdivisions in the State of California, including the State of California itself, that paid for the brand name drugs listed in Appendix A and whose payments were tied to AWP.

Excluded from the above-listed Class are: (a) Defendant and any entity in which Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors and (b) any co-conspirators.

177. The Class Period is August 1, 2001 to the present.

178. The exact identity of the drugs covered by this lawsuit is capable of being discovered from the records of First Data. Based on an investigation of First Data's databases, the list of such drugs is attached as Exhibit A.

179. The Class consists of dozens of entities throughout the State of California, making individual joinder impractical, in satisfaction of Rule 23. The disposition of the claims of the

- 62 -

Class Members in a single class action will provide substantial benefits to all parties and to the Court.

180.    The claims of the representative Plaintiff are typical of the claims of the Class, as required by Rule 23, in that the representative Plaintiff is an entity who, like all Class Members, purchased drugs whose prices were inflated by the 5% Scheme. Plaintiff SFHP, like all Class Members, has been damaged by McKesson's misconduct because, among other things, it paid higher prices than it would have absent McKesson's improper actions.

181.    The factual and legal bases for the defendant's misconduct are common to the Class Members and represent a common thread of fraud and other misconduct resulting in injury to Plaintiff SFHP and other members of the Class.

182.    There are many questions of law and fact common to Plaintiff and the Class. Those questions predominate over any questions that may affect individual Class Members. Common questions of law and fact include, but are not limited to, the following:

    a.    Whether AWPs published by First Data are used as a contractual benchmark for payments by third-party payors for drugs;

    b.    Whether the defendant McKesson and First DataBank engaged in a contract, combination, and/or conspiracy to fix or raise the WAC-to-AWP markup and the ultimate AWPs or cash price used by Plaintiff and other members of the Class as the basis for reimbursement for the drugs that are the subject of this Complaint;

    c.    Whether McKesson and First DataBank caused the prices of the subject drugs to be sold to Class Members at artificially high and noncompetitive levels;

    d.    Whether McKesson engaged in a course of conduct that improperly inflated the WAC-to-AWP markup and the ultimate AWPs or cash price used by Plaintiff and other members of the Class as the basis for reimbursement;

- 63 -

e.     Whether McKesson engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiff and other members of the Class;

f.     Whether McKesson formed an enterprise with First DataBank for the purpose of carrying out the 5% Scheme;

g.     Whether McKesson used the U.S. mails and interstate wire facilities to carry out the 5% Scheme;

h.     Whether Plaintiff and other members of the Class were injured by McKesson's conduct. and if so. the appropriate measure of damages for Class Members; and

i.     Whether Defendant's conduct violated the RICO and Cartwright statutes.

183.    Plaintiff SFHP will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting nationwide consumer and antitrust class actions. The Court has found counsel to be qualified and adequate in *New England Carpenters, et al. v. First DataBank, et al.*, No. 1:05-cv-11148-PBS (D. Mass.), a case raising the same issues. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiff nor its counsel have any interest adverse to those of the Class.

184.    Plaintiff and members of the Class have all suffered, and will continue to suffer, harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and would thus have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the Courts and the litigants, and promotes consistency and efficiency of adjudication.

## VI. COUNTS

### COUNT I

#### (On Behalf of SFHP and Proposed Class)
#### Violations of 18 U.S.C. § 1962(c)
#### [RICO]

185. Plaintiff SFHP, on behalf of itself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

186. This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against the defendant on behalf of the Class.

187. Plaintiff, the members of Class, and the defendant are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

188. At all relevant times, in violation of 18 U.S.C. § 1962(c), the defendant and co-conspirator First DataBank conducted the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

### A. The McKesson-First Data Enterprise

189. For purposes of this claim, certain RICO "enterprises" are associations-in-fact consisting of (a) First Data and (b) McKesson, including their directors, employees and agents. These associations-in-fact are sometimes collectively referred to herein as the "McKesson-First Data Enterprise." The Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price information, which all too often includes disseminating false and misleading AWPs; (b) implementing the 5% Spread Scheme; (c) deriving increased profits from the activities of the Enterprise; and (d) perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry. First Data and McKesson each had a common purpose of perpetuating the use of

- 65 -

AWPs as a benchmark for reimbursement in the pharmaceutical industry and a common purpose in inflating the AWPs by 5%.

190. The Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between McKesson and First Data. There is a common communication network by which McKesson and First Data shared and continued to share information on a regular basis throughout the Class Period. Typically this communication occurred by use of the wires and mails in which McKesson and First Data discuss and agree on the new WAC-AWP spread for a given drug. McKesson and First Data functioned as a continuing unit for the purposes of implementing the 5% Scheme. When issues arose during the Scheme each agreed to take actions to hide the Scheme and to continue its existence.

191. At all relevant times, First Data was aware of McKesson's conduct; was a knowing and willing participant in that conduct; and reaped profits from that conduct. First Data was aware that its published AWPs were inflated by the 5% Scheme. This awareness comes from the following sources: First, prior to the Scheme, First Data had in some instances obtained markups from wholesalers, which made First Data aware, even absent its agreement with McKesson, that its reported AWPs were not accurate. Second, as various congressional bodies and government agencies reported on AWP inflation, First Data did not change or challenge manufacturers regarding the self-reported WAC and AWPs, or the markups that First Data used. Third, First Data stopped conducting even limited surveys of other wholesalers and simply accepted the 5% Scheme, when it knew there was no basis for this 5% bump. Fourth, First Data actually received letters from certain manufacturers stating that the 5% increase in AWP was not justified. McKesson and First Data initiated the 5% Scheme in 2001-2002 and continued the Scheme in force in 2003-2004. Finally, McKesson and First Data regularly discussed the Scheme in wires, e-mails and in telephone conversations.

192.    The Scheme reached the point where FDB would query McKesson whether there had been a WAC increase so that a given drug could go to a 25% markup. Thus, both McKesson and FDB conspired to implement the Scheme. MCKAWP 0069553.

193.    The Scheme evolved to such an extent that McKesson would send to FDB, via e-mails. a "screen print" to indicate that the "WAC, markup and suggested sell price," always showed a 25% markup.

194.    The impacts of the Scheme are still in place, *i.e.,* the increased spreads are still being maintained. As described earlier, for sales to non-cash paying customers, pharmacies are reimbursed by health plans and other pharmacy benefit providers based on AWP. Consequently, pharmacies make a profit on the spread between AWP and their actual acquisition cost for the drug. Under this system, a higher WAC-to-AWP spread results in increased profits to pharmacies. Thus, McKesson and First Data helped deliver greater profits to pharmacies by conspiring to increase AWPs.

195.    This was acknowledged in McKesson's internal mails, where McKesson's executives discussed the positive impact of "normalizing" on McKesson's customers:

> Here is an idea. Two years later, *and having had some recent success in raising AWP's,* I think this could be presented to him positively in this way.
>
> Onmicare is looking for ..... say $500,000 in benefit from year end deals, even though this was not part of their contract. We need to ask them to roll up *or recalculate their reimbursements for last year based on the new AWP's with a 20% spread.* And ..... this is not just a one time benefit. *They will receive this now and each year going forward until they renegotiate contracts with third parties (and hopefully do not give up this gift).*
>
> *Our successes recently and during this past year includes raising AWP spreads to 20% (markup of 25%) include Parke Davis (division of Pfizer). Searle (division of Pharmacia). GlaxoSmithKline (Glaxo was at 16 2/3%). AstraZeneca, TAP, Berlex,* JOM including Alza and Centocor, parts of Merck and BMS where things were mixed between 16 2/3% and 20%, and more to come. *Some of our friends in retail that I have spoken with are pretty overwhelmed that we would be "driving" this process on their behalf.* Of course, we are not solely responsible for this "normalizing" of AWP's but we have done our part as I

> have discusses with your previously. I have had conversations
> with Albertsons and Safeway and a few others.
>
> Remember, "McKesson is doing this to improve our efficiencies in
> our BIS group." With mixed AWP spreads, our BIS group is
> required to make manual overrides (for every pricing activity) to
> input the First Data Bank AWP whenever there is a difference
> from our Suggested Sell or List Price. It could be stated as a
> benefit of the Sixth Sigma method of identifying defects. An
> "unintended consequence" is that the profitability of our customers
> will be impacted in a appositive way. *They will basically get*
> *3 1/3% more profit on Rx's filled with this new AWP spread.*
> *(Just imagine what this would mean on drugs like Lipitor or*
> *Prilosec*....
>
> This strategy might be of interest to Jack Fragie, Larry Greco, and
> others in discussions with our large national accounts, prospective
> new customers, and buying groups like Servall and IPC (that are
> continually asking for lower costs, more added value, and
> discounts beyond their contract language ..... like Owens
> programs). *We have an opportunity to "market" our efforts now.*
> If we do not do this, its possible that some of these accounts will
> believe that this stuff just happens and the efforts will go
> unrecognized. In my discussions, one of the comments that was
> made was "this would certainly be a good reason to renew our
> agreement with McKesson when its time." Talk about being good
> partners, wow! This is worth further discussion as we go forward.
> Maybe, a proactive strategy like this will soften some of the
> activity around asking for lower costs and more benefit.

MCKAWP 0065895 (emphasis added).

196.    Nonetheless McKesson also realized that it could "'market' [its] efforts" by

informing its customers that it was "doing everything possible to 'raise' AWP's when

appropriate." MCKAWP 0065895. McKesson appreciated that if it failed to inform its

customers that it was behind all these changes: "[I]t's possible that some of these accounts will

believe that this stuff just happens and our efforts will go unrecognized." MCKAWP 0065895.

As one McKesson executive put it: "This sounds like something we should at least [be] quietly

communicating to our customers in order to get some mileage from it[.]" MCKAWP 0069732.

And so it began:

> [To Dan Connolly of Bartell Drugs]: Celexa and Lexapro will have
> an AWP markup of 25% or a spread of 20% as soon as FDB
> information is updated. Look for the change to happen next week.

- 68 -

> Keep smilin[g] ... and who said we never listen to our customers
> (and old friends).

MCKAWP 0069817.

> [To Dan Connolly]: Just wanted you to know that Clarinex AWP
> spreads went to 20% this week. A few weeks ago Celexa went to
> 20% as well.   Fat cat status is just around the corner.

MCKAWP 0069901.

> [To David Vucurevich of Rite Aid]: P.S. latest AWP changes ...
> Celexa and Clarinex, working on Lilly and Novo.

MCKAWP 0069911.

197.   A field agent reports: "Some of the more savvy stores like Med-X have taken

notice." MCKAWP 0069732. Bob James realized that the goodwill McKesson established with

the pharmacies as a result of inflating AWPs would give it a substantial edge over its

competition:

> In my discussions [with select customers about McKesson's efforts
> to "normalize" the AWP markup at 25%], one of the comments
> that was made was "this would certainly be a good reason to renew
> our agreement with McKesson when its time." Talk about being
> good partners, wow! This is worth further discussion as we go
> forward. Maybe a proactive strategy like this will soften some of
> the activity around asking for lower costs and more benefit.

MCKAWP 0065895.

198.   Bob James proposed disclosing McKesson's efforts to customer Omnicare who

purportedly was looking for an extra-contractual year-end bonus in the neighborhood of

$500,000:

> Omnicare is looking for ..... say $500,000 in benefit from year end
> deals, even though this was not part of their contract. We need to
> ask them to roll up or recalculate their reimbursements for last year
> based on the new AWP's with a 20% spread. And ..... this is **not
> just a one time benefit**. They will receive this now and for each
> year going forward until they renegotiate their contracts with third
> parties (and hopefully do not give up this gift).

MCKAWP 0065895 (emphasis, ellipses in original). Bob James also noted with pleasure that

Kay Morgan spoke "with Eric Sorkin at RiteAid to let him know how much effort we are putting

00182116_24376.1

into this AWP thing to get it right." MCKAWP 0069669. Other customers were also appreciative. For example, an unnamed customer from Ohio, called McKesson "to say that he was looking at some of these items again and found that the spread appears to have increased significantly on most of these items to the area of 20-21%. He wondered if we had any part in doing this and, if so, he wanted to let us know that he really appreciated our efforts." MCKAWP 0069513. Med-X Corp.'s Director of Operations, Jerry Howard reviewed the numbers, put two and two together, MCKAWP 0069732, and "was very ex[c]ited about" McKesson "working on AWP expansion." MCKAWP 0069726.

199.    The foregoing shows that both First Data and McKesson were willing participants in the McKesson – First Data Enterprise; they had a common purpose and interest in the establishment and operations of the Scheme; and their agreement to a structure wherein First Data and McKesson agreed on how the operation of the McKesson-First Data Enterprise would be conducted, *i.e.*, through McKesson's transmission of increased markups and First Data's publication of those markups. This structure was the basis in which the McKesson-First Data Enterprise operated.

## B.    The Defendant's Use of the U.S. Mails and Interstate Wire Facilities

200.    The McKesson-First Data Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: The transmission and publication of false and misleading information concerning AWPs.

201.    During the Class Period, the defendant's illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

- 70 -

00821-16 224376 1

202.    The nature and pervasiveness of the Scheme, which was orchestrated out of the corporate headquarters of defendant McKesson and First Data, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities.

203.    Many of the precise dates of defendant and First DataBank's uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to their books and records. Indeed, an essential part of the successful operation of the Scheme alleged herein depended upon secrecy, however, Plaintiff can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the Scheme. Plaintiff describes this as follows:

204.    The defendant and First DataBank's use of the U.S. mails and interstate wire facilities to perpetrate the 5% Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

(a)    Marketing materials about First Data's services, which First Data, sent to health care providers located across the country;

(b)    Written representations and telephone calls between McKesson and First Data regarding markups and AWPs, which occurred on a regular basis each year;

(c)    Hundreds of e-mails between McKesson and First Data agreeing to, or effectuating the implementation of, the Scheme. These e-mails included, but are not limited to, the e-mails identified earlier in this Complaint;

(d)    Written and oral communications directed to U.S. Government agencies, public entities and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

- 71 -

(e)     Receipts of increased profits – the wrongful proceeds of the Scheme – sent through the U.S. mails and interstate wire facilities; and

(f)     In addition to the above-referenced RICO predicate acts, it was foreseeable to defendant that First Data would distribute publications containing false AWPs through the U.S. mails and by interstate wire facilities. Further, defendant has, in furtherance of the Scheme, communicated through use of the U.S. mails and by interstate wire facilities with its local headquarters or divisions. These uses of the U.S. mails include some of the documents referenced in this Complaint.

## C.     Conduct of the RICO Enterprises' Affairs

205.   During the Class Period, the defendant exerted control over the McKesson-First Data Enterprise and, in violation of Section 1962(c) of RICO, the defendant conducted or participated in the conduct of the affairs of those RICO enterprises, directly or indirectly, in the following ways:

(a)     Both McKesson and First Data had a degree of control concerning the WAC-to-AWP spread and each had AWPs that First Data reported;

(b)     First Data has directly controlled the creation and distribution of marketing, sales, and other materials used to inform members of the Class as to the value of its services;

(c)     McKesson intended that First Data would (and did) distribute their publications containing false AWPs through the U.S. mails and by interstate wire facilities; and

(d)     First Data allowed defendant McKesson to exert control over its organization, knowing that the AWPs were inflated as a result of the 5% Scheme and were not real numbers. McKesson controlled First Data by virtue of its ability to cause an increase in the

- 72 -

WAC-AWP markup. First Data did so because the reporting of AWPs was, and is, a major part of its business, and because McKesson was integral to First Data's AWP reporting and to increasing First Data's profits for the reasons set forth herein.

206. The McKesson-First Data Enterprise had a hierarchical decision-making structure headed by McKesson. McKesson issued instructions on how the WAC-to-AWP spread was to be reported and FDB readily accepted those instructions despite knowing of their falsity.

207. In violation of Section 1962(c) of RICO, defendant conducted the affairs of the McKesson-First Data Enterprise with which it associated by establishing a phony extra 5% WAC-to-AWP spread that First Data then published and disseminated nationwide.

## D. The Pattern of Racketeering Activity

208. Both defendant McKesson and its co-conspirator, First Data, conducted and participated in the affairs of the above-referenced Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. This pattern of racketeering likely involved thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their Scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the defendant intended to defraud Plaintiff, members of the Class and other intended victims.

209. The defendant calculated and intentionally crafted the Scheme to ensure that Plaintiff and members of the Class would be over-billed for the drugs. In designing and implementing the 5% Scheme, McKesson was cognizant at all times of the fact that End Payors rely on the integrity of the pharmaceutical companies, wholesalers and publishers in setting the AWPs, as reported by the publishers.

- 73 -

210.    By intentionally and artificially inflating the AWPs through the increase in the WAC-to-AWP spread, and by subsequently failing to disclose such practices to the individual patients, health plans and their insurers, the defendant engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

211.    The defendant and First Data's racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiff and other members of the Class. Each separate use of the U.S. mails and/or interstate wire facilities employed by the defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff and other members of the Class. The defendant engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular McKesson-First Data Enterprise.

## E.    Damages Caused by the Defendant's Five Percent Spread Scheme

212.    The defendant's violations of federal law and pattern of racketeering activity have directly and proximately caused Plaintiff SFHP and other members of the Class to be injured in their business or property because Plaintiff SFHP and members of the Class have paid hundreds of millions of dollars in inflated reimbursements or other payments for drugs whose AWP was artificially raised as described herein.

213.    The defendant conspired with First Data, who sent AWP information through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their 5% Scheme. Plaintiff SFHP and members of the Class have made inflated payments for drugs based on and/or in reliance on reported and false AWPs.

214.    Under the provisions of Section 1964(c) of RICO, the defendant is jointly and severally liable to Plaintiff SFHP and members of the Class for three times the damages that Plaintiff SFHP and the Class Members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

- 74 -

## COUNT II

### (On Behalf of SFHP and Proposed Class)
### Violation of CAL. BUS. & PROF. CODE § 16720, *et seq.*
### [The Cartwright Act]

215.    The preceding paragraphs of this Complaint are realleged and incorporated by
reference and asserted by Plaintiff SFHP on behalf of itself and members of the Class.

216.    The combination or conspiracy alleged in this Complaint consisted of a
continuing agreement, understanding or concert of action by McKesson, along with its co-
conspirator, First DataBank, the substantial terms of which were to raise, fix and maintain the
AWPs of the Marked Up Drugs at 25% over WAC.  The affected market is the market for brand
name retail drugs.

217.    McKesson and FDB had the power to set retail prices in the market for brand
name prescription drugs.  McKesson also acted for the illicit purpose of raising prices to create
goodwill with its retail pharmacy customers and did in fact cause harm to consumers.

218.    In the ordinary, non-monopoly case, companies do not have the ability to set
interbrand prices for an entire product market unless they enter into an agreement with other
producers.  But the prescription drug industry is defined by profound market imperfections that
enabled McKesson (in conjunction with FDB) to set retail prices of all brand drugs without
collaboration of either its competitors (*i.e.*, national wholesalers, AmeriSource Bergen and
Cardinal) or its suppliers.  These imperfections include:

> (a)  Industry-wide reliance on AWPs to set retail prices of brand
> drugs;
>
> (b)  Industry-wide reliance on First DataBank to calculate and
> disseminate AWPs;
>
> (c)  FDB's market power in the setting of AWP prices;
>
> (d)  McKesson's market power as one of the largest wholesalers;
>
> (e)  First DataBank's secretive survey process to calculate AWPs;

- 75 -

(f) Pre-scheme stability of and industry-wide reliance on established manufacturer markups; and

(g) AmeriSource Bergen and Cardinal's private refusal to participate in the survey process.

As a practical matter, the distinction between this case, involving an agreement between McKesson and FDB to set retail prices and a hypothetical collusion of wholesalers to accomplish the same result is a distinction without a difference.

219.  The fact that McKesson and FDB are not competitors in the rivalrous sense does not take away from the fact that they shared "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

220.  The price-fixing conspiracy was intended to affect directly the End Payors of the Marked Up Drugs, *i.e.*, Plaintiff and Members of the Class. The intent, purpose and effect of the conspiracy was to cause over-reimbursement for these drugs, and thereby increase retail pharmacy profit margins on the sales of the Marked Up Drugs to the detriment of the Class. The effect of the price fix was to disrupt the "central nervous system" of the market for brand name drugs.

221.  McKesson's scheme had a profoundly anticompetitive effect and no pro-competitive effects. McKesson obtained an unfair advantage in its competition with other wholesalers for retail pharmacies' business. Because it did not have to compete fairly, McKesson believed it could offer fewer incentives to its customers than in an unrestrained market.[15] By the same token, manufacturers have an interest in the efficient distribution of their

---

[15] *See, e.g.*, MCKAWP 0065895 (Bob James e-mail discussing how McKesson could avoid giving year end deals to one of its customers if it explained how McKesson's price fixing had benefited the customer, and relating James' discussions with other customers about its price fixing activities: "In my discussions, one of the comments that was made was 'this would certainly be a good reason to renew our agreement with McKesson when its time.' Talk about being good partners, wow!").

products. McKesson disrupted this process by unilaterally changing the price structure of hundreds of brand drugs, thereby subjecting manufacturers to potential lost sales and/or market share, and disrupting the pricing of drugs in the brand name drug market. And of course Plaintiff SFHP and Class members were injured because they were forced to pay higher prices without any benefit in terms of better products or better service.

222.    Through the price fixing conspiracy, defendant has in fact caused an increase in End-Payor reimbursement or payments for the Marked Up Drugs. At the same time the conspiracy had the intent, purpose and effect of increasing profits for other participants in the distribution chain (*i.e.*, pharmacies and/or PBMs in their retail capacity).

223.    As a result of the defendant's wrongful conduct, Plaintiff SFHP and Class Members paid higher prices for the Marked Up Drugs than they would have paid but for defendant's anticompetitive conduct, have been injured in their business or property, and have suffered damages in an amount to be determined at trial.

224.    Plaintiff SFHP and members of the Class were directly harmed by the defendant and First Data's agreement to raise and fix AWP/WAC markups in that they are the first and only ones in the distribution chain that actually pay the overcharge. The harm that they incur is not the result of a pass-on or otherwise derivative of any harm suffered by an upstream seller. On the contrary, retail pharmacies (including PBMs' mail order pharmacy businesses), from whom Plaintiff SFHP and the Class purchased the drugs **directly benefited** from the increased markups in the form of higher profit margins on the sales of Marked Up Drugs.

225.    Plaintiff SFHP and members of the Class are entitled to recover all damages and treble damages allowed under CAL. BUS. & PROF. CODE § 16700, *et seq.* against McKesson, together with their costs of suit, including reasonable attorneys' fees.

- 77 -

001821-16 224576 1

## COUNT III

### (Brought by SFHP on its Own Behalf and on Behalf of the State of California)
### Violations of Cal. Gov't Code § 12651(a)(1)
### [California False Claims Act, Causing Presentation Of False Claims]

226. Plaintiff SFHP realleges and incorporates by reference the preceding paragraphs.

227. At all times relevant to this Complaint, McKesson "knowingly" [as defined in CAL. GOV'T CODE § 12650(b)(2)], caused to be presented to officers or employees of SFHP and the State of California false claims for payment or approval, in the form of false price information for the drugs specified herein. As a result, SFHP and the State paid out as reimbursement to the Medi-Cal providers of the specified prescription drugs, sums of money grossly in excess of the amounts contemplated by law, resulting in great financial loss to SFHP and the State of California.

228. At all times relevant and material to this action, McKesson "knew" or acted "knowingly," which terms are defined in CAL. GOV'T CODE § 12650(b)(2), in causing the making, presenting, or submission of false claims. In that respect, McKesson acted:

 (a) With actual knowledge of the information; or

 (b) In deliberate ignorance of the truth or falsity of the information; or

 (c) With reckless disregard of the truth or falsity of the information.

229. At all times relevant and material to this action, McKesson "caused" the making, presenting, or submitting of false claims, as that term is defined in CAL. GOV'T CODE § 12651, in causing:

 (a) The presentation of false claims for payment or approval by SFHP and by the State of California's Medi-Cal program; and,

 (b) The making and using of false statements and/or records for the purpose of getting false claims approved or paid by SFHP and the State of California's Medi-Cal program. At all times relevant and material hereto, McKesson knew that its conduct would cause SFHP

- 78 -

and the State of California to pay claims for the specified prescription drugs in amounts exceeding that contemplated by applicable law.

230. McKesson "knowingly" reported or caused to be reported false and inflated AWPs to FDB and the other pricing services by systematically concealing or otherwise failing to report decreases in the prices of the specified prescription drugs.

231. McKesson "knowingly" reported or caused to be reported false and inflated AWPs, FDB, and the other pricing services by systematically concealing or otherwise failing to report decreases in the prices of the specified prescription drugs.

232. Because of Defendant's conduct in violation of CAL. GOV'T CODE § 12651(a)(1) as set forth in this Count, SFHP and the State of California sustained damages in an amount according to proof pursuant to CAL. GOV'T CODE § 12651(a).

## COUNT IV

### (Brought by SFHP on its Own Behalf and on Behalf of the State of California) Violations Of Cal. Gov't Code § 12651(a)(2) and (a)(3)) [California False Claims Act, Causing a False Record or Statement to be Made or Used to Get a False Claim Paid or Approved by the State of California]

233. Plaintiff SFHP realleges and incorporates by reference the preceding paragraphs.

234. At all times relevant to this Complaint, McKesson "knowingly" [as defined in CAL. GOV'T CODE § 12650(b)(2)] caused false records or statements to be made or used to get false claims to be paid or approved by SFHP and the State of California, in that McKesson caused false records or statements or prices of the prescription drugs specified in Appendix A (attached hereto) to be used by SFHP and the State of California to pay or approve claims presented by the providers and suppliers of those drugs. These paid or approved claims were grossly in excess of the amounts contemplated by law, resulting in great financial loss to SFHP and the State of California.

235. McKesson also violated § 1650(a)(3) by conspiring with FDB to defraud SFHP and the State.

- 79 -

236.     Because of Defendant's conduct in violation of CAL. GOV'T CODE § 12651(a)(2)

and (3) as set forth in this Count, SFHP and the State of California sustained damages in an

amount according to proof pursuant to CAL. GOV'T CODE § 12651(a).

## COUNT V

### (Brought by SFHP on its Own Behalf and on Behalf of the State of California)
### Violations of Cal. Gov't Code § 12651(a)(8)
### [California False Claims Act, Beneficiary of Inadvertent Submissions of False
### Claims to California Public Entities, Subsequent Discovery of the False Claims
### and Failure to Report Them Within a Reasonable Time After Discovery ]

237.     Plaintiff SFHP re-alleges and incorporates herein by reference all of the previous

allegations.

238.     At all times McKesson, knowingly [as defined in CAL. GOV'T CODE

§ 12650(b)(2)] was a beneficiary of inadvertent submissions of false claims to SFHP and the

State of California, subsequently discovered the falsity of the claims, and failed to disclose the

false claims to SFHP and the State of California within reasonable times after discovery of the

false claims. On learning that SFHP and Medi-Cal were paying inflated reimbursement amounts

based upon the falsely inflated reports of AWP, and thereby paying false claims for the drugs at

issue, McKesson failed to disclose the false claims to SFHP and the State of California within a

reasonable time after discovery of the false claims. McKesson's failure to disclose to SFHP and

the State of California, as required by § 12651(a)(8), caused great financial loss SFHP and the

State of California.

239.     Defendant's conduct violated CAL. GOV'T CODE § 12651(a)(8) as set forth in this

Count, and was a substantial factor in causing SFHP and the State of California to sustain

damages in an amount according to proof pursuant to CAL. GOV'T CODE § 12651(a).

## COUNT VI

### (Brought by the People of the State of California)
### Violations of the Unfair Competition Law

240.     Plaintiff the People of the State of California, acting by and through San

Francisco City Attorney Dennis J. Herrera, reallege and incorporate herein by references all of

the previous allegations of this Complaint. The People, assert this claim under the Unfair
Competition Law, BUS. & PROF. CODE § 17200, *et seq.* ("UCL" or "Section 17200"). Pursuant
to § 17206(a) of the UCL, the People seek civil penalties to be imposed against McKesson for
each violation of the UCL.

241.    Defendant's business acts or practices, as described in this Complaint, constitute
unlawful, unfair and/or fraudulent business acts or practices and unfair, deceptive, untrue and/or
misleading advertising, which are proscribed by § 17200 of the UCL and the False Advertising
Act, BUS. & PROF. CODE § 17500, *et seq.*, as well as CAL. CIV. CODE §§ 1572, 1709 and 1710.

242.    As set forth above, during the relevant time period, McKesson violated the
"fraudulent" prong of § 17200, the "unfair" prong of § 17200, and the "unlawful" prong of
§ 17200 by engaging in the following conduct:

    a.      McKesson's conduct was unfair, unlawful and deceptive in that knowing
of the use of AWP by End Payors, and despite knowledge as to representations that AWPs were
established in part by use of surveys, and were "reliable" and "accurate," McKesson artificially
raised AWPs by increasing as described herein the WAC-to-AWP spread by 5% thereby causing
publication of AWPs that were even more inaccurate and unreliable;

    b.      Defendant's conduct was unfair, unlawful and deceptive in that McKesson
knew that End Payors used AWP as a pricing mechanism and that the 5% WAC-to-AWP
increase was a phony increase, *i.e.*, it did not represent any true increase in cost prices, and as
such would artificially increase pharmaceutical payments by End Payors.

    c.      Defendant's conduct was unfair, unlawful and deceptive in that McKesson
knew that the 5% WAC-to-AWP increase was not based on any actual change in the average
wholesale price, and it knew that the increase did not have any other legitimate cost or pricing
basis and was implemented solely for McKesson's own economic and business purposes;

- 81 -

d.      Defendant's conduct was unfair, unlawful and deceptive in that McKesson and its co-conspirator. First Data, suppressed, manipulated and concealed information that would reveal the lack of any legitimate economic basis in the 5% increase in the WAC-to-AWP spread;

c.      Defendant's conduct was unfair, unlawful and deceptive in that Defendant and its co-conspirator, First Data, omitted material information known to them in order to induce payors to use an inflated AWP and pay an inflated price for drugs; and

f.      Defendant's conduct was unlawful in that it constituted mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343; violated the RICO act, 18 U.S.C. § 1961 *et seq.*; the Cartwright Act, CAL. BUS. & PROF. CODE §§ 16720 *et seq.*; and the California False Claims Act, Cal. Gov't Code § 12650 *et seq*.

243.    All of the conduct alleged herein occurred in defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

244.    The People request that this Court impose civil penalties not to exceed two thousand five hundred dollars ($2,500) for each violation, as provided in CAL. BUS. & PROF. CODE § 17206(a), and for such other relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SFHP, individually and on behalf of the State and on behalf of the Class, and the People pray for judgment and relief against McKesson as follows:

A.      An order of this Court granting approval of this as a proper class action and of named Plaintiff as proper class representative;

B.      Actual and treble damages and costs to Plaintiff SFHP and the Class pursuant to the federal RICO Act, 18 U.S.C. § 1964(c); and the Cartwright Act, CAL. BUS. & PROF. CODE § 16750(a); actual and treble damages and costs to Plaintiff SFHP and to the State of California pursuant to the California False Claims Act, CAL. GOV. CODE § 12651(a);

- 82 -

C.    Civil Penalties of $10,000 for each false claim submitted as a result of the

Scheme, as well as civil penalties of $2,500 to the People for each violation of the Unfair

Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq*.

D.    Attorney's fees pursuant to 18 U.S.C. § 1964(c); CAL. BUS. & PROF. CODE

§ 16750(a); CAL. GOV. CODE § 12651(a); and CAL. CODE CIV. PROC. § 1021.5;

E.    Interest as provided by law; and

F.    Such other legal or equitable relief as the Court may deem appropriate.

DATED: May 20, 2008.

HAGENS BERMAN SOBOL SHAPIRO LLP

By

Edward Notargiacomo (BBO #567636)
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Steve W. Berman (pro hac to be filed)
Sean R. Matt (pro hac to be filed)
Barbara Mahoney
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jeff Friedman (pro hac to be filed)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001

- 83 -

Dennis J. Herrera
City Attorney
Danny Chou (California Bar No. 180240) (pro hac
to be filed)
Chief of Complex and Special Litigation
Owen Clements (California Bar No. 141805) (pro
hac to be filed)
Chief of Special Litigation
Alex Tse
Erik Rapoport (California Bar No. 187059) (pro hac
to be filed)
Deputy City Attorneys
OFFICE OF THE SAN FRANCISCO CITY
ATTORNEY
1390 Market Street, 7th Floor
San Francisco, CA 94102
Telephone: (415) 554-3900
Facsimile: (415) 554-3985

Louise H. Renne (pro hac to be filed)
Jonathan V. Holtzman (pro hac to be filed)
Allyson S. Hauck
RENNE SLOAN HOLTZMAN SAKAI LLP
350 Sansome Street, Suite 300
San Francisco, CA 94104
Telephone: (415) 678-3800
Facsimile: (415) 678-3838

Attorneys for Plaintiffs

- 84 -