UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE MCKESSON GOVERNMENTAL ENTITIES AVERAGE WHOLESALE PRICE LITIGATION | Master File No.:  1:08-CV-10843-PBS Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO: *Douglas County*, No. 1:08-CV-11349-PBS | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**<u>MOTION FOR CLASS CERTIFICATION</u>**

001821-17  311995 V1

## TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ...................................................................................................1

II.   FACTS ....................................................................................................................2

III.  ARGUMENT ..........................................................................................................4

    A.    Rule 23 Standards in the First Circuit......................................................4

    B.    Plaintiffs Satisfy the Rule 23(a) Requirements........................................6

        1.    The numerosity requirement is met because joinder of all members is impracticable.......................................................................6

        2.    The commonality requirement is met because questions of law and fact are common to all Class members. ......................................6

        3.    The typicality requirement is met because Plaintiffs' claims arise from the same course of conduct alleged by the Classes....................................7

        4.    The adequacy requirement is met because Plaintiffs' interests do not conflict with those of other Class members and because Plaintiffs have chosen qualified, experienced counsel, who are capable of vigorously conducting the proposed litigation...............................................7

    C.    The Classes Also Meet the Requirements of Rule 23(b)(3) ....................8

        1.    Common questions predominate over any individual issues.....................8

        2.    The grounds for limiting *Carpenters* class damages through 2003 are not present in the current litigation. ............................................9

        3.    Class treatment is superior to other forms of litigation.............................11

        4.    Class damages can be easily calculated. ...................................................13

        5.    Plaintiffs' state law claims are manageable and involve common issues. ......................................................................................13

            a.    California law applies to the Classes. ............................................14

                (1)    California has an interest in policing misconduct within its borders..................................................................14

(2)     In close cases Massachusetts' choice of law analysis favors the law of the state that best effectuates the law's objective. ...................................................16

(3)     Applying California law best effectuates the states' interest in protecting their residence against conspirators and tortious interference with contract. .............................17

b.     Conspiracy. ...................................................................................18

c.     Tortious interference with performance of a contract....................19

D.     An Opt-In State Medicaid Class is Appropriate Under Rule 23 in This Case.......19

E.     The Eleventh Amendment is Not an Obstacle to Class Certification...................22

IV.     CONCLUSION..................................................................................................25

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Alden v. Maine*,
    527 U.S. 706 (1999)...............................................................................23

*Allen v. Woodford*,
    544 F. Supp. 2d 1074 (E.D. Cal. 2008).................................................23

*Andrews v. Bechtel Power Corp.*,
    780 F.2d 124 (1st Cir. 1985).............................................................7, 8

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
    869 P.2d 454 (Cal. 1994) ................................................................18, 19

*Blatchford v. Native Village of Noatak*,
    501 U.S. 775 (1991)..............................................................................24

*Borden v. Paul Revere Life Ins. Co.*,
    935 F.2d 370 (1st Cir. 1991) ................................................................16

*Bushkin Assocs., Inc. v. Raytheon Co.*,
    393 Mass. 622 (1985) .....................................................................16, 17

*California ex rel. Lockyer v. Dynegy, Inc.*,
    375 F.3d 831 (9th Cir. 2004) ...............................................................24

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 326 (E.D. Mich. 2001) ........................................................5

*Carnegie v. Household Int'l, Inc.*,
    376 F.3d 656 (7th Cir. 2004) ...............................................................12

*Clothesrigger, Inc. v. G.T.E. Corp.*,
    191 Cal. App. 3d 605, 236 Cal. Rptr. 605 (4th Dist. 1987)...............15

*Cohens v. Virginia*,
    19 U.S. 264, 1821 WL 2186 (1821)................................................22, 23

*Competitive Techs. v. Fujitsu Ltd.*,
    286 F. Supp. 2d 1118 (N.D. Cal. 2003) ...........................................17, 18

*Computer Sys. of Am., Inc. v. International Bus. Machines Corp.*,
    795 F.2d 1086 (1st Cir. 1986)..............................................................16

*In re Crazy Eddie Sec. Litig.*,
　　135 F.R.D. 39 (E.D.N.Y. 1991) ...............................................................................19, 21

*Diamond Multimedia Sys., Inc. v. Superior Ct.*,
　　19 Cal. 4th 1036, 80 Cal. Rptr. 2d 828 (1999)...................................................................15

*Dugan v. Rank*,
　　372 U.S. 609 (1963)..............................................................................................................23

*Edelman v. Jordan*
　　415 U.S. 651 (1974)..............................................................................................................23

*In re Fine Paper Antitrust Litig.*,
　　82 F.R.D. 143 (E.D. Pa. 1979), *aff'd*, 685 F.2d 810 (3d Cir. 1982) ...........................24, 25

*General Motors v. New York*,
　　501 F.2d 639 (2d Cir. 1974)................................................................................................24

*Hansberry v. Lee*,
　　311 U.S. 32 (1940)................................................................................................................21

*Hess v. Port Auth. Trans-Hudson Corp.*,
　　513 U.S. 30 (1994)................................................................................................................23

*Hopson v. Hanesbrands Inc.*,
　　2009 U.S. Dist. LEXIS 33900 (N.D. Cal. Apr. 3, 2009) ......................................................6

*Huber, Hunt & Nichols, Inc. v. Architectural Stone Co., Inc.*,
　　625 F.2d 22 (5th Cir. 1980) ................................................................................................24

*J.P. Morgan & Co., Inc. v. Superior Ct.*,
　　113 Cal. App. 4th 195, 6 Cal. Rptr. 3d 214 (4th Dist. 2003)..............................................15

*Kidron v. Movie Acquisition Corp.*,
　　40 Cal. App. 4th 1571, 47 Cal. Rptr. 2d 752 (2d Dist. 1995).............................................18

*Larocca v. Borden, Inc.*,
　　276 F.3d 22 (1st Cir. 2002)..................................................................................................10

*Lebegern v. Forman*,
　　471 F.3d 424 (3d Cir. 2006)................................................................................................18

*Louisiana v. Weinberger*,
　　369 F. Supp. 856 (E.D. La. 1973) .......................................................................................25

*In re Lupron Mktg. & Sales Practices Litig.*,
　　228 F.R.D. 75 (D. Mass. 2005)...................................................................................25

*In re Master Key Antitrust Litig.*,
　　70 F.R.D. 23 (D. Conn. 1975)....................................................................................25

*McCuin v. Secretary of Health & Human Servs.*,
　　817 F.2d 161 (1st Cir. 1987)........................................................................................6

*Monex Int'l, Ltd. v. CFTC*,
　　83 F.3d 1130 (9th Cir. 1996) .......................................................................................9

*In re Neurontin Mktg. & Sales Practices Litig.*,
　　244 F.R.D. 89 (D. Mass. 2007)..........................................................................5, 6, 7, 8

*New Eng. Carpenters Health Bens. Fund v. First Databank, Inc.*,
　　244 F.R.D. 79 (D. Mass. 2007)........................................................................... *passim*

*New Eng. Carpenters Health Bens. Fund v. First Databank, Inc.*,
　　248 F.R.D. 363 (D. Mass. 2008).........................................................................8, 9, 13

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
　　522 F.3d 6 (1st Cir. 2008)............................................................................................9

*Ex parte New York*,
　　256 U.S. 490 (1921)..................................................................................................24

*Oklahoma ex rel. Edmondson v. Magnolia Marine Transp. Co.*,
　　359 F.3d 1237, 1239 (10th Cir. 2004) ........................................................................24

*Ortiz v. Fibreboard Corp.*,
　　527 U.S. 815 (1999)..................................................................................................21

*Pacific Gas & Elec. Co. v. Bear Stearns & Co.*,
　　791 P.2d 587 (Cal. 1990) .....................................................................................17, 19

*In re Pharm. Indus. Average Wholesale Price Litig.*,
　　230 F.R.D. 61 (D. Mass. 2005)..................................................................................13

*In re Pharm. Indus. Average Wholesale Price Litig.*,
　　252 F.R.D. 83 (D. Mass. 2008)..................................................................................14

*In re Potash Antitrust Litig.*,
　　159 F.R.D. 682 (D. Minn. 1995)............................................................................8, 12

*Principality of Monaco v. Mississippi,*
    292 U.S. 313 (1934)..................................................................................24

*In re Real Estate Title & Settlement Servs. Antitrust Litig.,*
    MDL No. 633, 1986 WL 6531 (E.D. Pa. June 10, 1986) ................................24

*Regents of Univ. of Cal. v. Eli Lilly & Co.,*
    119 F.3d 1559 (Fed. Cir. 1997)....................................................................24

*In re Relafen Antitrust Litig.,*
    218 F.R.D. 337 (D. Mass. 2003)...................................................................11

*In Re Relafen Antitrust Litig.,*
    221 F.R.D. 260 (D. Mass. 2004)......................................................................6

*Seminole Tribe v. Florida,*
    517 U.S. 44 (1996)......................................................................................24

*Smilow v. Southwestern Bell Mobile Sys.,*
    323 F.3d 32 (1st Cir. 2003)............................................................................8

*Smith v. Reeves,*
    178 U.S. 436 (1900).....................................................................................24

*St. Louis Convention & Visitors Comm'n v. NFL,*
    154 F.3d 851 (8th Cir. 1998) ........................................................................17

*Swack v. Credit Suisse First Boston,*
    230 F.R.D. 250 (D. Mass. 2005)......................................................................6

*West Virginia v. Chas. Pfizer & Co.,*
    440 F.2d 1079 (2d Cir. 1971)........................................................................24

*Williams v. Mohawk Indus.,*
    2009 U.S. App. LEXIS 11391 (11th Cir. May 28, 2009)....................................5

## STATUTES

OAC 317:30-5-78 .....................................................................................................10

## MISCELLANEOUS

D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 3.7 (1973)...........................................9

RESTATEMENT (SECOND) CONFLICT OF LAWS § 145 .............................................16, 17

RESTATEMENT (SECOND) OF TORTS § 766(A) ................................................................17

22 AM JUR 2D DAMAGES § 354 ......................................................................................10

Plaintiffs respectfully submit this memorandum in support of their motion for class certification.

## I.     INTRODUCTION

In *New England Carpenters v. First DataBank*, No. 1:05-CV-11148-PBS, the Court certified, along with a consumer class, a national Class of non-governmental Third-Party Payors ("TPPs") in their suit against McKesson for its role in a scheme to raise the prices of brand-name prescription drugs.  The certified TPP class and pending settlement expressly preserve claims by Public Payors.  Plaintiffs now move to certify two multistate class actions:  (1) an opt-out class consisting of all non-Medicaid State and local government payors; and (2) an opt-in class consisting of all State Medicaid Payors.

The proposed class definitions in this case are essentially the same as the TPP Class certified by the Court in *Carpenters*, except that they involve public (rather than private) payors, and the proposed class period extends beyond 2005 to address lasting injuries.  Like the private payor class certified in *Carpenters*, Public Payors paid for marked up drugs based on the Average Wholesale Price ("AWP") published by First DataBank ("FDB") or Medi-Span and were therefore directly impacted by McKesson's scheme to increase AWPs.  The proposed Classes are defined as follows:

### a.     Opt-Out Non-State Medicaid Class

All governmental entities and their political subdivisions, agencies, departments, and divisions in the United States and its Territories, including the States, local governments, and Territories themselves, other than State Medicaid programs, that paid for Marked-Up Drugs based on AWP from August 1, 2001 to the present and that used First DataBank or Medi-Span data derived from First DataBank data in determining the AWP of the Marked-Up Drugs.  The Marked-Up Drugs are all drugs identified in

Exhibit A to the Second Amended Complaint and consist of brand-name drugs only.[1]

### b.    Opt-In State Medicaid Class

State and Territory Medicaid Programs that paid for Marked-Up Drugs based on AWP from August 1, 2001 to the present and that used First DataBank or Medi-Span data derived from First DataBank data in determining the AWP of the Marked-Up Drugs. The Marked-Up Drugs are all drugs identified in Exhibit A to the Second Amended Complaint and consist of brand-name drugs only.[2]

A longer class period is warranted because there is no evidence of pushback, concerns about individual issues of causation are addressed in the damages method and individual issues of mitigation are not present because McKesson is not entitled to that defense as a matter of law.

## II.    FACTS

This Court is very familiar with the allegations against McKesson, and therefore Plaintiffs limit this discussion to a brief factual summary of the Court's previous findings and to the proffer of evidence specific to the Public Payor litigation.[3]  AWP is the pricing benchmark for virtually all drug reimbursement transactions. *New Eng. Carpenters Health Bens. Fund v. First Databank, Inc.*, 244 F.R.D. 79, 81 (D. Mass. 2007).  These prices are compiled and published in electronic form principally by two companies:  (1) FDB, which had a virtual monopoly as an electronic source for drug pricing information, and (2) Medi-Span, another publisher that received its electronic data from FDB.  *Id.*

---

[1] The proposed class representatives for this Class are:  The Board of Commissioners of Douglas County, Kansas; the Oklahoma State & Education Employees Group Insurance Board; the City of Baltimore, Maryland; the City of Panama City, Florida; Anoka County, Minnesota; the City of Columbia, South Carolina; and the City of Goldsboro, North Carolina.  Excluded from the Class are:  Defendant, Defendant's parents, subsidiaries, and affiliates; co-conspirators; all governmental entities, agencies and political subdivisions in the State of California; the State of Connecticut and all Public Payors who are part of the State of Connecticut government; and federal governmental agencies.

[2] The proposed class representatives for this Class are:  The State of Oklahoma Medicaid program ("SoonerCare") and the State of Montana Medicaid program.

[3] Plaintiffs' Proffer of the Evidence Common to the Class In Support of Class Certification ("Proffer") is submitted concurrently with this motion.

Drug manufacturers typically sell drugs to wholesalers, like McKesson, on the basis of the Wholesale Acquisition Cost ("WAC"). *Id*. at 82. Wholesalers, in turn, sell drugs to retail pharmacies based on WAC. *Id*. But retail pharmacies are generally reimbursed for brand-name drugs based on a percentage of AWP. *Id*. Higher WAC to AWP markups made the drugs more appealing to pharmacies because they could reap a greater profit. *Id*. Historically, the manufacturer reported the AWP to the publisher at a markup of 20% or 25% from the WAC for brand-name prescription drugs, or alternatively the manufacturers may have only reported a WAC and then suggested the appropriate markup for the publishers to generate the AWP. *Id*. Typically, the publishing company played no independent role in establishing AWP. *Id*.

Before 2000, McKesson estimated that 80% of the manufacturers used a 20% markup for their drugs. *Id*. at 83. The low markup diminished profits for McKesson's primary customers – chain pharmacies – who sell the drugs based on AWP. Beginning in late 2001, FDB and McKesson reached a secret agreement to raise the WAC to AWP markup on all brand-name drugs to the higher 25% markup. *Id*. at 82. McKesson implemented this scheme in order to provide a greater spread to its retail pharmacy clients. *Id*. at 83. For a real life example, by McKesson's own estimate, the markup increased the profit on Lipitor (70 mg 90s) from $6.86 to $17.18. *Id*. Together, McKesson and FDB raised the markup on over four hundred brand-name drugs that previously received the 20% markup. *Id*. at 82. To camouflage the WAC to AWP markup increase, McKesson and FDB carried out the price changes only when some other WAC-based price announcement was made by a drug manufacturer. *Id*. McKesson's role in the scheme was also concealed because FDB falsely claimed that the markups were set in accordance with a survey of each of the major wholesalers. *Id*. at 83.

- 3 -

McKesson was fully aware that public payors relied on AWPs for reimbursement of brand drugs.[4]  McKesson maintained a Public Affairs Department to track federal and state developments that affected pharmacy sales.[5]  McKesson also actively lobbied the federal and state governments on its own behalf and on behalf of its customers.[6]  For example, when Congress changed the reimbursement formula for generics from an AWP-based reimbursement model to a model based on the Average Manufacturer Price ("AMP"), McKesson successfully lobbied Congress to increase the reimbursement limit from AMP + 20% to AMP + 250%.[7]  McKesson also lobbied against government importation of lower-priced drugs from Canada, knowing that "MCK customers will continue to turn to us seeking information/solutions."[8]

McKesson was fully aware of the impact its scheme would have on Public Payors.  Indeed, a McKesson employee specifically questioned Bob James, Director of Brand Pharmaceutical Product Management and the principal architect of the scheme, about the impact of rising AWPs on Public Payors:  "Has anyone researched what impact this will have on Medicaid/Medicare reimbursement in states where its [sic] still based on AWP?"  James responded:  "*Dale, this is not our issue.  But, I have thought about it a lot.*  One of the unintended consequences is that Retail Customers will potentially be more profitable."[9]

### III.    ARGUMENT

**A.    Rule 23 Standards in the First Circuit**

While class actions have long been recognized by the courts as an essential tool for adjudication of cases involving multiple claims and similar factual and/or legal inquiries, a

---

[4] Proffer at 4.

[5] *Id*. at 2-4.

[6] *Id*. at 4.

[7] *Id*. at 5.

[8] *Id*. at 4-5.

[9] *Id*. at 6.

001821-17  311995 V1

"district court must conduct a 'rigorous analysis' to determine whether a proposed class meets

the exacting prerequisites established by Rule 23."  *Carpenters*, 244 F.R.D. at 84.

> In "determining the propriety of a class action, the question is not
> whether the plaintiff or plaintiffs have stated a cause of action or
> will prevail on the merits, but rather whether the requirements of
> Rule 23 are met."  However, "a district court must formulate some
> prediction as to how specific issues will play out in order to
> determine whether common or individual issues predominate in a
> given case."

*In re Neurontin Mktg. & Sale Practices Litig.*, 244 F.R.D. 89, 104 (D. Mass. 2007) (quoting

*Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) (internal citation

omitted)).

To determine whether the Rule 23 factors are satisfied, courts undertake "an analysis of

the issues and the nature of required proof at trial to determine whether the matters in dispute and

the nature of plaintiffs' proofs are principally individual in nature or *are susceptible of common

proof* equally applicable to all class members."  *In re Cardizem CD Antitrust Litig.*, 200 F.R.D.

326, 334 (E.D. Mich. 2001) (emphasis added); *see also Williams v. Mohawk Indus.*, 2009 U.S.

App. LEXIS 11391, at *15 (11th Cir. May 28, 2009) ("claims under RICO, in contrast with

claims under Title VII, are often susceptible to common proof") (citations omitted).

Applying these standards, the Court previously certified a much larger and more diverse

private payor class than the Public Payor classes at issue in this case.  As set forth below,

Plaintiffs have satisfied each of the requirements of Rule 23, and the Court should certify the

proposed Public Payor classes that were uniformly injured by McKesson's fraudulent conduct.

**B.      Plaintiffs Satisfy the Rule 23(a) Requirements[10]**

**1.      The numerosity requirement is met because joinder of all members is impracticable.**

Numerosity is established if the size of a proposed class, even if inexactly determined, is sufficiently large as to make joinder impracticable given the relevant circumstances.  *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 267 (D. Mass. 2004).  Precise quantification of class members is not necessary; the Court may make common sense assumptions to support a finding of numerosity. *McCuin v. Secretary of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987).  While "forty individuals [are] generally found to establish numerosity"[11] classes of twenty-two members or more are appropriate under Rule 23.[12]  Plaintiffs estimate there are thousands of non-Medicaid Public Payors in the Class across the nation and its territories, thus easily satisfying the numerosity requirement of Rule 23(a)(1).  Joinder of nearly all of the State and Territory Medicaid payors would also be impracticable.

**2.      The commonality requirement is met because questions of law and fact are common to all Class members.**

Generally, the commonality requirement is easily met, provided that at least one common question of law or fact exists.  *In re Neurontin*, 244 F.R.D. at 105.  The common issues that warranted class treatment of the TPP and Consumer Co-pay claims in *Carpenters* are also present here, and they establish the existence of commonality required by Rule 23.  These issues include, among others, "whether the WAC to AWP margin was increased as a result of an agreement between FDB and McKesson; whether this agreement was a RICO enterprise; and

---

[10] While Plaintiffs address each of the Rule 23(a) requirements, Plaintiffs respectfully request that the Court take judicial notice that in *Carpenters* "McKesson [did] not contest that the plaintiffs have satisfied the four requirements in Rule 23(a)."  244 F.R.D. at 84.

[11] *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 259 (D. Mass. 2005).

[12] *Hopson v. Hanesbrands Inc.*, 2009 U.S. Dist. LEXIS 33900 (N.D. Cal. Apr. 3, 2009) (collecting cases).

whether [McKesson] engaged in deceptive and/or fraudulent activity using the United States mails and interstate wire facilities." *Carpenters*, 244 F.R.D. at 84.

   **3.    The typicality requirement is met because Plaintiffs' claims arise from the same course of conduct alleged by the Classes.**

"Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *In re Neurontin*., 244 F.R.D. at 106 (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996)).  Like the TPP Class certified in *Carpenters*, Plaintiffs and Class members reimbursed pharmacies for drugs dispensed to their plan members at a formula based on AWP (*e.g.*, AWP less a fixed percentage).  Second Amended Complaint ("SAC") (Dkt. No.  27), ¶¶ 29-36.  Plaintiffs and Class members paid for one or more of the drugs identified in Exhibit A to the Second Amended Complaint.  *Id.* Accordingly, Plaintiffs and Class members alike made excessive payments as a result of McKesson's scheme.  As in *Carpenters*, these common injuries satisfy the typicality requirement of Rule 23(a)(3).  *See* 244 F.R.D. at 84 ("A clear and distinct relationship exists between the injury to the named plaintiffs and the conduct affecting the two classes.  In other words, all members of the two classes, including the named plaintiffs, suffered harm resulting from the across the board 5% markup of drugs.").

   **4.    The adequacy requirement is met because Plaintiffs' interests do not conflict with those of other Class members and because Plaintiffs have chosen qualified, experienced counsel, who are capable of vigorously conducting the proposed litigation.**

To establish adequacy the moving party must show (1) that the interests of the representative party will not conflict with the interests of any of the class members, and (2) that counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation. *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.

1985).  Here neither Plaintiffs nor their counsel have any interest adverse to those of the Class. Each Plaintiff and each Class member were similarly injured by McKesson's wrongful conduct in the form of overcharges for affected prescription drugs and thus all have a common interest in recovering these overcharges.  *Carpenters*, 244 F.R.D. at 84-85.[13]  Similarly, Plaintiffs have retained counsel committed to vigorously prosecuting this action on behalf of the proposed Classes with substantial experience in prosecuting nation-wide class actions, including the TPP case successfully litigated before this Court and who have the financial resources to do so.  *Id.*

**C.    The Classes Also Meet the Requirements of Rule 23(b)(3)**

As the Court found in *New Eng. Carpenters Health Bens. Fund v. First Databank, Inc.*, because McKesson's fraudulent conduct impacted a uniform benchmark utilized by virtually every payor for prescription drugs, the predominance and superiority requirements are easily met in this case.  248 F.R.D. 363, 369, 371 (D. Mass. 2008).

**1.    Common questions predominate over any individual issues.**

The Rule 23(b)(3) predominance requirement does not mandate "that all issues be common to the class," *Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 39 (1st Cir. 2003), but rather that the proposed class is "sufficiently cohesive to warrant adjudication by representation."  *In re Neurontin*, 244 F.R.D. at 108.  The Court's prior orders certifying the *Carpenters* TPP and Consumer Co-pay Classes identify many of the numerous legal and factual issues common to the representative plaintiffs and Class members.  *See, e.g.*, 244 F.R.D. at 84-85.  Given the virtually identical claims and allegations asserted by Public Payors in this case, common issues also predominate here.

---

[13] Of course, should any putative class member disagree with participating in this class action, the appropriate remedy is not to deny certification, but for any such class member to opt-out of the class.  *See, e.g.*, *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 692 (D. Minn. 1995) ("[T]hose large-volume purchasers who do not wish to participate in the proposed class action are free to opt out of the class pursuant to the procedure set forth in Rule 23(c)(2).").

- 8 -

At the class certification stage the First Circuit does not require "hard factual proof but [rather] . . . a more thorough explanation of how the pivotal evidence behind plaintiffs' theory can be established."  *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 29 (1st Cir. 2008).  Plaintiffs clearly meet this standard.  They have identified the undeniably common evidence of McKesson's misconduct that would be utilized at trial for every single member of the proposed classes if certification is denied.  Given this common evidence of liability and proof of impact, common legal and factual issues predominate in this litigation.[14]  Furthermore, as in *Carpenters*, Plaintiffs have provided a preliminary assessment of damages using Centers for Medicare & Medicaid Services ("CMS") and IMS data.[15]  248 F.R.D. at 371.

## 2.    The grounds for limiting *Carpenters* class damages through 2003 are not present in the current litigation.

In *Carpenters*, the Court limited the TPP Class damages period to the end of 2003 to avoid the possibility of a multitude of mini-trials on whether individual TPPs knew about the markup increases and were able to renegotiate their contracts to clawback losses.  *Carpenters*, 248 F.R.D. at 371-72.  There McKesson argued that TPPs could have renegotiated with their PBMs to implement a variety of contractual changes to eliminate the effect of the scheme and therefore individual issues of causation and mitigation predominate.  *Carpenters*, 244 F.R.D. at 86.  However, as set forth in the accompanying motion to strike, McKesson is not entitled to a mitigation defense as a matter of law, nor is it entitled to a right of offset for any cost-saving devices unrelated to decreased reimbursement rates.[16]

---

[14] Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion For Class Certification ("Hartman Decl."), ¶¶ 24-26; *see also* Proffer.

[15] *Id.* at Tables 1 and 2.

[16] As set forth in greater detail in Plaintiffs' Motion to Strike McKesson's Statute of Limitations and Mitigation Defenses, filed concurrently with this motion and incorporated by reference herein, Plaintiffs and Class members were not required to mitigate because McKesson was in an equal position to prevent the harm from occurring and failed to do so.  *See, e.g., Monex Int'l, Ltd. v. CFTC*, 83 F.3d 1130, 1135-36 (9th Cir. 1996); 22 AM JUR 2D DAMAGES § 354; D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 3.7 at 186 (1973) (reciting established rule that

Furthermore, the Court's prior concerns about individual issues of causation and the risk of an overcalculation of damages have also been addressed. Whereas the contractual history of individual TPP class members' reimbursement contracts was unknown in *Carpenters*, the evolution of Medicaid Plaintiffs' and Medicaid Class members' current Medicaid reimbursement rates are publicly available. As set forth in Dr. Hartman's declaration, it is clear from the timing of the various changes to their reimbursement rates that they were not made in response to the scheme.[17] Specifically, in 2001 and early 2002, there was a systematic increase in the discount off AWP for many state Medicaid programs, whereas from 2003 to the present few states have increased their discounts off AWP, suggesting there was no systematic push-back by state.[18] That these changes occurred when the scheme was in its infancy and little or nothing was known of its effects, further supports Dr. Hartman's conclusion that there was no evidence of systematic pushback among the Medicaid programs.[19] On the contrary, these changes were made in response to the general increases in AWP occurring prior to that period.[20]

Regarding the non-Medicaid Public Payors, Plaintiffs' damages calculation is based on a conservative interpretation of the data that does not take into account the downward trend in

---

the injured party is not required to take steps to mitigate when the defendant has the same opportunity to prevent injury to the plaintiff and fails to do so). Nor is McKesson entitled to collateral benefits payors may have received unrelated to McKesson's conduct or that of the pharmacies its scheme benefitted (*e.g.*, cost reductions as a result of increased co-pays or increased rebates unrelated to AWPs). *See, e.g.*, *Larocca v. Borden, Inc.*, 276 F.3d 22, 30 (1st Cir. 2002) (holding that the "'benefits received by the plaintiff from a source collateral to the defendant may not be used to reduce that defendant's liability for damages.'") (citations omitted).

[17] Hartman Decl., ¶ 22 (g) and Attach. D, Chart 1.

[18] *Id.*

[19] *Id.*

[20] *Id.* For example, a June 17, 2002 amendment to the Oklahoma Administrative Code to increase the AWP discount states: "Additional revisions modify the Estimated Acquisition Cost (EAC) from the Average Wholesale Price (AWP) minus 10.5% to AWP minus 12%. The current EAC formula was developed in 1995 through a survey of other state's EAC formulas. Since that time, the usefulness of the AWP as a basis for reimbursement has deteriorated substantially. Unfortunately, there are no other widely available price estimates on which to base an Estimated Acquisition Cost as required by Federal Law. Given this situation, a more realistic approach to pharmacy reimbursement is to increase the amount of the discount taken from the published AWP for each drug." Oklahoma Administrative Code Citations: OAC 317:30-5-78, Title 317, Oklahoma Health Care Authority Chapter 30, Medical Providers-Fee for Service, Volume 19, Number 16, June 17, 2002.

reimbursement rates that continued to occur before, during and after the scheme.[21] Damages are calculated based on the difference between the Plaintiffs' actual costs and the pre-scheme but-for reimbursement rate for the Appendix A drugs,[22] using IMS aggregate pricing information, which necessarily includes any changes in reimbursement amounts stemming from changes in Class members' reimbursement formulas. Thus, any alleged pushback inherent in the changes to reimbursement rates would necessarily be included in the damages calculation.[23]

### 3. Class treatment is superior to other forms of litigation.

Rule 23(b)(3) also requires that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy," Fed. R. Civ. P. 23(b)(3), to ensure "that resolution by class action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 346 (D. Mass. 2003) (quoting *Amchem*, 521 U.S. at 615).

As set forth in the Hartman Declaration: "Detailed statistical analysis of reimbursement data for the challenged drugs demonstrates that the impact and injury of the Scheme upon all members of the Public Payor Classes reimbursing on the basis of the AWPs for those NDCs was immediate and lasting."[24] Since the Classes include only those payors whose reimbursement rates were determined by AWPs and the scheme increased those AWPs, the impact was uniform across Class members.[25] Class-wide analysis is feasible and the most effective way of

---

[21] Hartman Decl., ¶¶ 22(e), 46-47.

[22] *Id.* at ¶ 47.

[23] *See id.* at Attach. C (8.15.08 Expert Report of Raymond S. Hartman Refined Calculation of Damages, ¶ 8(b)).

[24] Hartman Decl., ¶ 23.

[25] *Id.* at ¶ 24(c) and (d).

demonstrating impact, corroborating liability and measuring damages.[26]  As established in *Carpenters*, existing data sources and analytic methods can be used to demonstrate that McKesson's conduct and conspiracy led to class-wide economic impact and injury to the Class members.[27]  Dr. Hartman has provided damages calculations for each of the Classes.[28]

Class certification in this case is far superior to any other procedure available for the treatment of the common factual and legal issues raised by Plaintiffs' claims.  Because the same facts and evidence can and must be used as proof for each Class member, "[s]eparate proceedings would produce duplicate efforts, unnecessarily increase the costs of litigation, impose an unwarranted burden on this Court and other courts throughout the country, and create the risk of inconsistent results for similarly situated parties."  *In re Potash*, 159 F.R.D. at 699; *see also Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("the more claimants there are, the more likely a class action is to yield substantial economies in litigation").  With an estimated membership in the thousands for the Opt-Out Non-State Medicaid Class and as many as fifty states and territories for the Opt-In State Medicaid Class, the litigation of Public Payor claims as class actions would clearly be more efficient than individual litigation.

Additionally, if the Court were to deny class certification, many Class members would likely be foreclosed from pursuing individual claims against McKesson due to the extensive costs involved.  *See In re Potash*, 159 F.R.D. at 699 ("[T]he cost associated with individual claims may require claimants with potentially small claim amounts to abandon otherwise valid claims simply because pursuing those claims would not be economical.").  Accordingly, Plaintiffs have satisfied the superiority requirement of Rule 23(b)(3).

---

[26] *Id.* at ¶ 26.

[27] *Id.* at ¶ 26(e).

[28] *Id.* at ¶¶ 27-50.

- 12 -

**4.    Class damages can be easily calculated.**

"[W]here damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 86 (D. Mass. 2005).  As in *Carpenters*, Dr. Hartman has calculated aggregate damages for the Non-State Medicaid Class using industry-wide data available from IMS.  *See* 248 F.R.D. at 371 ("After a rigorous review of the expert analysis for purposes of class certification, Plaintiffs have demonstrated that the IMS data is a reasonable proxy for what TPPs paid at retail during the redefined class period.").  Using the damages calculations for Plaintiffs Montana and Oklahoma as examples, Dr. Hartman has demonstrated a means to calculate damages for each member of the Non-State Medicaid Class by means of publicly-available CMS data.[29]

If the Court certifies the Class, allocation of the award will be made administratively upon the submission of claims, according to a Court-approved formula.  *See* Plaintiffs' Proposed Trial Plan, filed concurrently with this motion.  Plaintiffs have therefore met their burden at class certification of presenting the Court "with a *likely* method for determining class damages."  *Carpenters*, 244 F.R.D. at 89 (emphasis in original) (quotation and citation omitted).

**5.    Plaintiffs' state law claims are manageable and involve common issues.**

In *Carpenters*, the Court declined to resolve the issue of whether California law applied to the nation-wide class at class certification in light of the plaintiffs' federal RICO claims:

> When dealing with variations in state laws, courts have concerns about case manageability.  However, plaintiffs can address these concerns by grouping state laws in a case management plan.  The parties engage in vigorous debate as to whether California law can apply to this nation-wide class.  This Court need not resolve the

---

[29] Hartman Decl., ¶¶ 27-50.

> dispute because this Court can certify a nation-wide class under federal RICO law at this juncture, thus obviating difficult questions of choice of law.  If the RICO cause of action fails to survive a motion for summary judgment and the Court decides that California law does not apply, plaintiffs will have to propose groupings of state consumer protection laws, and a case management plan based on these clusters.

244 F.R.D. at 88 (citations omitted).  In keeping with the Court's established procedure in *Carpenters* and *AWP* to defer ruling on state unfair competition claims until the Court has determined whether certification of Plaintiffs' federal claims is warranted, Plaintiffs do not seek a ruling on the appropriate groupings of their unfair competition claims at this time.  And while the Court may also choose to defer ruling on Plaintiffs' remaining state common law claims, Plaintiffs firmly believe that California law applies on a nation-wide basis and briefly address this issue below.[30]

### a.    California law applies to the Classes.

#### (1)    California has an interest in policing misconduct within its borders.

Plaintiffs allege that McKesson, a California corporation, colluded with FDB, which maintains its corporate headquarters in California.  SAC (Dkt. No. 27), ¶¶ 37-38.  Plaintiffs also allege that the conspiracy and scheme outlined in the Second Amended Complaint occurred in California and provide numerous examples of fraudulent communications originating and implementing the scheme that occurred between McKesson employees in California and FDB employees in California.  *Id*. at ¶¶ 128-79.  California's interest in the enforcement of its laws is not limited to protecting its own residents, but also includes "an interest in deterring fraudulent

---

[30] Even if the Court concludes that the laws of the Class members' states of residence control, certification is still appropriate.  As the Court recognized in *Carpenters* and applied in *AWP*, to the extent the state laws differ, the Court may certify subclasses of claims based on state laws with essentially the same requirements.  *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83 (D. Mass. 2008).  In the event the Court determines that California law should not apply on a class-wide basis, Plaintiffs respectfully request that they be allowed to supplement briefing on this issue and provide the Court with a suggested grouping of state laws similar to the classes certified in *AWP*.

conduct by businesses headquartered within its borders and protecting consumers from fraudulent misrepresentations emanating from California." *J.P. Morgan & Co., Inc. v. Superior Ct.*, 113 Cal. App. 4th 195, 221, 6 Cal. Rptr. 3d 214 (4th Dist. 2003) (quotation, citation omitted). Because the State "has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices," it is appropriate to apply California law to Plaintiffs' conspiracy and tortious interference claims. *Diamond Multimedia Sys., Inc. v. Superior Ct.*, 19 Cal. 4th 1036, 1063-64, 80 Cal. Rptr. 2d 828 (1999). Under similar circumstances, California courts have found it appropriate to certify a national class action under California common law claims. *Id.* (discussing *Clothesrigger, Inc. v. G.T.E. Corp.*, 191 Cal. App. 3d 605, 615, 236 Cal. Rptr. 605 (4th Dist. 1987).

In *Clothesrigger*, the plaintiff moved to certify a national class against the defendant telephone company for fraud, negligent misrepresentation and unfair business practices arising from its policy of charging customers for unanswered long distance calls. 191 Cal. App. 3d at 610. The trial court certified a state-wide class but refused to certify a nation-wide class on the grounds that California had no interest in providing greater protection to residents of other states than that provided by their home states. *Id.* The Court of Appeal reversed, holding that the trial "court simply erred in stating California has no interest in providing nonresident plaintiffs greater protection than their home states provide. California's more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery." *Id.* at 616. Specifically, California's interest in fraud deterrence may warrant "applying its law to the claims of nonresident plaintiffs," where other affected states have no "interest overriding California's interests." *Id.* at 615, 616. As set forth below, California's interest outweighs competing interests of other states.

- 15 -

> **(2)      In close cases Massachusetts' choice of law analysis favors the law of the state that best effectuates the law's objective.**

Because this Court sits in Massachusetts, the law of Massachusetts applies to the choice of law analysis.  *Borden v. Paul Revere Life Ins. Co*., 935 F.2d 370, 375 (1st Cir. 1991). Massachusetts courts do not apply conflict of laws principles mechanically, but rather evaluate each case according to the facts.  *Computer Sys. of Am., Inc. v. International Bus. Machines Corp.*, 795 F.2d 1086, 1091-92 (1st Cir. 1986).   Under the Restatement rules for tort claims, the key factors are:  (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicil, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered.  RESTATEMENT (SECOND) CONFLICT OF LAWS § 145(2).  The only factors that have application here are (1), (2), and (3).  While the injury occurred in Class members' states of residence, the conduct causing this injury occurred in California, and McKesson also is incorporated and has its principal place of business there.  Thus, California has an equal or greater interest in having its laws applied than the laws of Class members' states of residence.

In close cases, Massachusetts favors applying the law that would best effectuate the states' interest in protecting the rights attendant to a given cause of action.  *Bushkin Assocs., Inc. v. Raytheon Co*., 393 Mass. 622, 634 (1985).  In *Bushkin*, the plaintiff filed a breach of contract action in Massachusetts to avoid the statute of frauds problem he would have encountered had he brought the same action in New York.  The federal district court certified the choice of law question to the Massachusetts Court of Appeals, which held that the plaintiff could not avoid the law of New York or benefit from alleged "forum shopping." *Id*. at 627.  The Massachusetts Supreme Judicial Court reversed, finding that while both states had an interest in the transaction,

Massachusetts law should apply because it was best able to effectuate both states' policy of

protecting the right of contract:

> Where relevant contacts and considerations are balanced, or nearly
> so, we are inclined to resolve the choice by choosing that law
> "which would carry out and validate the transaction . . . in
> preference to a law that would tend to defeat it. . . ." *Boston Safe
> Deposit & Trust Co. v. Paris*, 15 Mass. App. Ct. 686, 691 (1983).
> In this case, the law that will validate the agreement, if indeed
> there was an agreement, is that of Massachusetts.

*Id*. at 636.

<b>(3)    Applying California law best effectuates the states' interest in<br>protecting their residence against conspirators and tortious<br>interference with contract.</b>

Similarly, this Court should choose to apply California law on a nationwide basis, rather

than applying the laws of Class members states of residence, which may not provide the same

protections that California law does. California law follows RESTATEMENT (SECOND) OF TORTS,

§ 766(A), which provides that a defendant may be liable for tortious interference with a contract

even without a breach if it caused the performance of the contract to be more burdensome and

expensive. *Pacific Gas & Elec. Co. v. Bear Stearns & Co*., 791 P.2d 587, 592 (Cal. 1990).

Many other states require a plaintiff to prove an actual breach of contract. *See*, *e.g.*, *St. Louis

Convention & Visitors Comm'n v. NFL*, 154 F.3d 851, 865 (8th Cir. 1998). Applying California

law would serve the interests of all Class members' states in protecting against harm to their

residents caused by tortious conduct. By contrast, the interest of states requiring proof of a

breach is strictly local and aimed at either (1) protecting their courts from the burden of hearing

such claims, or (2) protecting their residents from being subjected to such claims. *See*

RESTATEMENT (SECOND) CONFLICT OF LAWS § 145, comment c (describing purposes of rules

denying or limiting liability). The interest of these states only arise when plaintiffs attempt to

bring claims in their courts or against their residents. *See*, *e.g.*, *Competitive Techs. v. Fujitsu*

- 17 -

*Ltd*., 286 F. Supp. 2d 1118, 1159 (N.D. Cal. 2003) ("The interest of a state in a tort rule limiting damages . . . is to protect defendants from excessive financial burdens or exaggerated claims. . . . This interest . . . is also primarily *local*; that is, a state by enacting a limitation on damages is seeking *to protect its residents* from the imposition of these excessive financial burdens.") (emphasis added) (quoting *Hurtado v. Super. Ct.*, 11 Cal. 3d 574, 579, 522 P.2d 666 (1974)).

With regard to Plaintiffs' conspiracy claim, Plaintiffs are unaware of any material differences between California law and that of the other states.  In such cases, there is no conflict in applying California law.  *See, e.g. Lebegern v. Forman*, 471 F.3d 424, 429 (3d Cir. 2006).

In summary, McKesson is a California corporation and the fraudulent conduct occurred in California.  California has a strong interest in policing the misconduct of California businesses even when the harm occurs outside its borders, and under similar circumstances, its courts have endorsed national class actions as an appropriate means of enforcing its laws.  A class action is therefore an appropriate and manageable vehicle for the resolution of Plaintiffs' California common law claims.

### b.    Conspiracy.

Technically, under California law, "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd*., 869 P.2d 454, 457 (Cal. 1994).  To prevail on a conspiracy claim under California law, Plaintiffs must provide substantial evidence of three elements:  (1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct.  *Kidron v. Movie Acquisition Corp*., 40 Cal. App. 4th 1571, 1581 47 Cal. Rptr. 2d 752 (2d Dist. 1995).  Each of these elements involves common proof of McKesson's or FDB's tortious conduct, and thus this

claim is also appropriate for class certification.  Moreover, if Plaintiffs prove that McKesson and FDB agreed to and took steps to carry out their illegal scheme to artificially inflate WAC to AWP markups, McKesson is liable for the harm caused by the conduct of FDB in carrying out the scheme.

**c.    Tortious interference with performance of a contract.**

To prevail on their claim for tortious interference with the performance of a contract under California law, Plaintiffs must prove that (1) they and members of the proposed Classes had reimbursement contracts based on AWP, (2) McKesson was aware of these contractual relationships, (3) McKesson acted intentionally to increase AWPs, and (4) in so doing, McKesson increased the costs of performance under these contracts, thereby causing injury to Plaintiffs and the Class members.  *Applied Equip. Corp.*, 869 P.2d at 458 n.4; *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d at 592.  Given the use of AWP as a benchmark for prescription drug reimbursements, each of the above elements will be proven with evidence common to each member of the proposed Classes.

**D.    An Opt-In State Medicaid Class is Appropriate Under Rule 23 in This Case**

Although Rule 23 does not explicitly authorize courts to certify opt-in classes, "[c]ircumstances may require a court to depart from the spirit of the Federal Rules and impose what amounts to an opt-in requirement."  *In re Crazy Eddie Sec. Litig.*, 135 F.R.D. 39, 42 (E.D.N.Y. 1991).  Given the National Association of Medicaid Fraud Control Units' ("NAMFCU") recent interest in the State Medicaid claims Plaintiffs are pursuing in this case, Plaintiffs believe circumstances exist that warrant the certification of an opt-in class.  While some States may choose to work through NAMFCU in an attempt to resolve their claims, each State should be given the opportunity to join this litigation through the proposed opt-in State

- 19 -

Medicaid class, particularly in light of Plaintiffs' counsel's origination and litigation of the claims at issue, and their experience from and success in the TPP litigation.

The vast majority of Public Payors are included in the Opt-Out Non-State Medicaid Class. This Class includes claims by all State, Territory, and local governmental entities, except those of State and Territory Medicaid programs. The claims of State and Territory Medicaid programs are represented by the Opt-In State Medicaid Class. Although Plaintiffs recognize their two-class framework may not be optimal in terms of streamlining the class certification process, circumstances largely beyond Plaintiffs' control have necessitated the inclusion of the separate Opt-In State Medicaid Class.

Specifically, in recent months NAMFCU has expressed an interest in Plaintiffs' claims. Each State and Territory that is a putative member of the Opt-In State Medicaid Class has a Medicaid fraud control unit that receives communications from NAMFCU regarding Medicaid-related fraud and litigation arising therefrom. Apparently as a result of the success of Plaintiffs' counsel in the TPP litigation, NAMFCU began investigating the State Medicaid claims Plaintiffs are pursuing in this case and created a "McKesson Team" consisting of representatives from the Attorney General offices in Delaware, New Jersey, New York, Texas, and Virginia.[31] This group has contacted Plaintiffs' counsel on several occasions seeking information and input on the progress of the litigation and the likelihood of recovery, and Plaintiffs' counsel understands NAMFCU is also communicating with McKesson and the State Medicaid Programs.

In an effort to work cooperatively and in recognition of NAMFCU's record of settling litigation on behalf of certain of its member State Medicaid fraud units, Plaintiffs agreed to seek certification of an opt-in class of State and Territory Medicaid claimants. Plaintiffs believe that

---

[31] Plaintiffs are not aware of the additional States, if any, NAMFCU purports to represent in this litigation.

such an opt-in class will promote the efficient litigation of State and Territory Medicaid claims against McKesson before this Court.

Moreover, the arguments typically made against the certification of opt-in classes are not applicable in this case.  For example, "[a]n important principle underlying Rule 23 is that class members should not be required to request inclusion into a class action.  Many will fail to do so for reasons of 'ignorance, timidity, [and] unfamiliarity with business or legal matters.'"  *In re Crazy Eddie*, 135 F.R.D. at 42 (quoting Benjamin Kaplan, "Continuing Work of the Civil Committee:  1966 Amendments of the Federal Rules of Civil Procedure I," 81 Harv. L. Rev. 356, 397-98 (1967)).  Here, the State and Territory Medicaid programs are sophisticated entities, knowledgeable about class action litigation, and staffed with in-house legal professionals available to facilitate a simple request to opt into the Opt-In State Medicaid Class.  Indeed most, if not all, of these programs have participated in settlements involving State Medicaid claims similar in structure to the proposed Opt-In State Medicaid Class.[32]

In light of the foregoing, this Court should exercise its equitable powers[33] and certify the Opt-In State Medicaid Class.  Notice can be sent to each State and Territory Medicaid program providing those that wish to participate in the case and whose interests are not represented by NAMFCU a simplified mechanism by which to opt their Medicaid claims into the Opt-In State Medicaid Class.  Such an opt-in class will promote the efficient litigation of the State and Territory Medicaid claims before this Court, which is extremely knowledgeable about the facts of this litigation.

---

[32] *See, e.g.*, Sanofi-Aventis Press Release Announcing Settlement of AWP Fraud Claims Relating to Anzemet (settlement included an "'opt-in' fund for states desiring to resolve any alleged Medicaid overpayment claims for Anzemet(R) relating to the same conduct"), Declaration of Steve W. Berman in Support of Plaintiffs' Proffer of Evidence Common to the Class in Support of Class Certification, Ex. C.

[33] The "class suit was an invention of equity."  *Hansberry v. Lee*, 311 U.S. 32, 41 (1940); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 822 (1999) (acknowledging that the modern class action device developed as an exception to the rigidity of the necessary parties rule in equity, as well as from the bill of peace, an equitable device for combining multiple suits).

- 21 -

**E.       The Eleventh Amendment is Not an Obstacle to Class Certification**

During the course of this litigation, McKesson has expressed concern about the Eleventh

Amendment and Plaintiffs' ability to certify a class that includes as absent Class members

agencies or governments of States that are not named class representatives (Oklahoma and

Montana) or pursuing their claims individually in separate cases (California and Connecticut).

As evidenced by nearly two hundred years of American jurisprudence, McKesson's concern

lacks merit, and the Eleventh Amendment is not an obstacle to certification of either proposed

Class.

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to
> extend to any suit in law or equity, commenced or prosecuted
> against one of the United States by Citizens of another State or by
> Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.  The Amendment bars "any suit . . . commenced . . . *against*" a State.  *Id.*

(emphasis added).  Consistent with the plain text of the Amendment, the Supreme Court has

*never* held that a suit *by or on behalf of* a State violates the Amendment.  On the contrary, in

*Cohens v. Virginia*, 19 U.S. 264, 1821 WL 2186 (1821), the Supreme Court was called upon to

decide the scope of its appellate jurisdiction when a State is a party to the appeal.  In reaching the

explicit conclusion that the Eleventh Amendment does not reach suits initiated by States, Chief

Justice Marshall parsed the language of the Eleventh Amendment to determine its meaning:

> The first impression made on the mind by this amendment is, that
> it was intended for those cases, and for those only, in which some
> demand *against* a State is made by an individual in the Courts of
> the Union.  If we consider the causes to which it is to be traced, we
> are conducted to the same conclusion. . . .
>
> The words of the amendment appear to the Court to justify and
> require this construction.

> . . . . [The amendment's] meaning is, that the judicial power shall
> not be construed to extend to any suit which may be commenced,
> or which, if already commenced, may be prosecuted *against* a
> State by the citizen on another State.

*Cohens v. Virginia*, 19 U.S. at 406-09, 1821 WL 2186, at *57-58 (emphasis added).

Over a hundred and fifty years later, the Supreme Court described the scope of the Eleventh Amendment almost identically. In *Edelman v. Jordan*, Justice Rehnquist wrote: "Thus the rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." 415 U.S. 651, 663 (1974). The Eleventh Amendment applies therefore solely to protect States from suits ***against*** them: "The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (internal quotations and citations omitted).[34]

While the Supreme Court has repeatedly held that the States' sovereign immunity is not limited to the literal text of the Eleventh Amendment, it has never held that sovereign immunity applies to suits commenced by States. The Supreme Court has only gone beyond the Eleventh Amendment's literal text in circumstances when a suit is commenced ***against*** a State. *See*, *e.g.*, *Alden v. Maine*, 527 U.S. 706, 727-28 (1999) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890) (citizen barred from suing his own State under federal question jurisdiction, and analyzing other instances in which it had extended sovereign immunity beyond the Eleventh Amendment's literal

---

[34] *See also Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994) ("[T]he vulnerability of the State's purse [is] the most salient factor in Eleventh Amendment determinations."); *Allen v. Woodford*, 544 F. Supp. 2d 1074, 1078 (E.D. Cal. 2008) ("It is recognized that the immunity of a state arises 'only when the state government (including state agencies, not its political subdivision) is sued.'") (quoting Rotunda and Nowak, *Treatise on Constitutional Law* (4th ed. 2007), § 2.12(x), p. 210-11).

text to bar suits against States)).[35]  Not surprisingly, circuit courts of appeal have reached the

same conclusion.  *See*, *e.g.*, *Oklahoma ex rel. Edmondson v. Magnolia Marine Transp. Co.*, 359

F.3d 1237, 1239 (10th Cir. 2004) ("[T]he Eleventh Amendment's abrogation of federal judicial

power 'over any suit . . . commenced or prosecuted against one of the United States' does not

apply to suits commenced or prosecuted by a State."); *California ex rel. Lockyer v. Dynegy, Inc.*,

375 F.3d 831, 848 (9th Cir. 2004) ("[W]e hold that a state that voluntarily brings suit as a

plaintiff in state court cannot invoke the Eleventh Amendment when the defendant seeks

removal to a federal court of competent jurisdiction.").[36]

       Further evidencing the well-settled rule that the Eleventh Amendment only applies when

suit is brought against a State, numerous courts have certified classes that have included States as

class representatives and/or absent class members.  *See*, *e.g.*, *General Motors v. New York*, 501

F.2d 639 (2d Cir. 1974) (dismissing appeal of class certification of nation-wide governmental

entity class); *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1082-83 (2d Cir. 1971)

(affirming Rule 23(b)(3) settlement class in antitrust pharmaceutical case that included "states,

counties, cities and their political subdivisions and agencies arising out of their purchases or out

of payments to or for the benefit of recipients of welfare or other aid," where states were given

opportunity to opt out); *In re Real Estate Title & Settlement Servs. Antitrust Litig.*, MDL No.

633, 1986 WL 6531 (E.D. Pa. June 10, 1986) (certifying class which included governmental

entities); *In re Fine Paper Antitrust Litig.*, 82 F.R.D. 143 (E.D. Pa. 1979) (certifying state class

---

[35] *See also Smith v. Reeves*, 178 U.S. 436 (1900) (non-consenting States are immune from suits brought by federal corporations); *Principality of Monaco v. Mississippi*, 292 U.S. 313 (1934) (non-consenting States are immune from suits brought by foreign nations); *Blatchford v. Native Village of Noatak*, 501 U.S. 775 (1991) (non-consenting States are immune from suits brought by Indian tribes); *Ex parte New York*, 256 U.S. 490 (1921) (non-consenting States are immune from suits brought in admiralty); *Seminole Tribe v. Florida*, 517 U.S. 44 (1996) (holding State immune from suit involving a federal question).

[36] *See also Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1564 (Fed. Cir. 1997) ("[T]he Eleventh Amendment applies to suits 'against' a state, not suits by a state."); *Huber, Hunt & Nichols, Inc. v. Architectural Stone Co., Inc.*, 625 F.2d 22, 24 n.6 (5th Cir. 1980) ("Of course, the eleventh amendment is inapplicable where a state is a plaintiff. . . .").

actions where States served as class representatives), *aff'd*, 685 F.2d 810 (3d Cir. 1982); *In re Master Key Antitrust Litig.*, 70 F.R.D. 23, 27 (D. Conn. 1975) (certifying national governmental entity class); *Louisiana v. Weinberger*, 369 F. Supp. 856 (E.D. La. 1973) (certifying class action consisting of the fifty states).

The procedural history in *In re Lupron Marketing and Sales Practices Litig.*, MDL No. 1430, 01-CV-10961 (D. Mass.), provides additional support for both governmental entity classes Plaintiffs propose here. In *Lupron*, the defendant settled a qui-tam action with the federal government and created an opt-in settlement fund for State Medicaid agencies similar to the proposed Opt-In State Medicaid Class. Nation-wide class actions on behalf of third-party payors – which included claims by all non-Medicaid governmental entities – were then consolidated in this Court. The Court ultimately approved a final settlement of these claims on behalf of a nation-wide third party payor class that included non-Medicaid governmental entities. *In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005).

In summary, the Supreme Court's modern interpretation of the Eleventh Amendment is indistinguishable from its interpretation of nearly two hundred years ago. Sovereign immunity was and continues to be an affirmative defense to actions commenced against the sovereign. Neither the concerns that led to the passage of the Eleventh Amendment nor the Supreme Court's interpretation of it since prohibit a class action brought on behalf of States. Moreover, when an adequate representative pursues a class action on behalf of and for the benefit of States, as in the instant case, the Eleventh Amendment does not apply because suit has not been commenced against the States.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion to certify the proposed Classes.

Dated this 1st day of July, 2009.

                     <u>    s/ Steve W. Berman         </u>
Steve W. Berman
Sean R. Matt
Barbara A. Mahoney
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
206-623-7292 (tel.)
206-623-0594 (fax)

James L. Ward, Jr.
A. Hoyt Rowell, III
Richardson, Patrick, Westbrook & Brickman, LLC
P.O. Box 1007
Mt. Pleasant, SC 29465
843-727-6500 (tel.)
843-216-6509 (fax)

*Co-Lead Counsel for Plaintiffs*

R. Bryant McCulley
McCulley McCluer PLLC
One Independent Drive, Suite 3201
Jacksonville, FL 32202
904-482-4073 (tel.)
904-354-4813 (fax)

Stuart H. McCluer
McCulley McCluer PLLC
1109 Van Buren Avenue
Oxford, MS 38655
662-236-1401 (tel.)
662-234-1974 (fax)

Daniel Kotchen
Daniel Low
Kotchen & Low LLP
2300 M St., NW, Suite 800
Washington, DC 20037
202-416-1848 (tel.)
202-280-1128 (fax)

*Attorneys for Plaintiffs*

- 26 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on July 1, 2009.


  s/ Steve W. Berman_____
Steve W. Berman