UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE MCKESSON GOVERNMENTAL ENTITIES AVERAGE WHOLESALE PRICE LITIGATION | Master File No.: 1:08-CV-10843-PBS |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| *Douglas County*, 1:08-CV-11349-PBS; *San Francisco Health Plan*, 1:08-CV-10843-PBS | |

**PLAINTIFFS' PROFFER OF EVIDENCE COMMON TO THE CLASS
IN SUPPORT OF CLASS CERTIFICATION**

**TABLE OF CONTENTS**

**PAGE**

I.    STATEMENT OF FACTS COMMON TO THE CLASS ...................................................1

    A.    McKesson was Aware that Public Payors rely on AWP to Reimburse
        Pharmacies Who Dispense Drugs to their Beneficiaries. ........................................1

II.    MCKESSON ENGAGED IN A SCHEME TO DEFRAUD PAYORS ............................7

    A.    McKesson's Public Position was that AWPs Were Determined by
        Manufacturers' Historic Mark-Ups and not by McKesson...................................7

    B.    Contrary to its Official Position, McKesson Raised its Internal
        Mark-Ups in an Effort to Increase AWPs for the Benefit of its Customers. ...........8

    C.    McKesson Colluded with First Data to Increase Brand Drug Mark-Ups..............12

III.    CLASS MEMBERS COULD NOT HAVE DISCOVERED THE SCHEME .................21

    A.    McKesson Sought to Conceal its Collaboration with First Data ..........................21

    B.    First Data Also Hid the Scheme...........................................................................22

IV.    CONCLUSION.....................................................................................................24

001821-17 311709 V1

## I.    STATEMENT OF FACTS COMMON TO THE CLASS

As this Court is aware, some of the Counsel for Plaintiffs discovered McKesson's Scheme in the course of discovery in the *AWP Litigation*, currently pending before this Court. Deposition testimony and documents produced in response to a subpoena issued in that case revealed that Defendants First DataBank ("First Data") and McKesson Corporation ("McKesson") worked in conjunction with each other to increase the WAC/AWP markup on brand-name prescription drugs from 20% to a standard 25%.  In *New England Carpenters v. First DataBank*, No. 1:05-CV-11148-PBS, this Court certified a class of private Third Party Payors ("TPPs") and a consumer class who purchased one or more of the over 450 brand-name prescriptions drugs that were inflated by the Scheme ("Appendix A drugs").  The record in *Carpenters* was highly developed and has been made available to the parties in this litigation pursuant to Case Management Order No. 2, as if produced in this case.  Plaintiffs provide a selective overview of the evidence from that litigation.

Discovery is ongoing, but recently produced documents confirm Plaintiffs' allegations that McKesson was aware of the effect of its scheme on Public Payors like Plaintiffs and members of the proposed Classes.  Because the Court will likely want to see how liability can be established at trial on a class-wide basis, Plaintiffs do so below.

**A.    McKesson was Aware that Public Payors rely on AWP to Reimburse Pharmacies Who Dispense Drugs to their Beneficiaries.**

McKesson maintains, and has maintained since the beginning of the proposed Class Period, a Public Affairs Department to track federal and state developments that affect pharmacy

sales and to lobby on behalf of its interests and the interests of its primary clients: retail

pharmacies.[1]  As explained in one of McKesson's internal documents:

**McK is engaged at all levels of government**

- **Congress**
- **Bush Administration**
- **Regulatory agencies**

**What has been successful in McK lobbying efforts**

1. Educate local Members of Congress re our business (and customers) in their district/state

2. Lobby Members directly in DC

3. Provide comments/analysis of proposed regulations

4. Work with our trade associations to build coalitions

**We are always concerned about the health and well-being of our customers.  If there are opportunities to weave similar messaging motions/issues during our conversations in DC, [we] will consider.**[2]

In another document, McKesson states:

**We stay actively engaged and actually impact the process**
- **McKesson Executives**
- **Lobbyists**
- **PAC & Corporate Contributions**
- **Business & Trade Associations**[3]

As an example of the type of monitoring McKesson conducted, in January 2002 Ann

Berkey, McKesson Vice President of Public Affairs, identified several new developments in

---

[1] *See*, *e.g.*, MCKAWP 0203514-23; MCKAWP 0203749-50; MCKAWP 0206126-28.  For the Court's convenience, all documents cited in Plaintiffs' Proffer of Evidence are in bates number order and attached as Exhibit A to the Declaration of Steve W. Berman in Support of Plaintiffs' Proffer of Evidence Common to the Class In Support of Class Certification ("Berman Decl.") unless otherwise indicated.  All deposition testimony cited herein is also attached to the Berman Decl. as Exhibit B in alphabetical order by the deponents' last name.

[2] MCKAWP 0203516 (emphasis in original).

[3] MCKAWP 0203025 (emphasis in original).

federal and state law.  She applauded the decision by the Centers for Medicare and Medicaid

Services ("CMS") to cover self-injected drugs, noting that "expanded reimbursement should be

beneficial for McKesson's customers, and therefore the company."[4]  In the same report she also

noted with dismay a report by the General Accounting Office ("GAO") that studied prescription

drug reimbursement under the states' Medicaid programs and recommended that the West

Virginia Department of Health and Human Resources adjust its drug reimbursement formula to

increase the discount off of AWP to more accurately reflect the prices pharmacies are actually

paying for drugs.[5]  She noted that "[n]umerous state Medicaid directors are relying on the OIG

[Office of Inspector General] and GAO reports to justify reduced reimbursements to pharmacies"

and pointed out a University of Texas report, commissioned by National Association of Chain

Drug Stores and the National Community Pharmacy Association, which questioned the

government's methodology.[6]  McKesson also tracked state Medicaid program reimbursement

rates and made a note of states that abandoned the AWP-based reimbursement formula.[7]

    In addition to tracking relevant legislation that may affect its retail pharmacy clients,

McKesson also actively lobbied on their behalf.  For example, when Congress implemented

Medicare Part D drug benefits for seniors, McKesson's "Public Policy Issues Update-April

2005" stated:  "We are considering opportunities to support our retail pharmacy base as this

benefit is rolled out."[8]

---

[4] MCKAWP 0206126.

[5] *Id.*

[6] *Id.*

[7] MCKAWP 0203742-44; MCKAWP 0203756.

[8] MCKAWP 0203550.

McKesson also actively lobbied against legislation that would reduce reimbursement costs for Public Payors.  For example, in an Issues Update (May 2005), under the caption "State issues":  "Drug Pricing," McKesson reports:

| Outlook | McKesson Position/Action |
|---|---|
| Multiple states continue to propose legislation to allow legalized Rx importation; unsuccessful to date.  Others have directly challenged the FDA with web links to approved Canadian pharmacies. Websites are generally ineffectual, however, FDA has increased enforcement efforts to shut down these sites and confiscate imported Rx.  Texas and CA are still deliberating on the implementation of wholesaler Rx reporting laws | Continue to express concerns about state/local government importation plans due to product safety, cost effectiveness and liability issues.  Ongoing discussions with state legislators and regulatory officials about proposed mandates for submission of wholesaler Rx pricing data: price information is proprietary and may not be inclusive, usage of this data will be disadvantageous to customers and submission will require costly systems changes.  Working with industry coalition in Texas to repeal the Rx price reporting mandate and in California to mitigate its onerous and precedent-setting impact on our operations.[9] |

In another document, McKesson acknowledged that "McK customers will continue to turn to us seeking information/solutions" to the threat of competition from lower-priced drugs imported from Canada.[10]

As another example of McKesson's efforts to lobby on behalf of its customers at the expense of higher reimbursement costs to Public Payors, in the fall of 2005 McKesson was "very

---

[9] MCKAWP 0203750.

[10] MCKAWP 0203023.

focused on proposed Medicaid cuts as they impacted pharmacy reimbursements for generics."[11] In response to this threat to its retail clients, McKesson successfully lobbied Congress to increase the proposed upper reimbursement limit for generic drugs from the Average Manufacturer Price ("AMP") + 20% to AMP + 250%.[12]

Even outside the Government Affairs Department, McKesson was fully aware of the impact its scheme would have on Public Payors. Indeed, a McKesson employee specifically questioned Bob James, Director of Brand Pharmaceutical Product Management and the principal architect of the scheme, about the impact of rising AWPs on Public Payors:

> Has anyone researched what impact this will have on Medicaid/Medicare reimbursement in states where its [sic] still based on AWP?

James responded:

> *Dale, this is not our issue. But, I have thought about it a lot.* One of the unintended consequences is that Retail Customers will potentially be more profitable.[13]

An internal memo from Johnson & Johnson ("J&J") also recognizes that the Scheme caused artificial increases for public payors, while increasing pharmacy profits:

> It has come to our attention that pricing services such as First DataBank are now adjusting our recommended AWP's based on a WAC + 25% formula. The result is a win for providers (pharmacies) since their reimbursement from Medicaid is increased. The state pays more and there is additional pressure on the industry as a whole because state expenditure for drugs will increase. This is an artificial price increase and setting of the AWP is out of our hands.[14]

---

[11] MCKAWP 0206247.

[12] *Id.*

[13] MCKAWP 0069594 (emphasis added).

[14] MDL-JJ00000110.

J&J drafted an internal memo in which it addressed First Data's unauthorized increase of

J&J's mark-up to 25%.  It observed:

> Since AWP is the basis for reimbursements in many segments, this
> action will increase the strain on multiple payers.  The inflated
> AWPs would benefit pharmacies under Medicaid payment
> procedures and since AWP is the primary basis of Medicaid
> reimbursement, the impact to states could be significant.
>
> * * * *
>
> When probed by various J&J contacts, FDB provided
> contradictory responses . . . ranging from: the use of survey
> methods and techniques have not changed: the data is what it
> is. . . . to the other end of the spectrum . . . . it was a deliberate
> action:  "J&J will be a +25% company" as would other 20%
> companies to standardize data collection and reporting
> requirements on FDB.  There was not much detail provided
> regarding survey techniques.  J&J trade relations believe the major
> wholesalers are surveyed and two out of the three majors would be
> enough to change the price point.  From a wholesaler perspective
> the theory exists that this would be a way to enamor themselves
> with the retail pharmacies, as greater profits would be realized by
> the pharmacists.[15]

The numerous incriminating communications by Bob James and others at McKesson

discussed below make clear that increased costs for public and private payors alike as a result of

the scheme was not an "unintended consequence."  Rather, McKesson knew that because the

scheme inflated AWPs used as benchmarks for reimbursement, all payors were directly impacted

through higher prescription drug costs to the benefit of McKesson's retail clients.

---

[15] MDL-CEN00103686 (Ortiz exhibit 001).  Ms. Ortiz testified that the memo represented a summary of her
research into the question of the AWP reporting issue.  Ortiz (AWP, 8-30-05) Dep. at 88:14-20.

## II.     MCKESSON ENGAGED IN A SCHEME TO DEFRAUD PAYORS

**A.     McKesson's Public Position was that AWPs Were Determined by Manufacturers' Historic Mark-Ups and not by McKesson.**

In January 2002, McKesson organized an upper-management "meeting to discuss McKesson's position regarding Average Wholesale Price."[16]  Among the topics discussed were "how different reimbursement models or change in reimbursement models might look,"[17] and "the legislative momentum surrounding the issue of Average Sale Price vs. Average Wholesale Price vs. Wholesale Acquisition Costs (WAC) and the complexities and potential implications to our customers of any such changes and eventually to our company [McKesson]."[18]  At the meeting, it was agreed that Greg Yonko and Jeff Herzfeld, Senior Vice President of Pharmaceutical Product/Pharma Finance, would "develop a position statement" that could be used to "communicate throughout our management team so that we are on all on the same page, so-to-speak, when discussing such issues with our customers, suppliers, and any legislative types."[19]

Yonko circulated a drafted of the official McKesson position, which defined AWP as a suggested retail price set by manufacturers' historic mark-ups and not established by McKesson:

> **What is AWP?** - AWP or Average Wholesale Price represents a suggested retail-selling price for a branded or generic pharmaceutical and has been around for many years.  Its [sic] calculated as a markup from WAC (Wholesale Acquisition Cost).  The markup typically runs 20 to 25 % and is for the most part determined by historical spreads from the manufacturer (not by McKesson).  McKesson carries the price in our system and adjusts it if there is any pricing action.  First Data Bank publishes this price and it is the basis for all retail pharmacy dispensed

---

[16] MCKAWP 0065896.

[17] Yonko (FDB, 5-15-07) Dep. at 89:10-12.

[18] MCKAWP 0084295.

[19] MCKAWP 0084295.

> prescriptions that are covered by 3rd Party reimbursement plans for branded products.[20]

According to this official position, McKesson did not meddle with the manufacturer-set AWP carried in its system and only adjusted the price if there was a pricing action, that is, if the manufacturer changed its WAC.[21]  And McKesson represented that it understood First Data to publish the AWP consistent with the manufacturers' historic mark-up.[22]

Notably, this policy, which was intended for public consumption, did not refer to McKesson's participation in wholesaler surveys of AWP or state that AWP was in any way affected by a wholesaler pricing policy.[23]  To the contrary, McKesson expressly disavowed any involvement in determining mark-ups.[24]

**B.    Contrary to its Official Position, McKesson Raised its Internal Mark-Ups in an Effort to Increase AWPs for the Benefit of its Customers.**

Although publicly disavowing its involvement in setting AWP/WAC mark-ups, behind the scenes, McKesson had already begun as early as 2000 to manipulate AWPs by unilaterally imposing a 25% mark-up on its suggested sell price for all brand prescription drugs.[25]  At his deposition, Greg Yonko confirmed that McKesson had previously set the markups to calculate projected retail prices, *i.e.*, its suggested sell prices, according to the manufacturers' historic markup:

> Q.  How did McKesson calculate its suggested sell price?

---

[20] MCKAWP 0084295 (emphasis added).

[21] *Id*.

[22] *Id*.

[23] *Id*.

[24] "The markup . . . is for the most part determined by historical spreads from the manufacturer (not by McKesson). *Id*.

[25] MCKAWP 0057171; MCKAWP 0047807 ("Our mark up is not coming from our suppliers.  Suppliers [have] nothing to do [with] how we mark up our items.  It is the Product Management team who make[s] the decision on our mark up.").

> A.  It's not a calculation.  It was a number that we input into our system, and it was again historical, provided by the manufacturer, though it's currently not.[26]

He also conceded that McKesson had increased the markup for its suggested sell prices with the intent that FDB would use the higher markup to set AWP:

> We are in business to support our customers, and we have always supported our customers.  And I believe that is what Bob is talking about when he says we have attempted to raise AWP's to support our customers, by changing our markup in our system, going through the First DataBank survey process, and hoping that, in fact, the AWP's will change.[27]

McKesson knew that First Data had a virtual lock on the determination of AWPs because First Data had "a contract with the Medispan group [the only other electronic pricing source] requiring that FDB supply the data over the next 3 or 4 years [*i.e.* through 2005 or 2006].  This means that essentially the Medispan data is the First DataBank data."[28]

McKesson knew that First Data purported to use a survey of national wholesalers to calculate AWPs, and that, as the largest national wholesaler, McKesson had "an opportunity to 'normalize' AWP spreads on brand pharmaceuticals at a 25% markup (or 20% spread)."[29]  And if it were to succeed, "most [of its] customers would love it."[30]

---

[26] Yonko (FDB, 5-15-07) Dep. at 42:15-20.

[27] Yonko (FDB, 5-15-07) Dep. at 41:8-14.

[28] MCKAWP 0057415; *see also* MCKAWP 0057171 ("[Medispan gets] . . . its data from FDB.  However, Redbook is a different deal.  Redbook publishes the AWP's that the manufacturers give them (which is not an average, nor determined by process) or use a markup of 1.20 which provides a 16 ⅔% AWP spread.  If our customers are allowing language to be put into their contracts allowing Redbook AWP's for reimbursement, they are not being very wise.").

Prior to 2001, First Data and Medispan were jointly owned by the Hearst Corporation.  Following an investigation and lawsuit brought by the Federal Trade Commission Hearst agreed to a divestiture of Medispan assets.  Hartman Decl. (filed 12/20/06 in FDB (Dkt. No. 181), ¶ 17.  As part of the divestiture, First Data was required to continue to provide pricing information to Medispan's purchaser for several years.  *Id.*, *see also* MCKAWP 0057415; MCKAWP 0057171.

[29] MCKAWP 0068514.

[30] *Id.* (MCKAWP 0068514).

- 9 -

In many of its internal communications, McKesson candidly admitted that the change was made for the benefit of its customers by increasing their profit margins.[31]  For example, McKesson's John Bonner, Director of Brand Rx Product Management and Finance, observed: "There's been a great deal of activity, by McKesson, of late to increase AWPs on brand items to a uniform 25%.  That helps the pharmacy profitability greatly."[32]  Reflecting on his achievements as of April 2003, Bob James noted:

> We played a major role (and still do) in normalizing the AWP's on Brand Pharmaceuticals from 16 ⅔% to 20% spreads [i.e. 20 to 25% markups].  This has had a huge impact on the profitability of our customers on their insurance based business (which is about 90% now).  To summarize this impact, it's the same as lowering their cost of goods 3 ⅓% on 70% of the brand drugs.  Historically, 75% to 80% of brand pharmaceuticals carried a 16 2/3% AWP spread and the remaining, a 20% spread.  Today, almost 95% of brand drugs carry a 20% spread.  This has provided millions of dollars in improved profits across our industry.[33]

Another McKesson employee explained:

> I received a response to an e-mail last week from John Bonner.  He mentions that McK is working to increase the spread on AWP to a uniform 25% on branded Rx.  One of the benefits of this will increase reimbursements to our customers from third parties. [34]

Yet another McKesson employee reported "What Bob explained to me a few months ago is we (mckesson) are working to 'expand' the margin between AWP and cost."[35]  An internal memo discussing the markup changes states:

> Here are a few examples of increases profits that our customers should be realizing now and into the future.  The following results

---

[31] *See, e.g.*, MCKAWP 0042664; MCKAWP 0065592; MCKAWP 0065885; MCKAWP 0066191-92; MCKAWP 0066464; MCKAWP 0068131; MCKAWP 0069594; MCKAWP 0069607; MCKAWP 0069615; MCKAWP 0071670; MCKAWP 0084327; MCKAWP 0084485.

[32] MCKAWP 0050602 (emphasis added).

[33] MCKAWP 0065592

[34] MCKAWP 0066465-66.

[35] MCKAWP 0069732.

are based on a reimbursement formula of AWP minus 15% plus a
$2.00 fee.

|  | Old 16⅔% spread | New 20% spread |
|---|---|---|
| Liptor 20 mg 90's | $6.86 | $17.18 |
| Prilosec 20 mg 30's | $4.22 | $8.92 |
| Allegra 60 mg 100's | $3.97 | $8.16 |
| Advair Discus 500/50 60 dose | $5.11 | $11.70 |
| Betasteron (previously a flat $7.00 fee) | $20.00 | $58.25 |

Most would agree that these improvements are extremely
significant.[36]

In other communications McKesson represented that it increased its markups for

"business efficiency purposes" because McKesson's Retail List Prices and FDB's AWP often

did not match[37]:

> [W]e were challenged to improve efficiencies in our systems,
> processes and execution of our Brand Rx Programs. One of the
> inefficiencies that we looked at was the number of manual
> overrides that were required to keep an accurate First DataBank
> (FDB) Average Wholesale Price (AWP) field in our system. Each
> time a pricing activity took place, a manual override was necessary
> when the Suggested Sell or Retail List Price was different from the
> FDB AWP. This took place several times a year and increased risk
> of errors.[38]

McKesson estimated that at the time 80% of brand markups were set at 20%.[39] Yet rather than

synching its markups with those used by FDB, McKesson reached the following decision:

> A decision was made to standardize our Brand Rx markups at 25%
> by using a 1.25 factor times the Wholesale Acquisition Cost
> (WAC).[40]

---

[36] MCKAWP 0069609.

[37] *See, e.g.*, MCKAWP 0042663; MCKAWP 0065885; MCKAWP 0069608; MCKAWP 0069613.

[38] MCKAWP 0069608.

[39] MCKAWP 0069502.

[40] MCKAWP 0069608.

Logically, the only way that raising markups to 25% in an industry dominated by 20% markups

would eliminate discrepancies between McKesson's suggested sell prices and FDB's published

AWPs is if FDB agreed with McKesson to increase AWPs across the board.  In an e-mail, dated

September 18, 2001, McKesson explains:

> We are talking with First DataBank about "normalizing" the Brand
> AWP spreads at 20% because we believe it makes sense for our
> customers and also for our own efficiency in BIS.  Today, when
> our AWP differs from First Data Bank [sic], BIS has to manually
> input the FDB AWP's.  This translates to a great deal of extra work
> on every price increase where this situation exists.  If all Brand
> product was at 25% markup none of this manual input would be
> necessary.[41]

McKesson discovered that it was not difficult to impose its suggested sell prices on First

Data's published AWPs.  In an October 9, 2001, e-mail, while still paying lip service to an

alleged survey process, McKesson marveled at "First Data Bank's willingness to work with us to

normalize the brand product AWPs."[42]

## C.    McKesson Colluded with First Data to Increase Brand Drug Mark-Ups.

As documented in an internal memo, McKesson began colluding with First Data to

increase brand drug mark-ups as early as August 2001:

> After a discussion with FDB last August [2001], we mutually
> agreed to standardize Searle (16⅔% spread) product line because it
> had been acquired earlier by Pharmacia (20% spread).  There
> seemed to be momentum in the industry to move to a normalized
> markup of 25% on brand Rx products.  In December [2001], after
> several discussions with FDB about our business efficiency
> improvement strategy we began to move many of the
> manufacturers with mixed spreads (16⅔ and 20% products in the
> same line) to a consistent 25% markup.  These were companies
> like GlaxoSmithKline, AstraZeneca, Aventis, Berlex, Bristol
> Myers Squibb, Merck, JOM, and 3M, Forest, Novertis, Roche,

---

[41] MCKAWP 0065885 (emphasis added).

[42] MCKAWP 0068599.

> Schering and several others. These were mixed product lines and
> we just set their Suggested Sell Prices at a consistent 25% markup.
>
> First DataBank re-surveyed most of these companies during
> January and February when price increases occurred. Many of the
> AWP's have been increased by FDB. Because a large number of
> price increases occurred, some AWP's were affected twice, once
> when the price increase[] took effect and then a second time when
> FDB raised the AWP after the survey process. . . . Not all products
> in these companies have had AWP increases at this point in time.
> However, as price increases occur FDB will re-survey those
> products and make their determination.[43]

While the memo invokes the survey process, FDB's express agreement to raise the

markup on Searle products is inconsistent with the use of a survey to ensure the appropriate

markup. More fundamentally, McKesson's "business efficiency improvement strategy," *i.e.*, the

goal of achieving harmony between its uniform 25% markup and FDB's data, could only be

achieved if FDB agreed to disregard contrary input from other industry sources.

Indeed, it was Erlinda Thomas' understanding at the time that she wrote the following

March 14, 2002, e-mail that McKesson dictated the price changes to FDB:

> Product Management is working closely with FDB to adjust their
> mark up. FDB [has] been changing their mark up to match with
> our mark up. Eventually our list price will [be] equal to FDB's
> AWP.[44]

The memo's discussion of an agreement with First Data is also reflected in a

September 18, 2001, e-mail in which McKesson also referred to its recent "agreement with First

Data Bank on raising" Searle prices.[45] The e-mail further revealed: "We are talking with First

---

[43] MCKAWP 69608-09 (emphasis added). Note that one of the named manufacturers, GlaxoSmithKline ("GSK"), wrote on March 1, 2002, to First Data asking it to explain the "unexpected change" which led First Data to list GSK products with a 25% markup. FDB-AWP 053695.

[44] MCKAWP 0042664; Thomas (FDB, 3-13-07) Dep. at 109:6-110:7 (testifying that she believed that the statement was true at the time she wrote it).

[45] MCKAWP 0065885. Nor can there be any doubt that First Data was aware that the markup information that McKesson provided was made up from whole cloth. In addition to the preceding documents referring to discussions with First Data about its normalization plan, the record also reveals that McKesson sent First Data a copy of its

- 13 -

Data Bank about 'normalizing' the Brand AWP spreads at 20% [*i.e.* markups at 25%] because we believe it makes sense for our customers."[46]  In an October 9, 2001, e-mail, applauding "First Data Bank's willingness to work with us to normalize the brand product AWP's",[47] indicates that McKesson had persuaded First DataBank to accept the markup for all brands.

Other evidence also supports this inference.  Consistent with an arrangement to change the markups on brand drugs to a uniform 25% FDB changed the markup for TAP and Astra Zeneca to 25% on December 15, 2001.[48]  The internal e-mail directing the change does not mention a survey, and FDB did not produce any documentation tending to show that a survey was conducted to warrant the changes.[49]

On January 23, 2002, another McKesson e-mail observed:  "AstraZeneca, Aventis, Bristol Myers, Glaxosmithkline, Jorn etc.  These vendors are now at a 25% markup instead of 20%.  Bob James is in contact with FDB in regards to adjustment of their AWP pricing."[50]  The McKesson e-mail does not refer to a survey process, and there are no FDB documents purporting to show that the changes to these manufacturer markups were made as a result of a wholesaler survey.

Later that month, McKesson's John Bonner, Director of Brand Rx Product Management and Finance, noted:  "There's been a great deal of activity, by McKesson, of late to increase

---

internal memo, titled "AWP Discussion," which stated:  "McKesson has chosen to 'normalize' the markups in the Brand Rx area resulting in a consistent 25% markup or use of a 1.25 factor.  This serves to level the playing field"; "customers may potentially benefit because this process provides the opportunity for increased profitability if managed care contracts remain as they are today."  MCKAWP 0069602; MCKAWP 0069611.

[46] MCKAWP 0065885 (emphasis added).

[47] MCKAWP 0068599 (emphasis added).

[48] FDB-AWP 033430.

[49] *See* Berman Decl., Ex. D (Morgan Dep. Exs. 25-48); Morgan (FDB, 6-28-07) Dep. at 278:16-279:9 (testifying that she could not recall any other written surveys other than those produced by FDB and identified as exhibits at her deposition).

[50] MCKAWP 0081250 (emphasis added).

AWPs on brand items to a uniform 25%. <u>That helps the pharmacy profitability greatly</u>."[51]  He advised a sales manager to let customers "know we are fighting on their behalf to normalize AWP @ 25% markup."[52]  Again there is no disclaimer that the AWPs are in fact determined by objective surveys as opposed to McKesson's acknowledged price manipulation.

Another internal e-mail demonstrates the same understanding:

> Some of our friends in retail that I have spoken with are pretty overwhelmed <u>that we would be 'driving' this process on their behalf</u>.  Of course, we are not solely responsible for this 'normalizing' of AWPs but we have done our part as I have discussed with you previously.  I have had conversations with Albertsons and Safeway and a few others.[53]

McKesson documents also report that Bob James called Kay Morgan in early 2002 "on behalf of VitaRx on Avonex and Copaxone" and reported that the call "result[ed] in a $500K profit improvement for VitaRx," and "FYI.  Kay Morgan, FDB confirmed today that this had been done."[54]  After the call, James circulated an e-mail:

> Just a note to let everyone know that "I am told" that the markup on Avonex and both the old and new sku's of Copaxone will be changed to 25% (to create a 25% spread on WAC/AWP) next week. . . . Yes!!"
>
> . . . .  This should have a significant contribution to your profitability as illustrated by the following example using a reimbursement of AWP – 15% plus $2.00 fee
>
> Avonex at 16⅔% spread, profit would be $18.42 . . . and now at a 25% spread, profit would be $51.31 . . . not bad!
>
> This is an increase of $32.89 per script.
>
> Copaxone at 16⅔% spread, profit would be $19.72 . . . an now at 20% spread, profit would be $57.39 . . . pretty good!

---

[51] MCKAWP 0050602 (emphasis added).

[52] *Id.*

[53] MCKAWP 0065895 (emphasis added).

[54] MCKAWP 0069615; *see also* MCKAWP 0084327.

This is an increase of $37.67 per script.[55]

Other communications do refer to a survey process, but they generally betray

McKesson's expectation that the alleged survey process will merely confirm McKesson's 25%

markup.  For example, an e-mail dated February 15, 2002, from Bob James states:

> What we are seeing is a normalizing process for brand Rx items.
> As you know, suppliers do not set AWP, wholesalers do not set
> AWP, and neither does FDB.  Wholesalers set their individual
> markups or Suggested Sell or List Price as in the case of
> McKesson. I'm not sure what the other wholesalers call their sell
> price.  This is done independently.  FDB takes a survey of at least
> three national wholesalers and if 2 out of 3 are at 25% markup,
> then that becomes the AWP . . . I think it is very positive for the
> industry and most people will be delighted when they understand
> what is going on and how the process works.[56]

He then predicts:  "In a few months I would expect to see most brand products at a 25%

markup."[57]  Given that McKesson is advocating a 25% markup in a predominantly 20% market

where such markups have remained largely unchanged for years, James' expectation of

widespread changes over a matter of months is simply not comprehensible unless he also

believed that FDB was complicit in McKesson's Scheme.

This inference is further supported by the statement he makes on February 26, 2002, that

he is simply waiting for FDB to "catch up" to McKesson's markups and that he has been told by

FDB that these changes, and the higher AWPs they entail, are immanent:

> The McKesson Sugg. Sell or List Prices for Brand Rx will remain
> at the 25% markup, however.  <u>We expect FDB AWP's to catch up
> over the next month or so as things normalize in the industry.</u>  I
> was not aware until last week that our BIS group was changing the
> AWP field to match or Sugg. Sell our List Price field in the DITM

---

[55] MCKAWP 0084327; *see also* MCKAWP 0065592 (April 22, 2003, memo from Bob James to Greg Yonko: "Worked on behalf of Vita Rx (now MSD) in raising the AWP's of Avonex, Copaxone and Betaseron to 20% [spread].  The impact of this effort was to increase their profits $800 k per year. . . each year, not just one time.").

[56] MCKAWP 0069590; MCKAWP 0069591.

[57] MCKAWP 0069592.

before FDB actually made the changes.  We have been told by
FDB that the items were going to move up but there obviously
have been some timing issues.  It's my fault, I guess I did not
communicate very clearly. There will be no changes by the FDB
AWP field unless the information comes by electronic download
from FDB.

When the changes do occur, there will be a slight delay for our
system to be changed.  More importantly, there will most likely be
a delay for the third parties to pick up and input the new higher
AWP's.[58]

A month later, James' confirms his expectation that FDB has changed the markups on the

majority of brand manufacturers:

I am told by FDB that 90% of the Brand Rx companies are now
listed as 1.25 factor or 25% markup companies. Not all the
products in these companies have had AWP increases at this point
in time.  However as price increases occur FDB will resurvey those
products and make their determination.[59]

In light of McKesson's confidence that FDB's AWPs will "catch up" to McKesson's Suggested

Sell or List Prices in short order, this statement leaves open the possibility that by "survey"

James does not mean the objective determination of the prevailing markup among the national

wholesalers, but merely the application of the agreed-upon 25% markup to the NDCs whose

WAC price was increased by the manufacturers:

Moreover, many of the communications between First Data and McKesson about

manufacturer mark-ups were initiated by McKesson, not First Data, and they do not discuss a

survey.  For example, on November 9, 2001, Bob James wrote to Kay Morgan:

Hello Kay . . . . . . . . .  Just went through the Merck items and
updated a couple of our items to 25% markup.  However, I found
some items that you might want to review.  They include

---

[58] MCKAWP 0057428.

[59] MCKAWP 0069609.

- 17 -

Noroxin's, Prinivil and Prinzide's. The latter two, should probably be consistent with the new AZ 1.25 markups.[60]

Hello Kay, this note is from BMS [Bristol-Myers Squibb] and is basically saying that FDB shows BMS at a 20.5% mark up while McKesson is showing a 25% mark up. I am assuming that they are looking at current information and I thought we took care of this several weeks ago. Ain't it Great.[61]

Rite Aid called this morning complaining about Diamox AWP. Just wondered if you had a chance to get to it yet?[62]

We're catching flack from our large retail friends about the Wyeth products that were sold to Barr . . . Of course, we raised the prices on both NDC's for consistency, . . . See if it makes sense to you that both NDC's should carry the new price.[63]

Good morning . . . .

We've had a couple of inquiries from the field asking us to correct our AWP's. J&J and one of the other wholesalers are saying that the McKesson AWP's are incorrect. We have them marked up 25% like the rest of the J&J line. When you have a minute, would you verify that our file matches the FDB file.[64]

Similarly, many of the communications from First Data are more consistent with an agreement to change AWP than an objective survey to determine what it should be. For example, on April 1, 2002, Alisha Nielson, Kay Morgan's assistant at First DataBank, e-mailed Bob James to "please provide me with your mark-up for Endo."[65] Bob James responded that McKesson used a 25% markup, and moments later, without any indication that she had received (or even requested) responses from other wholesalers, Alisha Nielson forwarded his response to

---

[60] MCKAWP 0068621.

[61] MCKAWP 0069586.

[62] MCK 0001168.

[63] MCKAWP 0070781.

[64] MCKAWP 0001188. Kay Morgan responded: "We are in sync. Janssen still suggests [sell price] on some items and perhaps this is one but as you know Manufacturer suggested is not the same as AWP. Don't know who is complaining (Janssen?) but FDB and McKesson match."

[65] FDB/NEC 031778.

her co-worker, Inna Dimitshteyn, with the instruction: "Please change the mark-up for Endo to 1.25 WAC."[66]

Similarly, the following exchange between McKesson and FDB led to increased markups for Lexapro and Celexa:

> [McKesson]  Question:  Is Forest's new Lexapro at 1.25?  and we still have Celexa at 1.20.  The retail customers would love to have that one changed.  Please advise.  Thank you.[67]
>
> [FDB] Lexapro and Celexa by Forest are still at the 1.20xW markup.  We will change this as directed, unless Kay objects.  I will speak with her about this.  She is in a meeting right now.[68]

Other exchanges also demonstrate that McKesson and FDB worked closely to change the markups for brand drugs industry-wide.  For example, without any explanation, Kay Morgan forwards to Bob James an internal First Data e-mail advising that First Data was moving Reliant to a 25% mark-up.[69]  Also, when Alisha Nielson e-mails Bob James and cc's Kay Morgan to request a markup for Enzon, Morgan responds before James even has a chance to answer:

> Alisha,
> Go ahead and put them on 1.25 times WAC.
> Thanks,
> Kay[70]

And in response to James' inquiry about whether First Data had a 25% mark-up on some of J&J's product lines, Morgan responded:  "We are in sync."[71]  Likewise Kay Morgan responded to an e-mail from Bob James asking whether Prilosec over-the-counter can be

---

[66] *Id.*

[67] FDB/NEC 040006.

[68] FDB/NEC 040006 (emphasis added).

[69] MCKAWP 0069782.

[70] FDB/NEC 032733.

[71] MCKAWP 001188.

considered like the prescription product with a 25% mark-up:  "Thanks and we have you covered."[72]

Also consistent with advancing the Scheme, McKesson conducted weekly review of First Data's AWPs. [73]  In April 2002, James forwarded one of McKesson's comparison files to Kay Morgan, asking her to

> let me know if you think this type of information is useful and also if you need additional information.  We should be enthused about how good this is looking.  Thank you for all your cooperation.  We can get similar information on the rest of the file that would include generics and OTC/Home Healthcare but for now I would like to focus on brand products[.][74]

Morgan replied:  "It's a start.  . . . I agree, brand comes first."[75]

In another instance , James wrote of McKesson's weekly FDB AWP comparison files:

> From the weekly data that I have been using, there are fewer than 100 brand items where we are not using the FDB AWP because its [sic] not correct.  They have the WAC and AWP as the same or 0.00 WAC or an old AWP that is less than our current WAC or they use a different multiplier and round down.  I have asked you to find out from Rite Aid if they would agree to us putting in a 25% markup (or 20% spread) on these items until FDB catches up.[76]
>
> I need to look at all brand Rx AWP's and not just the ones that are problems.  This will give me a chance to look at the big picture and see what I have left to do.[77]

---

[72] MCKAWP 0070967.

[73] MCKAWP 0042663.

[74] MCKAWP 0069617 (emphasis added).

[75] MCKAWP 0069640.  Over the course of the Class Period, McKesson forwarded several of its AWP comparison files to FDB.  *See*, *e.g.*, MCKAWP 0069717; MCKAWP 0070784; MCKAWP 0070826; and MCKAWP 0070928.

[76] MCKAWP 0063858 (emphasis added).

[77] MCKAWP 0069820 (emphasis added) (e-mail string between James and others at McKesson re FDB AWP comparison report).

### III.    CLASS MEMBERS COULD NOT HAVE DISCOVERED THE SCHEME

**A.    McKesson Sought to Conceal its Collaboration with First Data.**

The implication that McKesson knew that it was not simply participating in an objective survey process with First Data is further underscored by McKesson's efforts to maintain the secrecy of its normalization plan.  This secrecy also made it more difficult to discover the Scheme.

In a February 21, 2002, e-mail discussing McKesson's efforts to increase AWPs, McKesson's John Bonner closed with the admonition:  "I'm not sure it is something we want discussed.  Please contact him before discussing outside the company."[78]

When Brian Ferreira of VPS Retail wrote to Bob James asking him to "[p]lease provide the list of items and/or manufacturers that were included in the AWP standardization process," he knew better than to respond to the request in writing:  "Brian, this is an interesting request. . . . Please give me a call when it is convenient."[79]

McKesson knew that if it did not keep its manipulations of the AWPs a secret, there would be serious repercussions:

> Confidentially.  Not to pass on.  We have [only] about 470 brand Rx items where McK and FDB AWP's do not match. . . .[80]
>
> [Bob James, discussing McKesson's efforts to raise AWPs:]  For obvious reasons we don't want to write a memo and send it out because it would not be kept confidential.[81]
>
> [James, responding to McKesson field associate's request to share information about McKesson's efforts with her customers:]  I

---

[78] MCKAWP 0066464.

[79] MCKAWP 0069714.

[80] MCKAWP 0068889.

[81] MCKAWP 0069591.

would be careful . . . . . You be the judge on how your customer will interpret.[82]

[McKesson field associate writing to John Bonner:]  My accounts are having issues with us 'Normalizing brand pricing at 25%' . . . . You also mentioned that we should not discuss [this] outside of McKesson, how would you suggest we answer our customers['] questions?[83]

[McKesson field associate, discussing McKesson's "normalization plan":]  Obviously this is not out to the field.[84]

[James, signaling to McKesson employees that they should not state in writing that McKesson changed its markups to improve its customers' profitability:]  Remember, **"McKesson is doing this to improve our inefficiencies in our BIS group."**  With mixed AWP spreads, our BIS group is required to make manual overrides (for our pricing activity) to input the First Data Bank AWP whenever there is a difference from our Suggested Sell or List Price.  It could be stated as a benefit of the Sixth Sigma method of identifying defects.  An "unintended consequence" is that the profitability of our customers will be impacted in a positive way. They will basically get 3⅓% more profit on Rx's filled with this new AWP spread.  (Just imagine what this would mean on drugs like Lipitor or Prilosec.) [boldface in original].[85]

## B.    First Data Also Hid the Scheme.

And First Data also knew the importance of keeping the Scheme a secret.  In response to an e-mail inquiry about whether electronic drug pricing publishers were increasing the WAC-AWP spread, Kay Morgan denied any involvement and brandished the false "survey" defense: "I am most curious as to the source of this rumor.  First Data has always used a wholesaler survey to determine AWP."[86]  She forwarded the exchange to Bob James at McKesson, stating, "I thought you might want to see my answer," to which he responds:  "I love it!  You are the

---

[82] MCKAWP 0069592.

[83] MCKAWP 0066464.

[84] MCKAWP 0069732.

[85] MCKAWP 0065895 (emphasis in original).

[86] MCKAWP 0069588.

best."[87] And publicly, throughout the Class Period, FDB falsely represented that its surveys were "performed with all national wholesalers to determine the appropriate AWP."[88]

There was no Evidence in Carpenters that any Payors Discovered the Scheme. Nor could Payors have discovered McKesson and First Data's collusion through reasonable diligence. First Data's policy was to refuse to share responses to its purported "surveys" even when questioned by manufacturers or others concerned about changes to their traditional mark-up.[89] Additionally, the effects of the Scheme were obscured because First Data stored its mark-up information separately from its database of published prices and generally increased the mark-up on individual drugs only when the manufacturer announced a change to the WAC.[90]

Evidence also suggests that McKesson and First Data agreed, whether explicitly or implicitly, to perpetuate the myth of the objective survey process as a means of covering their scheme. For example, after FDB had already agreed to raise the markup on Schering products,[91] McKesson forwarded the e-mail from Schering, asking for McKesson's help in raising FDB's markup on Clarinex so that it could remain competitive with Claritin[92] – another of the drugs that were allegedly increased as a result of the Scheme:

> Even the Shering folks would like to see the AWP raised on Clarinex. Last time I spoke with Chuck, <u>I gave him the standard response about process.</u>[93]

---

[87] *Id.*

[88] *See, e.g.*, FDB-AWP 02023; FDB-AWP 02005.

[89] *See, e.g.*, Freeberry Dep. (AWP, 5-20-04) at 114:18-24 ("Q: Have you ever reviewed any of the wholesaler surveys that First DataBank purportedly did? A: I asked for them; they weren't provided.").

[90] Alisha Nielsen (FDB, 5-18-07) Dep. at 84:16-85:3, 158:2-7; *see also* MCKAWP 0069609 (explaining the delay between the change in markup and when it takes effect with the announcement of price changes).

[91] *See* MCKAWP 0069818.

[92] MCKAWP 0069857.

[93] MCKAWP 0069857.

# IV.     CONCLUSION

The foregoing facts will be used to prove the claims of Plaintiffs and all Class members,

and this common evidence further supports certification of the proposed Classes.

DATED:  July 1, 2009

By     **s/ Steve W. Berman**
  Steve W. Berman
  Sean R. Matt
  Barbara A. Mahoney
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

James L. Ward, Jr.
A. Hoyt Rowell, III
RICHARDSON, PATRICK, WESTBROOK &
BRICKMAN, LLC
P.O. Box 1007
Mt. Pleasant, SC 29465
843-727-6500 (tel.)
843-216-6509 (fax)

*Co-Lead Counsel for Consolidated Public Payor
Plaintiffs*

R. Bryant McCulley
MCCULLEY MCCLUER PLLC
One Independent Drive, Suite 3201
Jacksonville, FL 32202
904-482-4073 (tel.)
904-354-4813 (fax)

Stuart H. McCluer
MCCULLEY MCCLUER PLLC
1109 Van Buren Avenue
Oxford, MS 38655
662-236-1401 (tel.)
662-234-1974 (fax)

- 24 -

Daniel Kotchen
Daniel Low
KOTCHEN & LOW LLP
2300 M St., NW, Suite 800
Washington, DC 20037
202-416-1848 (tel.)
202-280-1128 (fax)

*Attorneys for Consolidated Public Payor*
*Plaintiffs*

Steve W. Berman
Sean R. Matt
Barbara A. Mahoney
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jeff Friedman
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001

*Attorneys for the San Francisco Health Plan*

Dennis J. Herrera
City Attorney
Danny Chou (California Bar No. 180240)
Chief of Complex and Special Litigation
Owen Clements (California Bar No. 141805)
Chief of Special Litigation
Alex Tse
Erik Rapoport (California Bar No. 187059)
Deputy City Attorneys
OFFICE OF THE SAN FRANCISCO
    CITY ATTORNEY
1390 Market Street, 7th Floor
San Francisco, CA  94102
Telephone:  (415) 554-3900
Facsimile:  (415) 554-3985

*Attorneys for the San Francisco Health Plan*
*and the People of the State of California*

Louise H. Renne (*pro hac* to be filed)
Jonathan V. Holtzman (*pro hac* to be filed)
Allyson S. Hauck
RENNE SLOAN HOLTZMAN SAKAI LLP
350 Sansome Street, Suite 300
San Francisco, CA  94104
Telephone:  (415) 678-3800
Facsimile:  (415) 678-3838

*Attorneys for the San Francisco Health Plan*

Steve W. Berman
Sean R. Matt
Barbara A. Mahoney
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on July 1, 2009.

                                         s/ Steve W. Berman
                                       Steve W. Berman