UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
IN RE MCKESSON GOVERNMENTAL   )
ENTITIES AVERAGE WHOLESALE    )
PRICE LITIGATION              )
_____)
                              )
THIS DOCUMENT RELATES TO:     )  MASTER FILE NO. 08-cv-10843-PBS
                              )
SAN FRANCISCO HEALTH PLAN v.  )
MCKESSON CORP.,               )  NO. 08-cv-10843-PBS
                              )  NO. 08-cv-11349-PBS
THE BOARD OF COUNTY           )
COMMISSIONERS OF DOUGLAS      )
COUNTY, KANSAS, et al. v.     )
MCKESSON CORP.                )
_____)
```

**MEMORANDUM AND ORDER**

March 4, 2011

Saris, U.S.D.J.

## I. INTRODUCTION

In these two proposed national class actions, plaintiffs San Francisco Health Plan ("SFHP") and the Board of County Commissioners of Douglas County, Kansas ("Douglas County") allege that McKesson Corporation engaged in a racketeering enterprise to raise the prices of numerous brand-name prescription pharmaceuticals by stating fraudulent "average wholesale prices" beginning in late 2001, in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §

1964 and state law.[1]

Plaintiff Douglas County seeks to certify a class that consists of public payors as large as a state and as small as a county jail, with some exclusions.  The proposed class definition is:

> All governmental entities and their political subdivisions, agencies, departments, and divisions in the United States and its Territories, including the States, local governments, and Territories themselves, other than State Medicaid programs, that paid for Marked-Up Drugs[2] based on AWP from August 1, 2001 to October 6, 2006[3] and that used First DataBank or Medi-Span data derived from First DataBank data in determining the AWP of the Marked-Up Drugs.[4]

Plaintiff SFHP seeks to certify a class of "California Public Payors," comprised of:

---

[1] In the second Amended Complaint, the Douglas County asserts claims under RICO, 18 U.S.C. § 1962(c)-(d) (Counts I and II), and various state consumer protection laws (Counts IV and V).  Plaintiff SFHP seeks certification of its claims under RICO for Counts I and II, and under California's law of tortious interference with a contract for Count III.

[2] The Marked-Up Drugs are all drugs identified in Appendix A to the Second Amended Complaint and consist of brand-name drugs only.  (See Docket No. 25-2.)

[3] Although plaintiffs' motions to certify the class requested certification of a class through the date on which the Court issued its order, at the hearing class counsel indicated that they wished to end the class period on October 6, 2006, the date on which the Carpenters class announced its settlement with First DataBank.  (Hr'g Tr. 8 (Docket No. 157).)

[4] The Douglas County plaintiffs originally sought to certify a second class referred to as "Opt-In State Medicaid Class," but withdrew that motion on April 12, 2010.  (See Docket No. 70.)

> All governmental entities, agencies and political
> subdivisions in the State of California, including the
> State of California itself, that paid for the brand
> name drugs listed in Appendix A and whose payments were
> tied to AWP.

After hearing and a review of the record, the Court concludes that the proposed classes, as defined, fail to meet the Rule 23(b)(3) requirements of superiority primarily because the class definition includes states. Moreover, the proposed class does not meet the predominance requirement because inquiries regarding efforts by public payors to mitigate damages will predominate over common questions if the proposed classes were certified from 2001 to October 6, 2006. There are also significant manageability issues in this sprawling proposed class which includes every public payor in America and its territories including states, workers compensation plans, state employee plans and jails. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), I certify the following class for liability only:

> All non-federal and non-state governmental entities in
> the United States and its Territories that paid for
> Marked-Up Drugs based on AWP from August 1, 2001 to
> June 2, 2005 and that used First DataBank or Medi-Span
> data derived from First DataBank data in determining
> the AWP of the Marked-Up Drugs.

Pursuant to Fed. R. Civ. P. 23(a) and (b)(3), I certify a class period of August 1, 2001 through December 31, 2003 for liability and damages.

## II. FACTUAL BACKGROUND

The Court has previously written about the allegations against McKesson, see New England Carpenters Health Benefits Fund v. First DataBank, Inc. ("Carpenters I"), 244 F.R.D. 79 (D. Mass. 2007), and assumes the parties' familiarity with the facts. This discussion is limited to the alleged facts specific to this litigation, referred to as the "Public Payor litigation." Many of the facts alleged by plaintiffs with respect to liability are disputed by McKesson.

### 1. Published Prices

Average Wholesale Price ("AWP") is the pricing benchmark for the vast majority of drug reimbursement payments made by public payors to retail pharmacies. These prices are compiled and published in electronic form principally by two companies: (1) First DataBank (FDB), which had the dominant market position as an electronic source for drug pricing information during the relevant time period, and (2) Medi-Span, another publisher that acquired its source data from FDB.

Drug manufacturers typically sell drugs to wholesalers, like McKesson, on the basis of the Wholesale Acquisition Cost ("WAC"), which is also a published price. Wholesalers then sell drugs to retail pharmacies based on a published price (typically WAC plus a markup). Public payors generally reimburse retail pharmacies for brand-name drugs based on a percentage off of AWP. Higher

WAC to AWP markups made the drugs more profitable for pharmacies. Historically, the manufacturer reported the AWP to a publisher, like FDB, at a markup of 20% or 25% above the WAC. Sometimes, the manufacturers only reported a WAC and then suggested a markup percentage so FDB could generate an AWP. Typically, the publishing company played no independent role in establishing AWP, other than applying this formulaic markup to the manufacturer's price.

    **2.   The Scheme**

Before 2000, McKesson, a wholesaler, estimated that 80% of the manufacturers used a 20% markup for their drugs. Beginning in late 2001, FDB and McKesson allegedly reached a secret agreement to raise the WAC to AWP markup on all brand-name drugs to the higher 25% markup. The purpose of this scheme was to provide a greater spread to McKesson's retail pharmacy clients. To conceal the scheme, McKesson and FDB agreed to effectuate price changes only when some other WAC-based price announcement was made by a drug manufacturer. This timing camouflaged the increase in the WAC to AWP markup and concealed McKesson as the source of the increased markup.

McKesson was aware that public payors, such as members of the proposed classes, relied on AWP for reimbursement of brand drugs. McKesson maintained a Public Affairs Department to track federal and state developments that affected pharmacy sales, and

actively lobbied the federal and state governments.  McKesson was
aware of the impact that the increased WAC to AWP markup would
have on public payors.  For example, a McKesson employee asked
Bob James, Director of Brand Pharmaceutical Product Management,
about the impact of rising AWPs on public payors: "Has anyone
researched what impact this will have on Medicaid/Medicare
reimbursement in states where its [sic] still based on AWP?"
James responded: "[T]his is not our issue.  But, I have thought
about it a lot.  One of the unintended consequences is that
Retail Customers will potentially be more profitable."

### III.  PROCEDURAL HISTORY

On June 2, 2005, the New England Carpenters Health Benefits
Fund ("Carpenters") filed a putative class action complaint
against McKesson and First DataBank.  See No. 05-cv-11148-PBS.
The factual allegations by Carpenters were substantially similar
to those made in the instant case, although the proposed class in
Carpenters consisted of consumers and private third party payors
("TPP"), such as health insurance companies.  In 2006, the Court
approved a preliminary settlement as to defendant First DataBank,
and certified a class for settlement purposes.  The FDB
settlement was made public in October 2006.  As to defendant
McKesson, this Court certified a consumer class in August 2007
and a TPP class in March 2008.  Final approval of a class
settlement with McKesson was granted in July 2009.

In its initial Order regarding class certification in the Carpenters case, the Court found that plaintiffs had satisfied the Rule 23(a) requirements with respect to the proposed TPP class, but deferred ruling on the more difficult Rule 23(b)(3) questions of predominance and superiority. Carpenters I, 244 F.R.D. at 89. In 2008, the Court revisited the predominance and superiority issues and certified the TPP class under Rule 23(b)(3), addressing the issue of predominance by limiting the class period, for damages, to August 2001 through December 2003, and only permitting certification for liability and equitable relief for the expanded class period. New England Carpenters Health Benefits Fund v. First DataBank, Inc. ("Carpenters II"), 248 F.R.D. 363, 369, 372 (D. Mass. 2008).

McKesson petitioned the First Circuit for leave to appeal the Court's class certification order. That petition was denied on November 16, 2007 because McKesson did not "develop its reliance argument" and "the certification order did not 'turn on' any question of law preserved by the petitioner." See New England Carpenters Health Benefits Fund v. McKesson Corp., No. 07-8030 (1st Cir. Nov. 16, 2007).

## IV. DISCUSSION

### A. Rule 23 Standard

A class may be certified pursuant to Fed. R. Civ. P. 23 only if:

> (1) the class is so numerous that joinder of all
> members is impracticable; (2) there are questions of
> law or fact common to the class; (3) the claims or
> defenses of the representative parties are typical of
> the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately
> protect the interests of the class.

Fed. R. Civ. P. 23(a). Plaintiffs seek to certify these classes pursuant to Rule 23(b)(3), which provides that an action may be maintained only if the Court also finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually
> controlling the prosecution or defense of separate
> actions;
>
> (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class
> members;
>
> (C) the desirability or undesirability of concentrating
> the litigation of the claims in the particular forum;
> and
>
> (D) the likely difficulties in managing a class action.

Fed R. Civ. P. 23(b)(3).

Under the First Circuit's approach, a district court must "conduct a rigorous analysis" of the Rule 23 requirements and "formulate some prediction as to how specific issues will play out[.]" See In re New Motor Vehicles Canadian Exp. Antitrust

-8-

Litig. (New Motor Vehicles), 522 F.3d 6, 25 (1st Cir. 2008)
(internal quotation marks omitted).  Courts are encouraged to
look beyond the pleadings when necessary for the purposes of a
Rule 23 analysis.  Id.  Although the First Circuit did not
resolve whether "findings" regarding the class certification
criteria are ever necessary, id. at 26, at least five circuits
(the Second, Fourth, Fifth, Seventh, and Ninth) require district
courts to make specific determinations that each Rule 23
criterion is met.  Id. at 24 (collecting cases); see also Dukes
v. Wal-Mart Stores, Inc., 603 F.3d 571, 581-82 (9th Cir. 2010).
In In re Initial Public Offering Secs. Litig., 471 F.3d 24 (2d
Cir. 2006), for example, the Second Circuit held:

> (1) a district judge may certify a class only after
> making determinations that each of the Rule 23
> requirements has been met; (2) such determinations can
> be made only if the judge resolves factual disputes
> relevant to each Rule 23 requirement and finds that
> whatever underlying facts are relevant to a particular
> Rule 23 requirement have been established and is
> persuaded to rule, based on the relevant facts and the
> applicable legal standard, that the requirement is
> met[.]

Id. at 41.  Circuits that have considered the issue have largely
required the district courts to "analyze underlying facts and
legal issues going to certification questions regardless of any
overlap with the merits."  Dukes, 603 F.3d at 585-86.  These fact
findings at the certification stage pertain only to this stage
and are not binding as to the ultimate merits of the case.  See
New Motor Vehicles, 522 F.3d at 24.

In addition, a court may certify a class on certain issues, like liability, while denying certification on other issues. See Fed. R. Civ. P. 23(c)(4)(A). The need for individualized damage proceedings does not ordinarily defeat predominance where there are still disputed common issues as to liability. New Motor Vehicles, 522 F.3d 6, 28 (1st Cir. 2008). "Failing some practical solution allowing full resolution of all class damage claims in a single case, the court could enter a judgment of liability, leaving class members to pursue damage claims in separate law suits." Tardiff v. Knox County, 365 F.3d 1, 7 (1st Cir. 2004); see also In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir. 2001) (listing solutions to individual damage issues, such as "bifurcating liability and damage trials with the same or different juries . . . [and] decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages").

## B.   **Rule 23(a) Requirements**

### 1.   **Numerosity**

Plaintiffs estimate that there are thousands of non-Medicaid Public Payors in the proposed classes nationwide. Defendants have not challenged the numerosity requirement for either class.

## 2. Commonality

"Rule 23(a)'s requirement of commonality is a low bar, and courts have generally given it a 'permissive application.'" New Motor Vehicles, 522 F.3d at 19 (quoting 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1763, at 221 (3d ed. 2005)). Commonality necessitates only the existence of a "single issue common to all members of the class." 1 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 3:10 (4th ed. 2002). "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).

Here, there are numerous common factual issues, as discussed in Carpenters I: whether the WAC to AWP margin was increased as a result of an agreement between FDB and McKesson; whether this agreement was a RICO enterprise; whether McKesson engaged in deceptive and/or fraudulent activity using the United States mails and interstate wire facilities. See Carpenters I, 244 F.R.D. at 84. Defendants have not challenged the commonality requirement.

### 3.  Typicality

"Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct."  In re Am. Med. Sys., Inc., 75 F.3d 1069, 1082 (6th Cir. 1996).

The class representatives for the Douglas County class are: (1) The Board of County Commissioners of Douglas County, Kansas; (2) the City of Baltimore, Maryland; (3) the City of Panama City, Florida; (4) Anoka County, Minnesota; (5) the City of Columbia, South Carolina; and (6) the City of Goldsboro, North Carolina. All plaintiffs are local or municipal government entities that pay for brand-name prescription drugs through a self-insured health insurance program that provides prescription drug benefits to current and former employees.  Reimbursement is based on a formula tied to the AWP of drugs.  (See Second Amended Complaint ¶¶ 29, 32-36.)

Defendants do not dispute that the typicality prerequisite has been met.  The named plaintiffs here were Public Payors that reimbursed pharmacies for drugs using a formula based on AWP.  A clear and distinct relationship exists between the injury to the named plaintiffs and the conduct affecting the class.  In other words, all members the class, including the named plaintiffs,

suffered harm resulting from the across the board 5% markup of drugs.  See Carpenters I, 244 F.R.D. at 84.

### 4.  Adequacy

"The [adequacy] rule has two parts. The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985).

Plaintiffs have retained vigorous counsel with substantial experience in prosecuting nationwide drug pricing class actions, including the related Carpenters litigation.  In addition, neither named plaintiffs nor their counsel appear to have any interest adverse to those of the class.  Defendants do not dispute adequacy.

## C.  Rule 23(b)(3) Requirements

The primary thrust of the challenge to class certification involves the Rule 23(b)(3) predominance, superiority, and manageability inquiries.  McKesson argues that: (1) Public Payors became aware of the AWP markup increases and responded to increased drug spending resulting from those increases at different times throughout the class period; (2) the variability among the programs that fall under the umbrella of the proposed

class makes class-wide adjudication unmanageable; and (3) each member of the class will necessarily have to establish causation of harm and damages in a different manner.

## 1. Superiority and Manageability

Rule 23(b)(3) requires a class action to be superior to other available methods of dispute resolution for the fair and expedient resolution of the matter. "In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 615 (1997) (citation omitted). "[A] class action has to be unwieldy indeed before it can be pronounced an inferior alternative - no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied - to no litigation at all." <u>Carnegie v. Household Int'l, Inc.</u>, 376 F.3d 656, 661 (7th Cir. 2004). "A key factor in making this [superiority] determination is manageability, which focuses on pragmatic concerns." <u>In re Pharm. Industry Average Wholesale Price Litig.</u>, 230 F.R.D. 61, 90 (D. Mass. 2005).

The proposed inclusion of states and state agencies in both classes creates serious concerns with respect to superiority. The

states not only have a significant monetary interest in controlling the prosecution of an action such as this, but they also have shown a willingness to litigate this matter themselves in the related AWP multi-district litigation.  Moreover, as sovereigns, states have a strong interest in individually controlling the prosecution of their own cases.  Indeed, significant sovereignty issues may preclude defining a class to include state entities as absent class members under the Eleventh Amendment of the Constitution.  See Thomas v. FAG Bearings Corp., 50 F.3d 502, 505-06 (8th Cir. 1995) (holding that the Eleventh Amendment barred involuntary joinder of a state agency in environmental litigation).  One federal district court has held that inclusion of states in a nationwide plaintiff class violates the Eleventh Amendment, and that the Eleventh Amendment bar was not overcome by the opt out provisions in a class action.  Walker v. Liggett Group, Inc., 982 F. Supp. 1208, 1210 (S.D. W. Va. 1997) (excluding states from nationwide class action upon motion of state entities).  In addition, defendants point out that most states have laws providing the Attorney General of the state with exclusive authority to represent the state in litigation.  See, e.g., Cal. Gov. Code § 12511. The Court could find no appellate case law addressing the question of whether states can be included in a class action. However, it is unnecessary to address this novel constitutional issue because the Court finds that a

class action that includes state agencies is not a superior way in which to conduct this litigation.

## 2. Predominance

Defendants argue that individual issues predominate over common ones because public payors learned about the increased spread and took mitigating actions at different times and in different ways.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 624. The "predominance criterion" is "far more demanding" than the commonality requirement. Id. at 623-24. Thus, each court must struggle with the significance of the "uncommon questions." Id. "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." Id. However, courts must exercise caution when "the individual stakes are high and disparities among members great." Id. Although the predominance analysis imposes a high bar, the First Circuit has found that "Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class." Smilow v. Southwestern Bell Mobil Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003) (citing In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 315 (3d Cir. 1998)).

In <u>Carpenters II</u>, faced with similar arguments, the Court limited the TPP Class damages period to the end of 2003 in order to avoid the possibility of a multitude of individualized trials on whether each TPP knew about the markup increases and were able to renegotiate their contracts to "clawback" losses. This clawback was facilitated by the vigorous competition among PBMs for business from the TPPs. Accordingly, it was in the interest of the PBMs to "squeeze[] out" any financial benefit pharmacies received from the increased spreads. As the plaintiffs' expert explained in <u>Carpenters</u>, "As the PBM industry learned of the change in AWP to WAC ratio[s], they were able to renegotiate pharmacy contract rates, reducing the prices paid to pharmacies to compensate wholly or partially for increased profit margins." These savings were passed along to TPPs through of renegotiated contract terms. In <u>Carpenters II</u>, the Court found that there was no evidence of "clawback" during the 2001 through 2003 period. 248 F.R.D. at 371-72.

I address each of defendants' predominance challenges in this litigation in turn.

### i.   <u>Statute of Limitations</u>

Defendants argue that individual issues of proof predominate with regard to statutes of limitations. Civil RICO claims are subject to a four-year statute of limitations. <u>Agency Holding Corp. v. Malley-Duff & Assocs., Inc.</u>, 483 U.S. 143, 156 (1987).

A plaintiff seeking to recover under RICO must file suit within four years of the date when it knew or should have known of its injury.  See Rotella v. Wood, 528 U.S. 549, 554 n.2 (2000) (leaving the question open as to whether to apply a discovery rule or injury occurrence rule to the civil RICO statute of limitations); Lares Group, II v. Tobin, 221 F.3d 41, 43 (1st Cir. 2000) (holding that the statute of limitations in a civil RICO action begins to run at "the time a plaintiff knew or should have known of his injury").  The SFHP and Douglas County complaints were filed on May 28 and August 7, 2008, respectively.

McKesson claims that knowledge of increases in AWPs was sufficient to trigger the statute of limitations even if there was no knowledge of the underlying fraud.  In a market where drug pricing was notoriously opaque and where AWPs were frequently increased by manufacturers for various reasons, public payors could not possibly have known that a price increase was the result of fraud perpetrated by a wholesaler in cahoots with the price reporting service.  The RICO claim did not accrue until plaintiffs knew or should have known that their financial loss was the result of defendant's wrongdoing, as opposed to standard market behavior.  See Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 365 (9th Cir. 2005) ("The limitations period for civil RICO actions begins to run when a plaintiff knows or should know of the injury which is the basis for the action.  Thus, Plaintiffs' RICO claims accrued when

-18-

Plaintiffs had actual or constructive knowledge of [defendant's] fraud."); <u>Love v. Nat'l Medical Enters.</u>, 230 F.3d 765, 777 (5th Cir. 2000) (holding that, "under the injury discovery rule, the claims did not accrue until [plaintiff] knew, or should have known, that it suffered an injury caused by that allegedly fraudulent conduct"); <u>cf.</u> <u>Merck & Co., Inc. v. Reynolds</u>, 130 S.Ct. 1784, 1796-98 (2010) (holding in a Section 10(b) action that the limitations period was not triggered until plaintiffs disregarded the facts constituting the violation).

In <u>Reynolds</u>, a group of investors brought a securities fraud class action against Merck, the manufacturer of the drug Vioxx, alleging that the company made misrepresentations and omissions about the safety of the drug. In its defense, Merck claimed that the plaintiffs' complaint was untimely under the statute's discovery rule because they knew or should have known "the facts constituting the violation" more than two years before filing the complaint. The Court held that scienter is a fact constituting the violation because under Section 10(b), "a plaintiff cannot recover without proving that a defendant made a material misstatement <u>with an intent to deceive</u> - not merely innocently or negligently." <u>Reynolds</u>, 130 S.Ct. at 1796 (emphasis in original). Accordingly, the Court found that, because a reasonable plaintiff could not have discovered Merck's scienter more than two years before the date on which the complaint was filed, the plaintiffs' complaint was timely.

-19-

McKesson gives several examples of what it alleges to be triggering events for statute of limitations purposes. For example, it cites to a bulletin issued in April 2002 by a PBM, Express Scripts, which described increased costs for the January through February 2002 time period resulting from increases that FDB made to its AWP markups and encouraged recipients of the bulletin to take mitigating measures. This bulletin was distributed to the City of Baltimore, a named plaintiff, among other public payors. While this bulletin is certainly an example of the City of Baltimore's knowledge of increased costs, such a bulletin does not trigger a duty to investigate whether or not these increased markups were the result of fraud as opposed to normal markups in the pharmaceutical industry.

Moreover, even if statute of limitations issues did arise through the course of class litigation with respect to some class members, individual issues presented by an affirmative statute of limitations defense do not automatically defeat class certification. See Waste Management Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000) (affirming the district court's determination that a statute of limitations defense did not defeat predominance); see also Smilow, 323 F.3d at 39 (noting that "[c]ourts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against different members"). Here, there is no evidence that any non-state public payor had any

knowledge of the alleged fraudulent scheme. Accordingly, the
Court finds that McKesson's asserted statute of limitations
defense does not defeat class certification.

### ii. Mitigation

McKesson's stronger attack on the motion for class
certification centers around mitigation. A hotly disputed factual
issue here is the extent to which public payors wittingly or
unwittingly mitigated any damage caused by the inflated AWPs.
The question is whether efforts to mitigate against the rising
AWP costs raise individual issues that will predominate over
common ones.

The record contains evidence to support the following facts.
Public payors generally contract with PBMs and/or TPPs to manage
their reimbursements to pharmacies for prescription drugs.
(Hartman Decl. ¶ 43, July 1, 2009; Hartman Response ¶ 9, May 19,
2010.) Typically, reimbursement is based on AWP minus a fixed
percentage plus a dispensing fee. Dr. Raymond Hartman,
plaintiff's expert, explained that the "most important
reimbursement terms" in a public payor's contract with a PBM are
the discount off AWP and the dispensing fee. (See Hartman
Response ¶ 4.) Public payors are able to negotiate the amounts
of discounts off AWP and dispensing fees when they choose to
contract with a PBM or TPP. In turn, PBMs and TPPs negotiate
contracts with retail pharmacies. Often, public payors'

contracts take the form of Administrative Service Agreements, which allow the public payors to reimburse for drugs at the same rate that the TPPs pay. (Willig Decl. ¶ 37.) In this way, public payors seek to benefit from changes those PBMs and TPPs make in their pharmacy network reimbursement terms to combat rising costs. In this litigation, many public payors employed increased discounts off AWP and other cost-cutting measures undertaken by TPPs and PBMs <u>before</u> the fraud was known. (Def.'s Proffer ¶¶ 3, 18; Hartman Decl. ¶ 22.)

Dr. Hartman contends that those cost-cutting measures would have taken place even in the absence of the five percent increase in the AWP/WAC ratio because other drug costs were also rising dramatically. He states: "[T]here is no reason to believe that the government payors would not have undertaken the exact same measures they undertook in the actual world. The reason is that the impacts of the fraudulent increases were trivial compared to all of the other cost increases experienced by government payors." (Hartman Response ¶ 4.) Dr. Hartman included graphical data from the State of Connecticut to illustrate the increase in drug costs that was happening across the board. As shown in Figure 1 from Dr. Hartman's declaration, the "impact of the scheme" was minimal compared to drastic increases in drug pricing for all drugs, including drugs not at issue in this case.

(Hartman Response at 9, Figure 1.)

Disagreeing that the five percent price hike was below the



**Figure 1: Connecticut Medicaid Spending**

radar screen, defendants argue that the proposed class members
mitigated their losses resulting from the Scheme by renegotiating
terms of their contracts with PBMs in very different ways, most
of which would not be accounted for in Dr. Hartman's damages
methodology.  Defendant's expert, Dr. Robert Willig, points to
contract renegotiations beginning in 2003, but in reality most
changes occurred in 2004 and afterwards.  (Willig ¶¶ 34-36; <u>Id.</u>
Appendix 4; <u>see also</u> Def.'s Proffer ¶ 1.)  This renegotiation

argument is similar to the one rejected in <u>Carpenters II</u>.  There, the TPPs typically had three year contracts, which could not readily be renegotiated to improve payment terms in the middle of the contract.  In contrast, defendants contend that public payors' one year renewable contracts did not have the same contractual stickiness, so that public payors were able to, and did, increase discounts off of AWP to deflect rising prices more easily than the TPPs.  (Willig Decl. ¶¶ 28, 39-40.)

Even though it is true that some public payor contracts were renegotiated to provide an increase in the discounts in AWP in 2003[5], plaintiffs make two persuasive counterpoints.  First, they emphasize that increased discounts off AWP in the renegotiated contracts as well as decreases in dispensing fees are accounted for in Dr. Hartman's damages model.  Second, plaintiffs emphasize that, despite the shorter duration of contracts for some public payors, local government entities were actually far less sophisticated than the TPPs in the <u>Carpenters</u> litigation, and did not typically renegotiate reimbursement contracts with PBMs in order to mitigate their losses resulting from rising AWPs.  (<u>See, e.g.</u>, Berman Decl., May 19, 2010, Ex. 2 at 53 (statement by

---

[5] One of the named plaintiffs, the City of Baltimore, increased its discount off AWP for reimbursement purposes during the time that defendants claim there were market-wide "clawbacks."  (<u>See, e.g.</u>, Ward Decl., Ex. 1.)  Specifically, in January 2003, the City of Baltimore changed its reimbursement formula from AWP-14% to AWP-16%.  (Def.'s Proffer ¶ 15.) It also sought manufacturer rebates in 2003.

representative of City of Panama that the city relies on BSBC to administer its pharmaceutical benefits and the city is generally unaware of what its reimbursement terms are for prescription drugs); id., Ex. 7 at 37-41 (statement by representative of the City of Goldsboro that she was only aware of FDB and Red Book in relation to this litigation and knew nothing about the relationship between WAC and AWP); id., Ex. 3 at 37 (statement from City of Columbia representative that he knew nothing about AWP other than what he had learned from his attorneys).)

While the facts are disputed, I find it is likely that the typical public payor did not renegotiate its contract with TPPs and PBMs in the early years of the scheme from 2001 through 2003, and instead relied on TPPs and PBMs to get the best deals they could in pharmacy reimbursement.  Accordingly, the Court rejects the argument that in the early years of the scheme individualized efforts to mitigate by renegotiating contracts predominate over the common practices.  There is no persuasive argument to end this class period, for purposes of damages, earlier than December 2003 (which was the cutoff in Carpenters).  The Court finds that the public payors should be treated exactly as the TPPs were in Carpenters II for purposes of a damage class.

Plaintiffs argue that the Court should not end the class period in 2003 but should continue it until October 6, 2006, the date on which the Carpenters class announced its settlement with First Databank.  In Carpenters II, the Court ended the damages

-25-

period in December 2003, in large part because the first example of significant mitigation, or "clawback," took place in December 2003, when Blue Shield of California decided to begin using Red Book instead of FDB as a source of AWP data. 248 F.R.D. at 368-69. Beginning in 2004, the Court found that individual issues of knowledge and mitigation predominated over issues common to the class. This is relevant to the public payors' case because Blue Shield of California processed the claims of numerous public payors under Administrative Service Agreements, and Blue Shield also began using Red Book for those public payors in December 2003. (Def.'s Proffer ¶ 12.) In addition, Argus Health Systems, the company that processed Blue Shield of California's claims, implemented a "lowest-AWP-among-publishers" reimbursement methodology for other plan administrators in the same time frame. (Id. ¶ 13.)

Defendants have presented evidence that most PBMs had negotiated away or "neutralized" the original impact of the AWP-to-WAC markup by 2009. (Willig Decl. ¶ 42.) Indeed, Medco, a large PBM, completed its mitigation efforts by 2005. (Def.'s Proffer ¶ 30.) Defendant's expert, Dr. Robert Willig, contends that market responses did not necessarily take the form of increased discounts off AWP, which Dr. Hartman accounts for, but included cost-saving measures undertaken by public payors, like

rebates, which are <u>not</u> captured by Dr. Hartman's methodology.  He

explains

> When negotiating contracts with PBMs, [public payors]
> look at all price-related terms of the contract in the
> aggregate.  This results in a trade-off between
> contract terms, depending on the characteristics of the
> particular TPP or [public payor] and PBM.  For example,
> . . . the trade-off for a TPP between rebate pass-
> through and discounts off AWP depends on the level of
> risk aversion of the TPP because there is greater <u>ex
> ante</u> uncertainty associated with rebate pass-through as
> compared with the more certain discounts off AWP.  More
> generally, the TPP's or [public payor's] reimbursement
> package includes some or all of the following pricing
> terms: discount off AWP, dispensing fee, administrative
> fees, and rebate pass-through percentage.  For this
> reason, many TPPs and [public payors] focus on the
> bottom line net pricing.  The result is the creation of
> complex and individualized contracts between PBMs and
> TPPs and between PBMs and [public payors] that do not
> conform to Dr. Hartman's simplified formulaic
> methodology.

(Willig Decl. ¶ 29.)  McKesson points out several examples of

contract renegotiation of terms other than the discounts off of

AWP that Dr. Hartman discusses by named plaintiffs during 2002

and 2003.  The City of Baltimore negotiated a contract in 2003

that added a provision guaranteeing the city a share of

manufacturer rebates ($1.75 per claim for pharmacy claims and

$5.00 per claim for mail-order claims).  (<u>Id.</u> ¶ 35.)  In January

2003, SFHP increased its rebate share from 80 percent to 90

percent.  This change was made mid-contract with a PBM.  (<u>Id.</u>)

In 2002, Douglas County increased its co-pays for its "retiree

group" from $20 to $45 for brand name drugs with no generic
substitute.[6]  (Id. ¶ 35.)

While these examples do create some concern for a
predominance analysis, the Court finds that instances of contract
renegotiation in 2002 and 2003 are outliers, and that the vast
majority of renegotiation began in 2004 and 2005.  For example,
the City of Baltimore also increased its drug co-pays in 2004.
(Willig Decl. ¶ 36.)  In June 2004, Douglas County increased co-
pays for all other beneficiaries.  Also in 2004, Douglas County
increased its rebate share from 60 percent to 65 percent, and in
2009 it added guaranteed rebates of $5 per claim for 30-day
supply prescriptions.  (Id. ¶¶ 35-36.)  In 2005, Anoka County
selected a new provider for its 2006 contract and negotiated an
increase in the discount off AWP from 10 to 16 percent.  The new
contract also eliminated the dispensing fee.  (Id. ¶ 34.)  In
2004, the City of Columbia improved its guaranteed mail-order AWP
discount from 19.5% to 20.5%.  (Id. ¶ 34.)  In 2005, Panama City
increased its rebate share from a range of 60-70% to 85%, and
increased its schedule of minimum rebates.  (Id. ¶ 35.)

Regardless of whether these cost saving techniques were
prompted by the Scheme, or by an overall increase in drug costs,
the differences in mitigation approaches after December 2003

_____

    [6] The Court notes that co-pay increases are not, in fact, an
example of contract renegotiation, but rather a unilateral change
made by the public payor.

would necessitate individualized damage hearings.  As such, the Court finds that the proposed class, as currently defined, cannot meet Rule 23(b)(3)'s predominance requirement after December 31, 2003.

  iii. Miscellaneous

Defendants argue that Dr. Hartman's damages methodology overestimates alleged damages for multiple reasons that the court will address later in the litigation, in the context of the inevitable Daubert challenge, because it includes capitated programs[7], programs that use Red Book instead of FDB as their source of AWPs, and programs for which the utilization of brand name drugs differs dramatically from the retail populations reflected in the IMS data.  As an example, defendants allege that Workers' Compensation programs, which represent a significant segment of the non-Medicaid, non-state public payors at issue, are often capitated.  They claim that Dr. Hartman fails to make an adjustment to his damages calculation to exclude premium payments made by Workers' Compensation programs.

As for McKesson's assertion that Dr. Hartman's damages methodology includes programs that use Red Book instead of FDB, this is not a persuasive argument for denying class certification, because the definition of each proposed class clearly excludes public payors that were reimbursing based on

_____

[7] Capitated programs reimburse medical providers based on a set fee per patient regardless of the treatment required or the drugs dispensed.

AWPs listed in Red Book as opposed to FDB. The possible inclusion of capitated programs is admittedly more concerning. However, to the extent that this concern is limited to Workers' Compensation programs, the elimination of workers' compensation and other capitated programs from the class addresses this issue. In any event, Workers' Compensation programs are typically administered by the states. (Burton Decl. ¶ 11.)

## V. ORDER

Plaintiff Douglas County's motion to certify a class (Docket No. 59) is **ALLOWED** in part. Because the Court sees no reason to maintain two separate classes in light of its redefinition of the Douglas County class, the Court **DENIES** plaintiff SFHP's motion to certify a separate class (Docket No. 56). The Court certifies the following class for a period beginning August 1, 2001 and ending on December 31, 2003 for the purpose of damages, and for a period beginning August 1, 2001 and ending on June 2, 2005[8] for purposes of RICO liability only[9] and equitable relief:

> All non-federal and non-state governmental entities in the United States and its Territories that paid for Marked-Up Drugs based on AWP from August 1, 2001 to June 2, 2005 and that used First DataBank or Medi-Span data derived from First DataBank data in determining the AWP of the Marked-Up Drugs.

The Marked-Up Drugs are all drugs identified in Appendix A to

---

[8] The Class Period ends on June 2, 2005, the date that the complaint was filed in the Carpenters litigation, putting public payors on notice.

[9] The plaintiffs do not appear to be pressing a claim under state law, and have not presented a trial plan to do so.

the Second Amended Complaint and consist of certain brand-name drugs only.  (<u>See</u> Docket No. 25-2.)  Excluded from the class are defendant, defendant's parents, subsidiaries, and affiliates, and co-conspirators.

    <u>/s/ PATTI B. SARIS</u>
PATTI B. SARIS
United States District Judge
